# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF RHODE ISLAND, by and
through PETER F. NERONHA,
ATTORNEY GENERAL,

        *Plaintiff,*

        v.

CAREMARKPCS HEALTH, L.L.C., ZINC
HEALTH SERVICES, LLC, EXPRESS
SCRIPTS, INC., ASCENT HEALTH
SERVICES LLC, OPTUMRX, INC., and
EMISAR PHARMA SERVICES, LLC,

        *Defendants.*

CIVIL NO.: 25-cv-00306-MRD-PAS

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FOR LACK OF SUBJECT MATTER JURISDICTION PURSUANT TO RULE 12(B)(1)
AND FOR FAILURE TO STATE A CLAIM PURSUANT TO RULE 12(B)(6)**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

LEGAL STANDARD ...................................................................................................... 4

ARGUMENT .................................................................................................................... 5

   I.   The Deceptive Trade Practice Act's Safe Harbor Provision Does Not Apply ................. 5

   II.  The State Does Not Have to Allege a "Vendor-Consumer Relationship"—Direct or Otherwise .................................................................................................................... 9

   III. Actions Brought by the Attorney General Under Section 6-13.1-5 Are Not Subject to Any Statute of Limitations ................................................................................................. 13

   IV. The State Sufficiently Alleges a Claim for Deceptive Acts and Practices Against Defendants .................................................................................................................. 16

      A.  The PBM Defendants' Representations Are Actionable, Not Puffery ...................... 16

      B.  Defendants' Deceptive Acts and Practices Are Material ........................................... 18

   V.  The State Sufficiently Alleges a Claim for Unfair Acts and Practices Against Defendants .................................................................................................................. 21

      A.  Defendants' Acts and Practices Violate Public Policy ............................................. 22

      B.  Defendants' Acts and Practices Are Immoral, Unethical, Oppressive, Or Unscrupulous Conduct ............................................................................................. 23

      C.  Defendants' Acts and Practices Are Substantially Injurious to Consumers ............. 27

   VI. The State Sufficiently States a Claim for Unfair Methods of Competition ..................... 31

      A.  Defendants' Methods of Competition Are Unfair Because They Violate the S&H Standard ................................................................................................................... 32

      B.  The Court Should Give "Due Consideration and Great Weight" to the FTC's 2022 UMC Statement as Required by the Deceptive Trade Practices Act ......................... 38

      C.  The State Does Not Have to Allege that Defendants' Conduct Violated Federal Antitrust Laws .......................................................................................................... 40

   VII. The State's Allegations Relate to Defendants' Acts and Practices, Not Specific Drugs . 44

CONCLUSION ............................................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Ames v. Oceanside Welding and Towing Co., Inc.*,
   767 A.2d 677 (R.I. 2001) ............................................................................ passim

*Anoush Cab, Inc. v. Uber Techs., Inc.*,
   8 F.4th 1 (1st Cir. 2021) ............................................................................ 43

*Atlantic Refining v. F.T.C.*,
   381 U.S. 357 (1965) ............................................................................ 41, 43

*Azurity Pharms., Inc. v. Edge Pharma, LLC*,
   45 F.4th 479 (1st Cir. 2022) ............................................................................ 16

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................ 44

*Boudreau v. Automatic Temperature Controls, Inc.*,
   212 A.3d 594 (R.I. 2019) ............................................................................ 15

*Chen v. Subaru of America*,
   58 A.3d 910 (R.I. 2012) ............................................................................ 12, 18

*Chuck's Feed & Seed Co., Inc. v. Ralston Purina Co.*,
   810 F.2d 1289 (4th Cir. 1987) ............................................................................ 41

*City of Miami v. Eli Lilly & Co.*,
   2022 WL 198028 (S.D. Fla. Jan. 21, 2022) ............................................................................ 17

*Cooperman v. Individual Inc.*,
   171 F.3d 43 (1st Cir. 1999) ............................................................................ 4

*Danca v. Private Health Care Sys., Inc.*,
   185 F.3d 1 (1st Cir. 1999) ............................................................................ 40

*Dolemba v. Illinois Farmers Ins. Co.*,
   213 F. Supp. 3d 988 (N.D. Ill. 2009) ............................................................................ 23

*E.I. du Pont de Nemours & Co. v. FTC*,
   729 F.2d 128 (2d Cir. 1984) ............................................................................ 39, 40, 41

*Edwards v. N. Am. Power & Gas, LLC*,
   120 F. Supp. 3d 132 (D. Conn. 2015) ............................................................................ 25

*Est. of Charania v. Shulman*,
608 F.3d 67 (1st Cir. 2010) ................................................................. 38

*F.T.C. v. Direct Mktg. Concepts, Inc.*,
569 F.Supp.2d 285 (D. Mass. 2008) ..................................................... 29

*F.T.C. v. IFC Credit Corp.*,
543 F. Supp. 2d 925 (N.D. Ill. 2008) ................................................... 29

*F.T.C. v. Neovi, Inc.*,
604 F.3d 1150 (1st Cir. 2010) ......................................................... 29, 31

*FTC v. Direct Mktg. Concepts, Inc.*,
624 F. 3d 1 (1st Cir. 2010) ................................................................. 17

*FTC v. Sperry & Hutchinson Co.*,
405 U.S. 233 (1972) ...................................................................... 21, 39

*Gordo-González v. United States*,
873 F.3d 32 (1st Cir. 2017) .................................................................. 5

*Harris County, Texas v. Eli Lilly & Co.*,
2020 WL 5803483 (S.D. Tex. Sept. 29, 2020) ..................................... 17

*Hawai'i ex rel. Lopez v. CaremarkPCS Health, L.L.C.*,
2024 WL 4625719 (D. Haw. Oct. 30, 2024) ....................... 11, 20, 26, 42

*Hishon v. King & Spalding*,
467 U.S. 69 (1984) ............................................................................. 4

*In re Cliffdale Assocs., Inc.*,
103 F.T.C. 110 (F.T.C. 1984) ............................................................ 18

*In re Express Scripts, Inc., Pharmacy Benefits Mgmt. Litig.*,
2006 WL 2632328 (E.D. Mo. Sept. 13, 2006) ..................................... 11

*In re Insulin Pricing Litig.*,
2024 WL 416500 (D.N.J. Jan. 24, 2024) ............................................... 8

*In re Insulin Pricing Litig.*,
2025 WL 2551738 (D.N.J. Sept. 5, 2025) ........................................... 15

*In re Insulin Pricing Litig.*,
2025 WL 2573405 (D.N.J. Sept. 5, 2025) ..................................... passim

*In re Insulin Pricing Litig.*,
2025 WL 2573406 (D.N.J. Sept. 5, 2025) ...................................................................... passim

*In re Pharm. Indus. Average Wholesale Price Litig*,
582 F.3d 156 (1st Cir. 2009)............................................................................................ 24, 26

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
355 F. Supp. 3d 145 (E.D.N.Y. 2018) ................................................................................ 11

*In re Sensipar Antitrust Litig.*,
2022 WL 736250 (D. Del. Mar. 11, 2022) ......................................................................... 11

*In re Volkswagen of America, Inc.*,
99 F.T.C. 446, 1982 WL 608292 (F.T.C. 1982) ................................................................ 19

*In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Practice and Antitrust Litig.*,
336 F. Supp. 3d 1256 (D. Kan. 2018) ........................................................................... 16, 30

*Kelley v. Cowesett Hills Assocs.*,
768 A.2d 425 (R.I. 2001) ................................................................................................... 10

*L.G. Balfour Co. v. FTC*,
442 F.2d 1 (7th Cir. 1971) ................................................................................................. 41

*Laccinole v. Appriss, Inc.*,
453 F. Supp.3d 499 (D.R.I. 2020) ..................................................................................... 10

*Laccinole v. Navient Sols., LLC*,
589 F. Supp. 3d 261 (D.R.I. 2022)..................................................................................... 10

*Laccinole v. Students for Life Action Inc.*,
2022 WL 3099211 (D.R.I. Aug. 4, 2022)........................................................................... 10

*Lawrence v. Anheuser-Busch, Inc.*,
523 A.2d 864 (R.I. 1987) ..................................................................................................... 5

*Lee v. Life Ins. Co. of N. Am.*,
829 F. Supp. 529 (D.R.I. 1993)........................................................................................... 41

*Long v. Dell, Inc.*,
93 A.3d 988 (R.I. 2014) ............................................................................................... 18, 21

*Long v. Dell, Inc.*,
984 A.2d 1074 (R.I. 2009) ...................................................................................... 13, 18, 22

iv

*Lynch v. Conley,*
  853 A.2d 1212 (R.I. 2004) .................................................................................. 6

*Mills v. Toselli,*
  819 A.2d 202 (R.I. 2003) ................................................................................... 14

*MSP Recovery Claims, Series, LLC v. Sanofi-Aventis U.S. LLC,*
  2020 WL 831578 (D.N.J. Feb. 20, 2022) ......................................................... 11

*Mulder v. Koh's Dep't Stores, Inc.,*
  865 F.3d 17 (1st Cir. 2017) ................................................................................ 16

*Muniz-Rivera v. U.S.,*
  326 F.3d 8 (1st Cir. 2003) .................................................................................... 5

*Official Airline Guides, Inc. v. FTC,*
  630 F.2d 920 (2d Cir. 1980) ............................................................................... 42

*Ohio v. Am. Express Co.,*
  585 U.S. 529 (2018) ........................................................................................... 42

*Park v. Ford Motor Co.,*
  844 A.2d 687 (R.I. 2004) ................................................................................... 12

*Pelletier v. Main Street Textiles, LP,*
  740 F.3d 48 (1st Cir. 2006) ................................................................................ 26

*Rivera v. Centro Medico de Turabo, Inc.,*
  575 F.3d 10 (1st Cir. 2009) ........................................................................... 5, 44

*Rohrer v. Knudson,*
  203 P.3d 759 (Mont. 2009) ................................................................................ 22

*Ryan, LLC v. Federal Trade Commission,*
  746 F. Supp. 3d 369 (N.D. Tex. 2024) .............................................................. 38

*Schuster v. Wynn Ma LLC,*
  118 F.4th 30 (1st Cir. 2024) ............................................................................... 25

*Skinner v. Switzer,*
  562 U.S. 521 (2011) ............................................................................................. 5

*Sperry & Hutchinson v. FTC,*
  432 F.2d 146 (5th Cir. 1970) ............................................................................. 41

*State v. Lead Ind. Ass'n, Inc.*,
    2001 WL 345830 (R.I. Super. Ct. Apr. 2, 2001) ............................................................ 13, 14

*State v. Pawtuxet Turnpike Co.*,
    8 R.I. 521 (R.I. 1867) ............................................................................................................. 13

*State v. Piedmont Funding Corp.*,
    382 A.2d 819 (R.I. 1978) ......................................................................................................... 6

*Texaco v. F.T.C.*,
    393 U.S. 223 (1968) ............................................................................................................... 41

*Tomasella v. Nestle USA, Inc.*,
    962 F.3d 60 (1st Cir. 2020) .................................................................................................... 25

*U.S. v. Holloway*,
    630 F.3d 252 (1st Cir. 2011) .................................................................................................. 22

**Statutes**

Hawaii Revised Statutes § 480-1 .................................................................................... 11, 12

R.I. Gen. Laws § 27-18-33.2 ................................................................................................ 9

R.I. Gen. Laws § 27-19-26.2 ................................................................................................ 9

R.I. Gen. Laws § 27-20.1-15.1 ............................................................................................. 9

R.I. Gen. Laws § 27-20-23.2 ................................................................................................ 9

R.I. Gen. Laws § 27-41-38.2 ................................................................................................ 9

R.I. Gen. Laws § 6-13.1-1 ............................................................................................ *passim*

R.I. Gen. Laws § 6-13.1-1(3) .............................................................................................. 12

R.I. Gen. Laws § 6-13.1-1(5) ................................................................................... 9, 12, 18

R.I. Gen. Laws § 6-13.1-1(6) .............................................................................................. 21

R.I. Gen. Laws § 6-13.1-1(6)(v) ......................................................................................... 34

R.I. Gen. Laws § 6-13.1-1(6)(xi) .................................................................................. 23, 34

R.I. Gen. Laws § 6-13.1-1(6)(xii) ....................................................................................... 34

R.I. Gen. Laws § 6-13.1-1(6)(xiii) ................................................................................. 32

R.I. Gen. Laws § 6-13.1-1(6)(xiv) ................................................................................. 34

R.I. Gen. Laws § 6-13.1-2 ............................................................................................ 21

R.I. Gen. Laws § 6-13.1-3 ................................................................................... 4, 18, 38

R.I. Gen. Laws § 6-13.1-4 ....................................................................................... 5, 6, 7

R.I. Gen. Laws. § 6-13.1-4(a) ......................................................................................... 6

R.I. Gen. Laws § 6-13.1-4(b) ................................................................................... 5, 6, 7

R.I. Gen. Laws § 6-13.1-5 ..................................................................................... passim

R.I. Gen. Laws § 6-13.1-5(a) ........................................................................................ 13

R.I. Gen. Laws § 6-13.1-5.2 ................................................................................. 9, 10, 12

R.I. Gen. Laws § 6-36-4 ............................................................................................... 40

R.I. Gen. Laws § 6-36-5 ............................................................................................... 40

**Other Authorities**

15 U.S. Code § 1 ......................................................................................................... 40

15 U.S. Code § 2 ......................................................................................................... 40

42 U.S. Code § 1395w-3a(c)(6)(B) ................................................................................. 8

42 Code of Fed. Regulations §1001.952 .......................................................................... 8

R.I. Pub. Laws, Ch. 363 § 2 (2004) ............................................................................... 36

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ......................................................................... 5

Federal Rule of Civil Procedure 12(b)(6) ...................................................................... 4, 5

## INTRODUCTION

The State of Rhode Island ("State") alleges that Defendants—the three largest pharmacy benefit managers ("PBMs") in the country and their group purchasing organizations ("GPOs")—increase prescription drug prices for consumers and drive down reimbursements to independent pharmacies by engaging in unfair and deceptive acts and practices and unfair methods of competition.[1]  ECF No. 1-1 ("Complaint") ¶ 1.  The PBM Defendants represent that Defendants apply independent medical science and leverage their large-scale purchasing to select the safest and most effective drugs for consumers and bring down prices.  *Id.* ¶ 6.  Instead, Defendants capitalize on their role as middlemen in the drug supply chain to favor select drugs, not because of their safety or efficacy, but because they provide the highest rebates and other fees (aka "kickbacks") to the PBMs.  *Id.*  For example,  Defendants gave preferential formulary status to Humira (a high-cost biologic used to treat arthritis and other inflammatory disorders) over lower-cost biologics that the U.S. Food and Drug Administration approved to be fully interchangeable with Humira, which Defendants nonetheless excluded from their formularies—causing many consumers' out-of-pocket costs to soar by hundreds of dollars per month and effectively blocking lower-priced competitors from entering the market.  *Id.* ¶¶ 10, 117.

The PBM Defendants also engage in unfair methods of competition by using their significant power in the PBM market to force independent pharmacies that compete with the PBM Defendants' affiliate pharmacies to accept unfair contractual terms.  *Id.* ¶¶ 11–12.  This includes reimbursing independent pharmacies near or below the pharmacies' costs for acquiring the

---

[1] CaremarkPCS Health, L.L.C. ("CVS Caremark"), Express Scripts, Inc. ("Express Scripts") and OptumRx, Inc. ("OptumRx") will be referred to as the "PBM Defendants."  Zinc Health Services, LLC, Ascent Health Services, LLC, and Emisar Pharma Services LLC will be referred to as the "GPO Defendants."  The PBM Defendants and the GPO Defendants will be collectively referred to as "Defendants."

prescription drugs they dispense, and below the rate the PBM Defendants pay their own pharmacies, capturing all the profit for themselves and making it impossible for many independent pharmacies to stay afloat. *Id.* For example, one Rhode Island independent pharmacist reported that CVS Caremark only reimburses her $2,200 for a drug that costs over $2,800 despite reimbursing CVS pharmacies over $4,000 for the exact same drug. *Id.* ¶ 12. The PBMs also unfairly steer business to the PBM Defendants' mail-order pharmacies, including their own specialty pharmacies. *Id.* ¶¶ 203–216. They do this by: (1) prohibiting independent pharmacies from providing mail order services; and (2) incentivizing consumers to utilize the PBM Defendants' mail-order affiliate pharmacies for everyday prescription and over-designating many drugs as "specialty," which triggers exclusivity clauses in the PBM Defendants' contracts with health plans that ***require*** consumers to fill prescriptions for specialty drugs through the PBM Defendants' affiliated mail-order specialty pharmacies. *Id.*

Defendants make four overarching challenges to the State's Complaint in addition to their claim-specific arguments. All of them fail. ***First***, Defendants' conduct is not protected by the safe harbor provision of the Deceptive Trade Practice Act ("DTPA"), R.I. Gen. Laws §§ 6-13.1-1, *et seq.* Defendants have not met (and cannot meet) their burden of establishing that the at-issue conduct: (1) is regulated by a state or federal agency; and (2) complies with relevant regulations. ***Second***, the DTPA's plain language contradicts Defendants' contention that a "vendor-consumer relationship" (direct or otherwise) is required for actions brought by the Attorney General. ***Third***, the general statute of limitations for civil actions does not apply to the Attorney General pursuant to the doctrine of *nullum tempus*. Even if it did, the State's action would nonetheless be timely due to equitable tolling and the continuing violations doctrine. ***Fourth***, the State's claims should not be limited to specific prescription drugs as Defendants request, because the State is alleging

that Defendants engage in systemically unfair and deceptive practices and unfair methods of competition across the board and are not limited to any particular drug.

Defendants' claim-specific arguments do not fare any better. **First**, Defendants' deceptive acts and practices are presumptively material because they involve the pricing, safety, or efficacy of prescription drugs, which are of obvious importance to both consumers and health plans. The misrepresentations the State alleges in its Complaint also relate to key aspects of the services that Defendants offer, mainly that the PBM Defendants represent that Defendants will take actions to lower drug costs, when, in fact, their practices raise drug costs. These specific misrepresentations are not puffery, but demonstrably false and central to the PBM Defendants' marketing. **Second**, the State sufficiently pleads that Defendants engage in unfair practices by alleging that Defendants' conduct: (1) offends Rhode Island's established public policy of making affordable and effective medications accessible to consumers and preventing PBMs from driving up drug costs; (2) is immoral, unethical, oppressive, or unscrupulous because it makes drugs unaffordable for many Rhode Islanders; and (3) is substantially injurious to consumers by raising costs for health plans and certain consumers and, in some instances, restricting consumers' access to safer, more effective, or cheaper drugs. **Third**, contrary to Defendants' claim, the State asserts that Defendants' conduct violates enumerated practices prohibited under the DTPA in support of its unfair method of competition claim. For that reason alone, Count Three should not be dismissed. The Court should also give "due consideration and great weight," as the DTPA requires, to the Federal Trade Commission's ("FTC") 2022 policy statement regarding unfair methods of competition ("FTC's 2022 UMC Statement"),[2] which Defendants' conduct violates. R.I. Gen.

---

[2] *See* Fed. Trade Comm'n, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act, Commission File No.*

Laws § 6-13.1-3.  Lastly, as Defendants concede, nothing requires the State to allege that Defendants' conduct violates traditional antitrust laws to sufficiently plead a claim for unfair methods of competition.

Many of the arguments Defendants raise here have been rejected by numerous courts, including, most recently, the District of New Jersey in the Insulin Pricing MDL, *In re Insulin Pricing Litig.*, No. 23-md-3080 (D.N.J.), where more than a dozen State Attorneys General have brought actions against the PBM Defendants concerning the price of insulin and other diabetes products under state consumer protection laws analogous to the DTPA.  *See In re Insulin Pricing Litig.*, 2025 WL 2573405, at *1 (D.N.J. Sept. 5, 2025); *In re Insulin Pricing Litig.*, 2025 WL 2573406, at *1 (D.N.J. Sept. 5, 2025).  The reasoning behind those decisions applies with equal force here.

For all these reasons, the State requests that this Court deny Defendants' Motion to Dismiss in its entirety.

## **LEGAL STANDARD**

When ruling on a motion to dismiss under Federal Rule of Civil Procedure ("FRCP") 12(b)(6), courts must construe the complaint in the light most favorable to the plaintiff, taking all well-pleaded allegations as true and giving the plaintiff the benefit of all reasonable inferences. *See Cooperman v. Individual Inc.*, 171 F.3d 43, 46 (1st Cir. 1999).  Dismissal under FRCP 12(b)(6) is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  The Court "may properly consider only facts and documents that are part of or

---

*P221202* (Nov. 10, 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P221202Section5PolicyStatement.pdf.

incorporated into the complaint." *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009) (internal citation omitted).  The question on a 12(b)(6) motion to dismiss is not whether plaintiffs will prevail on their claims, but whether complaints are sufficient to cross the federal court's threshold.  *See Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011).

Under FRCP 12(b)(1), the pleading standard for satisfying the factual predicates for proving jurisdiction is the same as applies under FRCP 12(b)(6).  *See Gordo-González v. United States*, 873 F.3d 32, 35 (1st Cir. 2017).  As a result, an order granting a motion to dismiss at the pleading stage is appropriate only when the facts in the plaintiff's complaint, taken at face value, fail to bring the case within the court's subject-matter jurisdiction.  *See Muniz-Rivera v. U.S.*, 326 F.3d 8, 11 (1st Cir. 2003).  The FRCP 12(b)(1) standard applies only to Defendants' argument that the DTPA's safe harbor provision applies.  *See infra*, Section I.

## <u>ARGUMENT</u>

## I.    **The Deceptive Trade Practice Act's Safe Harbor Provision Does Not Apply**

The DTPA was amended in 2021 to add Section 6-13.1-4(b), which clarifies that the safe harbor provision only applies in actions brought by the Attorney General if the defendant's relevant business activities are: (1) subject to regulation by a state or federal agency; and (2) the activity or conduct is in compliance with orders, or rules of, or a statute administered by, a federal or state government agency.[3]  R.I. Gen. Laws § 6-13.1-4(b).  Defendants concede (as they must)

---

[3] Section 6-13.1-4(b) applies retroactively because it is procedural or remedial in nature in that it clarifies when defendants can assert the safe harbor provision in state enforcement cases rather than creating a new, substantive right.  *See Lawrence v. Anheuser-Busch, Inc.*, 523 A.2d 864, 869 (R.I. 1987) ("If the statute is remedial or procedural, that is, if it 'neither enlarges nor impairs substantive rights but prescribes the methods and procedures for enforcing such rights,' it may be construed to apply retroactively.") (internal citation omitted).  Moreover, the State alleges that Defendants' conduct is ongoing.  Thus, even if the Court does not retroactively apply Section 6-13.1-4(b), it would still apply to Defendants conduct from 2021 forward.

that they face a high hurdle in claiming immunity from the State's action under the safe harbor provision but incorrectly conclude they have cleared it.   ECF No. 40 ("Defendants' Memorandum") at 6.  Their faulty conclusion rests on case law that predates the 2021 amendment by decades.  Defendants also fail to identify (as they must) any regulation permitting the practices that the State alleges are unlawful.

Relying on *State v. Piedmont Funding Corp*., 382 A.2d 819, 822 (R.I. 1978) and *Lynch v. Conley*, 853 A.2d 1212, 1214 (R.I. 2004), Defendants claim they must only demonstrate that the general activities complained of are subject to monitoring or regulation by a state or federal agency to invoke the safe harbor.  Defs.' Mem. at 6.  Defendants claim the burden then shifts to the plaintiff to establish that the specific acts at issue are not covered by the exemption.  *Id*.  They are wrong.  Both *Piedmont* and *Lynch* were decided before the 2021 amendment and thus interpreted Section 6-13.1-4(a) to exempt activities and businesses subject to monitoring by state or federal regulatory bodies or officers, not Section 6-13.1-4(b).  There is a presumption in Section 6-13.1-4(b) that the safe harbor does **not** apply, and the burden of proving otherwise is on the person claiming the exemption.  *See* R.I. Gen. Laws § 6-13.1-4(b) ("For actions brought by the attorney general, the exemption in subsection (a) applies **only if the person claiming the exemption shows** . . .") (emphasis added).  Thus, for the safe harbor to apply, Defendants must show that their at-issue business activities are subject to regulation by a state or federal government **and** that the activity or conduct complained of complies with state and federal law.  Defendants do not (and cannot) show that here.

**First**, Defendants claim their at-issue business activities are subject to regulation by a state or federal agency.  But Defendants do not identify any regulation relating to the specific unlawful activities alleged in the State's Complaint, and federal or state "oversight" is not the same as

regulation promulgated by an agency through appropriate procedures. Many of the general requirements that Defendants identify are obligations stemming from CVS Caremark's and Express Script's contracts with the United States Office of Personnel Management ("OPM") and the Department of Defense ("DOD")—not regulations. *See e.g.*, Defs.' Mem. at 9 ("OPM's Federal Employees Health Benefit Program ("FEHB") Standard Contract exemplifies the degree of oversight OPM exercises over PBMs."). Likewise, Defendants argue that CVS Caremark and Express Scripts are subject to regulation because they purportedly act as federal officers pursuant to their contracts with OPM and DOD. That is irrelevant. Contractual obligations with a government agency are insufficient to invoke the safe harbor provision. *See* R.I. Gen. Laws § 6-13.1-4(b) ("subject to **regulation** by a state or federal agency") (emphasis added). Defendants also do not assert that OptumRx or the GPO Defendants have any contract with the federal government or act as federal officers.

**Second**, the regulations that Defendants identify (as opposed to the contractual obligations discussed above) do not permit the conduct the State alleges is unlawful. Defs.' Mem. at 7. While these regulations allow Defendants to utilize certain tools like drug rebates, formularies, and pharmacy networks, they do not give Defendants *carte blanche* to engage in deceptive and unfair practices in using those tools to the detriment of consumers and health plans. For example, the State alleges that Defendants deceptively represent that their formularies maximize effectiveness and safety and minimize cost. Compl. ¶ 67. However, when Defendants select drugs to include on their formularies, they prioritize expensive brand-name drugs with high rebates from which Defendants can profit the most rather than the safest and/or most effective drugs with the lowest cost for health plans and consumers. *Id.* ¶¶ 79–109, 133–141. These tactics, among others, lead to list price (*i.e.*, the manufacturer's published price before any rebates or other fees are applied)

inflation, which increases costs to health plans and consumers whose out-of-pocket costs are tied to list prices. *Id.* ¶¶ 110–132. With respect to the PBM Defendants' pharmacy practices, the State alleges that the PBM Defendants engage in unfair methods of competition by under-paying independent pharmacies for filling prescriptions and steering consumers to the PBMs' own affiliated pharmacies—some of which, the FTC found, markup numerous specialty drugs by thousands of percent, and many others by hundreds of percent. *Id.* ¶¶ 203–216.

None of the practices described above are authorized, let alone protected, by the regulations that Defendants identify.[4] For example, Defendants rely upon the federal "discount safe harbor" that exempts drug rebates from the federal Anti-Kickback Statute ("AKS"). Defs.' Mem. at 7–8. But nothing in that safe harbor provision allows Defendants to prefer expensive drugs with high rebates over lower cost drugs. *See* 42 CFR §1001.952. In fact, the U.S. Department of Health and Human Services clarified that the discount safe harbor that exempts payments to manufacturers from the AKS does not apply to PBM's administrative fees or any portion of rebates that PBMs retain (as opposed to passing them through to health plans or consumers).[5] The State alleges that the portion of administrative fees and rebates manufacturers pay to PBMs and that PBMs retain, Compl. ¶¶ 133–141, 8, 10, 179, therefore constitute kickbacks that not only are ***not*** permitted by

---

[4] Defendants cite to *In re Insulin Pricing Litig.*, 2024 WL 416500, at *28 (D.N.J. Jan. 24, 2024) where the Court noted it was unclear how it could enjoin the defendants as the plaintiffs requested without violating 42 U.S.C. § 1395w-3a(c)(6)(B), which defines Wholesale Acquisition Cost ("WAC") to be the manufacturer's list price excluding rebates or other discounts. The plaintiffs in *In re Insulin Pricing Litig.*, 2024 WL 416500, at *26, were seeking to enjoin ***insulin manufacturers*** from reporting artificially inflated list prices that do not approximate the true price of drugs (*i.e.*, WAC) ***to PBMs***. The State is not seeking the same relief here, nor could it, since the State did not name any drug manufacturers as defendants.

[5] *See* Health and Human Services Office of Inspector General, *General Questions Regarding Certain Fraud and Abuse Authorities* (last updated July 8, 2024), https://oig.hhs.gov/faqs/general-questions-regarding-certain-fraud-and-abuse-authorities/ ("Any payment retained by a PBM—even if characterized as a 'rebate'—is a service or administrative fee and would not be eligible for protection under the discount safe harbor").

federal law, they are actually prohibited. Defendants also argue that their pharmacy practices are permitted by certain Rhode Island pharmacy regulations. Defs.' Mem. at 11–12 (citing R.I. Gen. Laws §§ 27-18-33.2, 27-19-26.2, 27-20-23.2, 27-20.1-15.1, 27-41-38.2). The regulations that Defendants identify permit the use of Maximum-Allowable Cost ("MAC") pricing (a PBM-created maximum price at which the PBM will reimburse pharmacies to fill prescriptions for generic medications) and create a process for pharmacies to appeal issues relating to MAC pricing. *See* R.I. Gen. Laws §§ 27-18-33.2, 27-19-26.2, 27-20-23.2, 27-20.1-15.1, 27-41-38.2. None of these laws allow Defendants to set MAC unfairly or anticompetitively by reimbursing independent pharmacies differentially at or below pharmacies' acquisition costs or steering consumers to their own affiliated pharmacies. *See id*.

Since Defendants have failed to meet their burden of showing they are in compliance with federal or state regulations that permit the practices at issue, the Court should deny Defendants' motion on this ground.

## II. The State Does Not Have to Allege a "Vendor-Consumer Relationship"—Direct or Otherwise

Defendants falsely assert that the DTPA applies only to transactions involving a "direct vendor-consumer relationship." Defs.' Mem. at 13. Their argument conflates the standard for claims brought by private individuals under Section 6-13.1-5.2 (which requires the plaintiff to have a "vendor-consumer relationship") with the standard for claims brought by the Attorney General under Section 6-13.1-5 (which does not). It also misstates the plain language of the DTPA which applies to "any trade or commerce ***directly or indirectly*** affecting the people of this State" regardless of whether an action is brought by private individuals or the Attorney General. R.I. Gen. Laws § 6-13.1-1(5) (emphasis added).

The different language of Sections 6-13.1-5.2 and 6-13.1-5 make clear that enforcement actions brought by the Attorney General do not require a "vendor-consumer" relationship. Section 6-13.1-5 states: "Whenever the attorney general has reason to believe that ***any person*** is using, has used, or is about to use any method, act, or practice declared to be unlawful by § 6-13.1-2 . . . the attorney general may bring an action . . . against ***the person***[.]" *Id*. § 6-13.1-5 (emphasis added). By contrast, Section 6-13.1-5.2 requires the plaintiff to be a person "who purchases or leases goods or services ***primarily for personal, family, or household purposes***." R.I. Gen. Laws § 6-13.1-5.2 (emphasis added). The plain text of the statute does not impose any such limitation on actions brought by the Attorney General.

Defendants' cited cases interpreting the DTPA are inapposite because they were all brought by private individuals under Section 6-13.1-5.2. Defs.' Mem. at 13–15.[6] Defendants could not muster—and the State is not aware of—a single case applying the vendor-consumer requirement to actions brought by the Attorney General under Section 6-13.1-5. The distinction reflected in the different DTPA provisions applicable to private and Attorney General actions make sense: while only individual consumers who suffered loss as a result of a consumer transaction have standing to bring a claim, the Attorney General has broad authority to address wrongdoing in the market.

Defendants' representation that courts outside of Rhode Island routinely hold that analogous consumer protection laws do not apply to PBMs' transactions with health plans is false. Defs.' Mem. at 15. All but one of Defendants' cited cases found that health plans (as opposed to

---

[6] *Kelley v. Cowesett Hills Assocs.*, 768 A.2d 425, 427 (R.I. 2001) (tenant sued apartment owner); *Laccinole v. Students for Life Action Inc.*, 2022 WL 3099211, at *1 (D.R.I. Aug. 4, 2022) (consumer sued corporation); *Laccinole v. Appriss, Inc.*, 453 F. Supp.3d 499, 501 (D.R.I. 2020) (same); *Laccinole v. Navient Sols., LLC*, 589 F. Supp. 3d 261, 266 (D.R.I. 2022) (same).

consumers) did not have standing to bring private claims under the relevant state consumer protection laws.[7]  That is not the same as finding the laws were inapplicable to the underlying transactions.  Further, unlike Defendants' cited cases, this is a law enforcement action brought by the Attorney General, not a private action.  Thus, standing is not an issue.  The Attorney General clearly has standing to bring an action under the DTPA.  *See* R.I. Gen. Laws § 6-13.1-5.  In the Insulin Pricing MDL, the court found that the Attorneys General of Illinois and Montana sufficiently pled claims against PBMs under their respective state consumer protection laws, which are analogous to the DTPA, by alleging facts with respect to insulin and other diabetes drugs that are similar to the State's allegations here.  *See In re Insulin Pricing Litig.*, 2025 WL 2573405, at *6-14; *In re Insulin Pricing Litig.*, 2025 WL 2573406, at *8–12.

The other case Defendants cite, *Hawai'i ex rel. Lopez v. CaremarkPCS Health, L.L.C.*, 2024 WL 4625719 at *5 (D. Haw. Oct. 30, 2024), found that third-party payers were not "consumers" under Hawaii's consumer protection law because the law defined "consumer" to mean "a natural person."  HRS § 480-1.  The Rhode Island DTPA does not have the same

---

[7] *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 355 F. Supp. 3d 145, 157 (E.D.N.Y. 2018) (health plan plaintiffs did not have standing to bring private claim under Missouri consumer protection law; "Numerous courts have interpreted the [consumer protection statute] to confer standing exclusively on those who purchase property for their own use."); *MSP Recovery Claims, Series, LLC v. Sanofi-Aventis U.S. LLC*, 2020 WL 831578, at *11 (D.N.J. Feb. 20, 2022) (health plan assignee plaintiffs did not have standing to bring private action under Virginia consumer protection law); *In re Sensipar Antitrust Litig.*, 2022 WL 736250, at *21 (D. Del. Mar. 11, 2022) (health plan plaintiffs did not have standing to bring private action under Missouri consumer protection law; "statute should be construed to authorize only claims brought by persons who have purchased merchandise for their own—but not someone else's—'personal, family, or household purposes.'") (internal citation omitted); *In re Express Scripts, Inc., Pharmacy Benefits Mgmt. Litig.*, 2006 WL 2632328, at *9 (E.D. Mo. Sept. 13, 2006) (health plan plaintiffs did not have standing to bring private action under New York consumer protection law; "Although Plaintiffs allege that Defendants['] actions harmed a multitude of prescription benefit plans, they never explain how Defendants actions harmed individuals.").

restriction, it applies to any "person."  *Compare* HRS § 480-1 ("'Consumer' means a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment.") *with* R.I. Gen. Laws § 6-13.1-1(3) ("'Person' means natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity.")

Moreover, nothing in Section 6-13.1-5 (or Section 6-13.1-5.2) requires privity or a "direct" relationship between consumers and defendants in either a private action or a law enforcement action brought by the Attorney General.  Defs.' Mem. at 13.  To the contrary, the DTPA broadly defines "trade" and "commerce," to include:

> the advertising, offering for sale, or ***distribution of any services*** and any property, tangible, or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situate, and include any trade or commerce ***directly or indirectly*** affecting the people of this state."

*Id*. § 6-13.1-1(5) (emphasis added); *see also Chen v. Subaru of America*, 58 A.3d 910, 911 (R.I. 2012) (noting trial court found DTPA did not "seem to require privity of contract between the consumer and the alleged deceptive trade practice violator, as long as there is a connection between the deceptive trade practice and the harm to the plaintiff.").  The State alleges that Defendants engage in trade and commerce in Rhode Island by administering prescription drug benefits for Rhode Island health plans and consumers, who the PBM Defendants interact with directly and refer to as their "members," Compl. ¶¶ 55, 61.  As part of that service, the PBM Defendants also do business with the local pharmacies that fill prescription for their Rhode Island members.  *Id*. ¶¶ 45, 181–187.  "[I]n enacting the DTPA, the Legislature intended to declare unlawful a broad variety of activities that are unfair or deceptive[.]" *Park v. Ford Motor Co.*, 844 A.2d 687, 692 (R.I. 2004).  Writing a privity requirement into the DTPA contradicts not only the plain language

of the statute but its purpose, as well as the Rhode Island Supreme Court's direction that the DTPA "should be liberally construed." *Long v. Dell, Inc.*, 984 A.2d 1074, 1081 (R.I. 2009) ("*Long I*").

Consistent with the plain language of the DTPA and the Rhode Island Supreme Court's direction that it should be liberally construed, the Court should find there is no "vendor-consumer relationship" requirement for actions brought by the Attorney General and no privity or "directness" requirement for any action.

## III.    Actions Brought by the Attorney General Under Section 6-13.1-5 Are Not Subject to Any Statute of Limitations

Defendants' contention that the general 10-year statute of limitations for civil actions, R.I. Gen. Laws § 9-1-13(a), bars this action contradicts both the plain language of Section 6-13.1-5 and well-established Rhode Island law.

Section 6-13.1-5 explicitly states there is no statute of limitations for actions brought by the Attorney General. *See* R.I. Gen. Laws § 6-13.1-5(a) ("***Whenever*** the attorney general has reason to believe that any person is using, has used, or is about to use any method, act, or practice declared to be unlawful by § 6-13.1-2, . . . ***the attorney general may bring an action***[.]") (emphasis added). As Defendants' cited authority acknowledges, under the doctrine of *nullum tempus*, the State is exempt from statutes of limitations unless a statute specifically provides otherwise. *State v. Lead Ind. Ass'n, Inc.*, 2001 WL 345830, at *12 (R.I. Super. Ct. Apr. 2, 2001) ("The doctrine is well-established in Rhode Island."); *see also State v. Pawtuxet Turnpike Co.*, 8 R.I. 521, 524 (R.I. 1867) ("[W]hen, acting in behalf of the State, [the Attorney General] deems it his duty to prosecute for a forfeiture, it is not for the court, in the absence of any statutory limitation, to say he is too late."). Section 9-1-13(a) does not specify that it applies to the State; thus, under the doctrine of *nullum tempus*, it does not. *See* R.I. Gen. Laws § 9-1-13(a).

Defendants argue that *nullum tempus* does not apply in this action because the Attorney General is purportedly not acting in a governmental capacity to preserve a public right. That argument misinterprets *Lead Industries Association*. In *Lead Industries Association*, 2001 WL 345830, at *12, the court found that the Attorney General could not invoke *nullum tempus* in common law tort claims for individual citizens—specifically strict liability, negligence, and negligent and fraudulent misrepresentations. The court did not discuss—nor does it appear the defendants raised—statute of limitations with respect to the Attorney General's DTPA claim, which the court did **not** dismiss. *Id.* at *3–4. The DTPA explicitly grants the Attorney General authority to bring actions in the name of the state to protect the public interest, and the Attorney General acts here in his governmental capacity. *See* R.I. Gen. Laws § 6-13.1-5.

In addition, Defendants are wrong that equitable tolling is inapplicable. Defs.' Mem. at 17. The PBM Defendants actively concealed Defendants' misconduct by misrepresenting their role in the market, which was also masked by the highly opaque and complex nature of drug pricing. *See* Compl., Section II; *see also Mills v. Toselli*, 819 A.2d 202, 205 (R.I. 2003) ("[T]he heart of the discovery rule is that the statute of limitations does not begin to run until the plaintiff 'discovers, or with reasonable diligence should have discovered, the wrongful conduct of the [defendant].'") (internal citation omitted). Equitable tolling applies to actions brought by Attorneys General, as with other plaintiffs. Thus, considering the same argument from Defendants, the court presiding over the Insulin Pricing MDL held that the statute of limitations only began to run against plaintiffs, including several State Attorneys General, when a Senate report on insulin pricing put them on notice of the defendants' conduct:

> Given Defendants' finger pointing and consistent reassurances to Plaintiffs, along with the incredibly complicating pricing structures that come with the pharmaceutical industry, this Court finds a reasonable person would not have

14

discovered their injury of being overcharged for the price of insulin until the Senate Insulin Report alerted them to that injury.

*In re Insulin Pricing Litig.*, 2025 WL 2551738, at *14–15 (D.N.J. Sept. 5, 2025).  The same is true of the State's claims with respect to PBMs' role in inflating drug prices to consumers and driving down reimbursements to independent pharmacies.  Thus, even if the 10-year statute of limitations applied (which it does not), it would not bar the State's action.

Any statute of limitations period (to the extent one applied) would have also been tolled due to Defendants' continuing violations.  "Under the continuing violation doctrine, where a tort involves a continuing or repeated injury, the limitations period does not begin to run until the date of the last injury or the date the tortious acts cease." *Boudreau v. Automatic Temperature Controls, Inc.*, 212 A.3d 594, 602 (R.I. 2019).  In Counts One and Two, the State alleges that Defendants engaged in an unfair and deceptive scheme to artificially inflate list prices for brand-name drugs to extract higher fees, which harms consumers in the form of higher prices and reduced access to prescription drugs.[8]  In furtherance of this scheme, Defendants have engaged in conduct that caused injury continuously or repeatedly from at least 2012 through the present, including: (1) preferring drugs with the highest rebates on their formularies rather than preferring the safest or most effective drug or the drugs with the lowest cost to health plans and/or consumers; (2) directing pharmacies to collect cost-share payments from consumers based on artificially inflated list prices; and (3) the PBM Defendants' representing that Defendants function to lower drug prices when, in fact, their practices raise drug prices.  Compl. ¶¶ 82–132. In *In re: EpiPen (Epinephrine Injection,*

---

[8] Even if the ten-year statute of limitations applied, it would not bar any conduct that occurred from August 18, 2015 forward.  In Count Three, the State alleges that the PBM Defendants engaged in unfair methods of competition for at least the past five years.  Thus, it would not be barred by Section 9-1-13(a).

*USP) Mktg., Sales Practice and Antitrust Litig.*, 336 F. Supp. 3d 1256, 1299, 1319 (D. Kan. 2018), the plaintiffs alleged that drug manufacturers worked together to prevent competitors from entering the market by filing patent infringement lawsuits and entering into "pay-for-delay settlement agreements," causing consumers to pay artificially inflated drug prices similar to the State's allegations here. The court applied the continuing violations doctrine and held that a new cause of action accrued to purchasers upon each overpriced sale of the drug. *Id*. at 1328. The same reasoning applies here. Thus, even if a statute of limitations applied, the clock has not yet started to run because of Defendants' continuing violations.

## IV.    The State Sufficiently Alleges a Claim for Deceptive Acts and Practices Against Defendants

The State sufficiently pleads a claim for deceptive acts and practices because it alleges that the PBM Defendants made material representations and omissions and all Defendants engaged in material practices that were likely to mislead consumers acting reasonably under the circumstances. Compl. ¶¶ 217–227. Defendants' arguments to the contrary distort Rhode Island law and have been uniformly rejected by courts.

### A.    The PBM Defendants' Representations Are Actionable, Not Puffery

Representations are non-actionable puffery only when they are: (1) "grossly exaggerated advertising claims that no reasonable buyer would believe was true"; or (2) "a general claim of superiority over a comparative product that is so vague and indeterminate that it will be understood as a mere expression of opinion." *Azurity Pharms., Inc. v. Edge Pharma, LLC*, 45 F.4th 479, 503 (1st Cir. 2022) (internal citation omitted); *see, e.g.*, Defs.' Mem. at 20 (citing *Azurity Pharms.*, 45 F.4th at 505 (stating that competing medications were "not ideal for use in the hospital setting")); *Mulder v. Koh's Dep't Stores, Inc.*, 865 F.3d 17, 22 n.5 (1st Cir. 2017) (advertising "amazing prices"). By sharp contrast, the State outlines representations by the PBM Defendants that are

16

"specific and measurable claims and claims that may be literally true or false," and thus are not puffery. *FTC v. Direct Mktg. Concepts, Inc.*, 624 F. 3d 1, 11–12 (1st Cir. 2010); *id.* at 9 ("Supreme Greens cure cancer, heart disease, and cause weight loss by rendering acidic bodies more alkaline."). The representations the State identifies in the Complaint, particularly when viewed collectively, show that the PBM Defendants made specific, deceptive representations that the State can—and will—prove are false. Primarily, the PBM Defendants claim that Defendants lower prescription drug costs, when in fact, they engage in business practices that increase costs. Compl. ¶ 69(a) (CVS Caremark – "MYTH: Rebates negotiated by PBMs are driving up the prices of prescription drugs for consumers and plan sponsorship. FACT: Pharmaceutical manufacturers set the list price for a given drug. PBMs then negotiate with manufacturers to secure the drug at a lower cost for their plan sponsors and their members."); ¶ 70(a) (Express Scripts – "PBMs help get the lowest net cost for their clients and consumers. Claims that 'higher rebates mean higher prices' have been repeatedly debunked and repeatedly disproven."); ¶ 73(a) (OptumRx - "Rebates are a longstanding tool used by PBMs to negotiate with drug manufacturers to achieve lower prescription drug costs for clients.").

Defendants also fail to acknowledge that every other court to consider this argument has rejected it. *See, e.g.*, *In re Insulin Pricing Litig.*, 2025 WL 2573405, at *9 (rejecting puffery defense); *In re Insulin Pricing Litig.*, 2025 WL 2573406, at *9 (same). In *City of Miami v. Eli Lilly & Co.*, 2022 WL 198028, at *8 (S.D. Fla. Jan. 21, 2022), the Court found: "[T]he alleged misrepresentations state that the PBM Defendants use the formularies to obtain the cheapest price for their clients. Such statements do not amount to mere opinion or nonquantifiable and vague claims." *See also Harris County, Texas v. Eli Lilly & Co.*, 2020 WL 5803483, at *7 (S.D. Tex. Sept. 29, 2020) (court disagreed with the PBM Defendants' assertion that their representations

17

were merely "'generalized statements of superiority' that courts typically reject.") (internal citation omitted). The same is true here.

### B. Defendants' Deceptive Acts and Practices Are Material

Nothing in the plain language of the DTPA supports Defendants' contention that consumers must directly purchase goods or services from a company for the company's acts or practices to be considered material. *See Chen*, 58 A.3d at 911 (noting that the trial court found the DTPA did not "seem to require privity of contract between the consumer and the alleged deceptive trade practice violator as long as there is a connection between the deceptive trade practice and the harm to the plaintiff."); *see also supra*, Section II. To the contrary, the DTPA specifies that it applies to any trade or commerce "***directly or indirectly*** affecting the people of this State." R.I. Gen. Law § 6-13.1-1(5) (emphasis added). Adopting Defendants' strict interpretation of materiality, which is wholly unsupported by Rhode Island law, would significantly narrow the intentionally broad scope of the DTPA. *See Long I*, 984 A.2d at 1081 ("The DTPA is a remedial act and it should be liberally construed.").

The purpose of the materiality requirement in the DTPA is to ensure that deceptive acts and practices are important rather than de minimis. *See Long v. Dell, Inc.*, 93 A.3d 988, 1003 (R.I. 2014) ("*Long II*") (representation is considered "material" if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product."). The FTC considers certain categories of information presumptively material, including express claims and claims or omissions that "significantly involve health, safety, or other areas with which the reasonable consumer would be concerned." FTC Policy Statement on Deception at 5 ("FTC Deception Statement"), appended to *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 174 (F.T.C. 1984); *see also* R.I. Gen. Law § 6-13.1-3. All the acts or practices that the State alleges

18

are deceptive (many of which are express representations) and involve the pricing of drugs or the safety or efficacy of drugs and are therefore of obvious importance to consumers, which Defendants know. *See, e.g.*, Compl. ¶ 154 ("[P]eople are more likely to take their prescribed medications when they know they can afford them – and that can lead to better health outcomes."), ¶ 155 ("Express Scripts describes cost as 'one of the greatest barrier to care.'"), ¶ 156 ("Optum Rx routinely delivers a far lower price.  And lower prices matter."); *see also* Compl. ¶¶ 223–224, 157. Thus, the Court should consider Defendants' acts and practices to be presumptively material.

Moreover, although consumers do not directly purchase services from Defendants, consumers purchase health insurance and Defendants' actions are funded by and targeted to increase the likelihood of securing that purchase/service.  *Id*. ¶ 31.  Also, a health plan may consider complaints made by aggrieved consumers in determining whether to select or retain a particular PBM.  *Id*. ¶ 158.  Some consumers may also be able to change PBMs by selecting a different health plan from those offered by their employer or on the individual market with a different PBM.  *Id*.  Additionally, the FTC has long held that "[m]aterial information may affect conduct other than the decision to purchase a product."  FTC Deception Statement at 5 n.45; *see also In re Volkswagen of America, Inc.*, 99 F.T.C. 446, 1982 WL 608292, at *2 (F.T.C. 1982) (finding failure to disclose likelihood of oil filter leak material because it was likely to affect consumers' decisions concerning the maintenance, repair, use or care vehicles).  If consumers knew that Defendants preferred expensive, brand-name drugs with the highest rebates over cheaper drugs that may have superior safety or efficacy, consumers may have made different choices.  For example, consumers may have decided to pay cash for a generic drug rather than use their insurance and pay a higher cost-share amount for a brand-name drug.  Compl. ¶¶ 160–161. Consumers may have also decided to purchase a non-preferred drug their doctor prescribed (either

by paying cash or paying a higher cost-share amount) rather than switching to a preferred drug with an inferior efficacy or safety profile. *Id.*

In the Insulin Pricing MDL, the court found that the PBM Defendants' acts and practices, which are similar to the acts and practices the State alleges here, are material to consumers. *In re Insulin Pricing Litig.*, 2025 WL 2573405, at *10 ("[T]he State alleges these are material misrepresentations upon which PBM Defendants intended Illinois diabetics to rely in purchasing insulin at an artificially inflated price, thinking they were actually receiving a discount."). Defendants' representation that the District of Hawaiʻi reached a different conclusion is misleading. Defs.' Mem. at 22. The court found that Hawaiʻi could not base its deceptive acts and practices claim on allegedly material representation that the PBM Defendants made to third-party payers, because third-party payers are not "consumers" under Hawaiʻi law. *See Hawaiʻi*, 2024 WL 4625719, at *5; *see also supra*, Section II. That conclusion was limited to a specific textual provision present in Hawaiʻi law and not in Rhode Island law. *See supra*, Section II. It further found that Hawaiʻi failed to plead factual allegations showing how the representations were material to consumers but noted it was possible for the deficiency to be cured through an amendment, which Hawaiʻi subsequently did. *Hawaiʻi*, 2024 WL 4625719, at *5–7.

Lastly, although consumers do not directly purchase services from Defendants, health plans do. Health plans, which are consumers of Defendants' services and within the scope of Section 6-13.1-2, pay increased costs for prescription drugs due to Defendants' deceptive practices. Compl. ¶¶ 78–141. Tellingly, Defendants do not argue their representations are immaterial to health plans, which have the power to hire or fire PBMs including Defendants.

For these reasons, this Court should find that the State sufficiently alleges a claim for deceptive acts and practices and deny Defendants' motion on this ground.

V.      **The State Sufficiently Alleges a Claim for Unfair Acts and Practices Against Defendants**

To determine whether a trade practice is "unfair" under the DTPA, the Rhode Island

Supreme Court instructed courts to consider the following factors:

(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness;

(2) whether it is immoral, unethical, oppressive, or unscrupulous;

(3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*Ames v. Oceanside Welding and Towing Co., Inc.*, 767 A.2d 677, 681 (R.I. 2001) (citing *FTC v.

Sperry & Hutchinson Co.*, 405 U.S. 233, 244–45 n.5 (1972)). "The plaintiffs need not establish

every factor, and they may prove unfairness by showing that a trade practice meets one factor to a

greater degree or two or three factors to a lesser degree." *Long II*, 93 A.3d at 1001. Nonetheless,

the State has shown that all three factors are satisfied here.

Defendants ask this Court to abandon the Rhode Island Supreme Court's unfairness

standard, which is based on the Supreme Court's interpretation of the FTC Act in *Sperry &

Hutchinson* ("S&H standard") in favor of the FTC's current unfairness standard.[9] Defs.' Mem. at

---

[9] The DTPA broadly prohibits "[u]nfair methods of competition ***and*** unfair or deceptive acts or practices. R.I. Gen. Laws § 6-13.1-2 (emphasis added). Section 6-13.1-1(6) defines "unfair methods of competition and unfair or deceptive acts or practices" to mean one or more of twenty enumerated practices. *Id*. § 6-13.1-1(6). Nineteen of those practices are specific and one is a catch-all that includes "any unfair act or practice that is unfair or deceptive to the consumer." *Id*. Defendants argue this Court is required to apply the new FTC standard, which considers only harm to consumers, instead of the S&H standard, which considers harm to both consumers and competitors or other businessmen. Defs.' Mem. at 22–23. But they then also claim—without any explanation for the inconsistency—that the Court is not required (and in fact maybe even prohibited) from applying the FTC's 2022 UMC standard. *Id*. at 31–33. At minimum, the 2022 UMC standard is useful persuasive information about how unfairness works in this market.

22–23.  This request contravenes well-established law.  *See, e.g.*, *U.S. v. Holloway*, 630 F.3d 252, 259 (1st Cir. 2011) ("[A] federal court is bound by the construction of state law rendered by the highest court of the state.").  Moreover, the Rhode Island Supreme Court decided *Ames* in 2001, more than six years after the FTC amended its unfairness standard in 1994.  Nonetheless, it chose— like most other states, including states with consumer protection statutes that require courts to give due consideration and great weight to interpretation of the FTC and the federal courts relating to Section 5(a) of the FTC Act—to adopt the S&H standard.  *See, e.g.*, *Rohrer v. Knudson*, 203 P.3d 759, 763 (Mont. 2009) ("Most states with consumer protection acts patterned after § 5(a)(1) of the FTC Act interpret unfairness as described in the landmark United States Supreme Court case, *FTC v. Sperry & Hutchinson*[.]").  Defendants' acts and practices, however, are unfair under both the S&H standard and the current FTC standard.

### A.     Defendants' Acts and Practices Violate Public Policy

The State does not—as Defendants assert—have to identify a statute prohibiting rebate agreements to show Defendants' conduct violates public policy.  Defs.' Mem. at 23–24.  The Rhode Island Supreme Court held that a practice can be unfair "without necessarily having been previously considered unlawful" if "it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness."  *Long II*, 93 A.3d at 1000.  The State shows exactly that in its Complaint.

Rhode Island has an established public policy of making affordable and effective medications accessible to consumers and preventing PBMs from driving up drug costs.  Compl. ¶¶ 78–141, 162–167.  This public policy is evidenced by multiple state laws, including laws

---

Defendants' argument would tie this Court's hands and have it eschew both binding precedent and helpful persuasive interpretation.

capping consumers' out-of-pocket costs for specialty drugs and insulin products and banning PBMs' contractual clauses that prevent pharmacies from disclosing information concerning consumers out-of-pocket costs and lower-priced alternatives. *Id*. ¶¶ 163–166. In explaining the purpose behind the legislation to cap out-of-pocket costs for specialty drugs, the legislative sponsor said: "[I]t is the responsibility of our state government to ensure that all people, regardless of socioeconomic status, can afford these lifesaving medications." *Id*. ¶ 161. Ensuring access to affordable prescription drugs is the public policy of Rhode Island. *Id.*

    The DTPA itself also expressly prohibits "making false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions." R.I. Gen. Laws § 6-13.1-1(6)(xi). The court in the Insulin Pricing MDL relied on similar laws to establish the public policy of Illinois and Montana. *See In re Insulin Pricing Litig.*, 2025 WL 2573406, at *10–11; 2025 WL 2573405, at *10–11. Defendants' rebate and formulary practices offend Rhode Island public policy because they increase drug prices and restrict consumers' access to more affordable, and in some instances, safer or more effective drugs—all while the PBM Defendants claim to health plans and consumers that Defendants exist to do the complete opposite. Compl. ¶¶ 67–77, 82–132. The PBM Defendants also violate the DTPA by misrepresenting that rebates serve as price reductions when, in fact, rebates drive up out-of-pocket costs for many consumers. *Id*. ¶¶ 67–77.

### B.    Defendants' Acts and Practices Are Immoral, Unethical, Oppressive, Or Unscrupulous Conduct

    Courts interpreting the second factor of the S&H standard have found that "[a] practice may be considered immoral, unethical, oppressive, or unscrupulous if it imposes a lack of meaningful choice or an unreasonable burden on the consumer." *See Dolemba v. Illinois Farmers Ins. Co.*, 213 F. Supp. 3d 988, 998 (N.D. Ill. 2009). When applying the second S&H factor to similar allegations in *In re Insulin Pricing Litig.*, 2025 WL 2573405, at *12, the court concluded:

"[I]t is hard to see how the alleged exploitation of Illinois diabetics who require this life-saving insulin medication and have little to no choice but to purchase insulin through PBM Defendants would not be considered immoral, unethical, oppressive, or unscrupulous."  The same is true of Defendants' conduct in raising the price of brand-name drugs other than insulin.  For example, the State alleges that nearly a quarter of adults in Rhode Island either did not fill a prescription, cut pills in half, or skipped a dose due to concerns about costs.  Compl. ¶ 2.  The cost of Spiriva Handihaler, an essential drug used to treat asthma and COPD from which more than 96,000 Rhode Islanders suffer, increased more than 36% (from $3,886 per year in 2015 to $5,289 per year in 2020).  *Id.* ¶ 144.  The State also alleges that while consumers have some choice over their health plan (and by extension, their PBM), in many instances, switching health plans is cost prohibitive, particularly if consumers switch from an employer-sponsored plan to a private-market plan.  *Id.* ¶ 158.  It can also be difficult for consumers and health plans to escape Defendants' practices because they control approximately 80% of the market.  *Id.*

Analogous to the State's allegations, the consumer-plaintiffs in *In re Pharm. Indus. Average Wholesale Price Litig*, 582 F.3d 156, 160–161 (1st Cir. 2009), alleged that it was unfair for manufacturers to artificially inflate the average wholesale price ("AWP") for physician-administered drugs and to market the spread between the AWP and the true cost of those drugs as a selling point to physicians.  This practice allowed physicians to buy drugs at a secret, lower price while being reimbursed for it at a public, higher price.  *Id.*  It also gave manufacturers who engaged in the practice an advantage over their competitors.  *Id.*  The First Circuit upheld the district court's finding that increasing the AWP was evidence of unethical conduct because raising the AWP imposed costs on the payors and patients.  *Id.* at 185–86.  Defendants' conduct here is similar.  The State alleges that Defendants profit from their rebate and formulary practices that artificially inflate

list prices but increase costs to consumers and health plans. *See* Compl., Section III. Additionally, in *Edwards v. N. Am. Power & Gas, LLC*, 120 F. Supp. 3d 132, 143–144 (D. Conn. 2015), the court concluded that "telling customers one thing and doing another"—as Defendants have done here—"could well be unethical, immoral or unscrupulous business behavior" satisfying the second S&H factor. *See* Compl., Section II.

Relying on *Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 82 (1st Cir. 2020) and *Schuster v. Wynn Ma LLC*, 118 F.4th 30, 42–43 (1st Cir. 2024), Defendants assert that Rhode Island courts considering the second factor of the S&H standard focus on whether a defendant has deceived or otherwise taken advantage of others' assumptions in taking the alleged actions. Defs.' Mem. at 24. However, in *Tomasella* and *Schuster*, the First Circuit reviewed orders from the District of Massachusetts dismissing claims under the Massachusetts Consumer Protection Act—the cases had nothing to do with Rhode Island or its courts. *Tomasella*, 962 F.3d at 65–65. Moreover, *Tomasella* did not find that deceit or taking advantage of others' assumptions were the only practices that could be immoral, unethical, oppressive, or unscrupulous. *Id*. at 81–82. Those practices were just the ones alleged in that case. *Id*. Further, the parties in *Tomasella* agreed that although the defendants failed to disclose their use of supply chains that utilized child and slave labor on their product labels, the defendants made that information publicly available through their websites and other media. *Id*. at 82. Similarly, in *Schuster*, the court noted that the plaintiff (a patron of a casino) had access to the same information as the defendants (a casino and its owners), mainly that consumers could redeem tickets from winning games for their full value rather than continue gambling. By contrast, the State alleges that the PBM Defendants have consistently misrepresented information and limited health plans' and consumers' access to data and other

information that would have revealed the harm caused by Defendants' true practices.  *See* Compl., Section II.

Defendants' reliance on *Hawaiʻi ex rel. Lopez v. CaremarkPCS Health, L.L.C.*, 2024 WL 4625719, is also misplaced.  The District of Hawaiʻi gave the Attorney General leave to file an amended complaint, which it has since done.  *Id.* at *10.  The additional allegations may change the court's analysis.  Moreover, this out-of-circuit decision is an outlier.  Other courts, including the First Circuit and the District of New Jersey in the Insulin Pricing MDL, have found Defendants' practices are immoral, unethical, oppressive, or unscrupulous.  *See, e.g.*, *In re Insulin Pricing Litig.*, 2025 WL 2573405, at *12; *In re Insulin Pricing Litig.*, 2025 WL 2573406, at *10–11; *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d at 160–161, 185–186.

Defendants' contention that their practices cannot be immoral, unethical, oppressive, or unscrupulous because they are part of a standard industry practice in which employers, unions, government entities, and others participate is baseless.  Defs.' Mem. at 25–26.  First, this is a matter reliant on facts wholly outside the complaint and cannot be considered on a motion to dismiss.  *See supra*, Legal Standard.  Second, Defendants have not shown any so-called standard industry practices by which they are allegedly abiding other than utilizing rebates, formularies, and pharmacy networks.  Even if Defendants did, the existence of industry standards is an issue of fact that will likely require expert testimony and is therefore not appropriate for resolution at the motion to dismiss stage.  *See Pelletier v. Main Street Textiles, LP*, 740 F.3d 48, 55 (1st Cir. 2006) ("[T]he customs and practices of an industry are proper subjects for expert testimony.'").  Moreover, as explained above, the State is challenging Defendants' specific unlawful practices involving rebates, formularies, and (in the case of the PBM Defendants) pharmacy networks—none of which are permitted by state or federal law—not the use of those tools generally.  *See supra*, Section I.

In addition, Defendants cannot shift the blame for their unfair practices on to their health-plan clients within the confines of the allegations in the Complaint. Defendants, which control approximately 80% of the market, have made drug pricing a complete black box. Compl. ¶¶ 40, 80. Their rebate and formulary negotiations with drug manufacturers are highly confidential and, for the most part, the exact terms of their agreements are unknown to others in the supply chain, even to PBMs' own clients. *Id.* ¶¶ 40, 133–141. In addition, the PBM Defendants' clients hire them to conduct formulary and rebate negotiations because they generally lack the expertise to do so. *Id.* ¶ 84. Thus, they lack the ability or knowledge to identify or control Defendants' unlawful practices. Moreover, the Complaint alleges that Defendants have created a Catch-22 in which health plans must negotiate rebates to avoid paying the artificially inflated prices caused by Defendants' practices. *Id.* ¶ 112 (drug manufacturer testifying before Congress said: "It is not our intention that anyone should pay the list price . . . The list price is the starting point for our negotiation against the PBMs and insurance companies.").

### C.    Defendants' Acts and Practices Are Substantially Injurious to Consumers

Defendants argue that the State fails to allege facts establishing a substantial injury to consumers that is not reasonably avoidable and not outweighed by countervailing benefits to consumers or competition. But these are the elements of an unfairness claim under the new FTC standard, not the S&H standard that Rhode Island courts utilize. Defs.' Mem. at 26; *see also Ames*, 767 A.2d at 681. Nonetheless, the State's allegations show that Defendants' conduct is not reasonably avoidable and not outweighed by countervailing benefits to consumers or competition.

***First***, Defendants misstate the allegations in the Complaint. The State does not allege that "drug manufacturers raised their own prices to increase their own profits despite Defendants' efforts to *reduce* clients' costs via rebates." Defs.' Mem. at 27 (emphasis in original). It alleges

the opposite.  Defendants give preferential treatment on their formularies to expensive, brand-name drugs with the highest rebates and other fees over drugs that may be safer, more effective, or cost less to health plans or consumers to line their own pockets (not reduce costs for clients or consumers).  Compl. ¶¶ 82–109, 133–141.  As a result, drug manufacturers raise their prices to pay Defendants kickbacks in the form of rebate and other fees.  *Id*. ¶¶ 110–132.  For example, in 2020, Express Scripts excluded AstraZeneca's Calquence (a drug used to treat Chronic Lymphocytic Leukemia) in favor of the higher-priced Imbruvica (manufactured by AbbVie and Johnson & Johnson) despite significantly fewer people taking Calquence suffering atrial fibrillation compared to Imbruvica in a head-to-head trial.  *Id*. ¶ 94; *see also* ¶¶ 97–98, 124 (exemplifying Defendants practices of selecting a brand-name drug over a cheaper generic drug option); ¶ 91 (showing Defendants preferred expensive, brand-name insulins over lower-priced versions of the same products).  This harms consumers by requiring them to purchase a more expensive (and, in some instances, inferior) drug.  It also forces health plans and consumers with cost-share payments tied to list prices (*e.g.*, consumers with high-deductible plans and coinsurance rather than flat copayments) and uninsured consumers to pay higher drug costs.  *Id*. ¶¶ 8–9, 50–54, 111–112, 117, 128, 130, 146.  In addition, the practice harms competition because it forces competitors to compete through kickbacks to Defendants rather than the safety, efficacy, or price of their products like competitors would do in a normal, competitive market.  *Id*. ¶¶ 169–180, 130, 113.

**Second**, Defendants have not cited—and the State is not aware of—any Rhode Island authority supporting the proposition that to be unfair, a substantial injury must be not reasonably avoidable and not outweighed by countervailing benefits to consumers or competition.  Defs. Mem. at 26–29.  These elements are part of the new FTC standard, which is inapplicable to the

DTPA for all the reasons discussed above.  *See*, *supra* Section VI.  Nonetheless, Defendants practices are unfair under either standard.

When determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice.  *F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1158 (1st Cir. 2010); *see also F.T.C. v. Direct Mktg. Concepts, Inc.*, 569 F.Supp.2d 285, 300 (D. Mass. 2008) (purpose of "reasonably avoidable" element is "not to second-guess the wisdom of particular consumer decisions, but rather to halt some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking.").  The State's allegations show that consumers do not have "a free and informed choice," *Neovi*, 604 F.3d at 1158, when it comes to PBMs.  The PBM Defendants deceptively represent their role in the market and limit health plans' and consumers' access to information and data that would show the true impact of Defendants' practices.  Compl. ¶¶ 67–77, 40, 139.  Additionally, the PBM Defendants utilize the GPO Defendants to conduct negotiations with drug manufacturers, which adds an additional, non-transparent layer to the drug pricing system, making it impossible for health plans to know whether they are receiving their fair share of rebates and other manufacturer payments.  *Id*. ¶¶ 136–138, 6.  This lack of transparency allows Defendants to profit from secret, undisclosed fees that drive up the cost of drugs.  *Id*. ¶ 139.  Failing to provide critical price or performance data—as Defendants have done here—is well-known to hinder free market decisions.  *See, e.g.*, *F.T.C. v. IFC Credit Corp.*, 543 F. Supp. 2d 925 (N.D. Ill. 2008).  Further, because Defendants administer prescription drugs for approximately 80% of the market, it would be hard for health plans and consumers to escape their practices.  Compl. ¶158.

Also, Defendants focus on the potential competitive benefits that rebates can provide.  But, as explained above, the State is not claiming that rebates are inherently unlawful, but that

Defendants' ***practices*** involving rebates, to which Defendants have not alleged any countervailing benefit, are unfair.  *See supra*, Section I.  More specifically, the State alleges that Defendants' rebate and formulary practices harm health plans, consumers, and competition—which contradicts what Defendants claim (without any support) in their brief.  Defs.' Mem. at 28.  For example, the State alleges:

> Researchers from the University of Southern California found that consumers with coinsurance in Medicare Part D plans had substantially higher out-of-pocket costs for drugs in concentrated markets where the demand for rebates is the highest.  In other words, paradoxically, more competitors in the market caused at least certain consumers to pay higher costs, which is contrary to how competitive markets typically work.  This can be attributed to the fact that Defendants leverage the availability of competitor drugs to demand higher rebates to give preferential treatment to one manufacturer's product and exclude others from their formularies.

*Id*. ¶ 130.  Defendants also retain a significant portion of the rebates and other fees that Defendants receive from drug manufacturers rather than passing them through to health plans.  *Id.*  ¶¶ 76, 133–141.  This prevents rebates from fully offsetting the higher drugs cost that health plans pay as the result of Defendants preferring expensive, brand-name drugs over cheaper and safer alternatives.  *Id.*

Defendants' reliance on *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022), is misplaced.  Defs.' Mem. at 29.  In *In re EpiPen*, 44 F.4th at 964, a drug manufacturer filed a Sherman Act claim against its competitor, claiming the competitor monopolized the epinephrine auto-injector market by entering into exclusive rebate agreements with PBMs.  On summary judgment (not a motion to dismiss), the court relied on expert testimony from both sides to reach the conclusion that the competitor's product had the lowest list price and the exclusive rebate agreement lowered prices in the epinephrine auto-injector market.  *Id.* at 990, 987.  The State is asserting a claim for unfair practices (not an antitrust violation) and alleges that Defendants prefer products with high list prices and that their practices

increase prices.  Compl. ¶¶ 228–234.  Further, the court's analysis focused only on the competitive conditions in one market.  It did not consider how Defendants' acts and practices impacted drugs outside the epinephrine auto-injector market or the PBM Defendants' deceptive representation about the role Defendants play in the market.

*Third*, Defendants argue the State failed to plead that the injury affected a large number of Defendants' consumers, competitors, or businesspeople.  Defs.' Mem. at 29.  "An act causes 'substantial injury' if it does 'small harm to a large number of people, or if it raises a significant risk of concrete harm.'"  *Neovi*, 604 F.3d at 1157 (internal citation omitted).  The State alleges that Defendants' practices harm thousands of Rhode Island residents.  Compl. ¶ 104.  Even though the State has not quantified the number of health plans or competitors whose practices Defendants have harmed, that number is likely to be substantial given Defendants' control of the overwhelming majority of health plan formularies.  *Id.* ¶ 80.  The State also alleges that Defendants' practices pose a significant risk of concrete harm to consumers by increasing out-of-pocket costs and preferring drugs that may have inferior efficacy or safety.  *Id.*, Section III.

For all these reasons, the Court should find that the State sufficiently pleads a claim for unfair acts and practices and deny Defendants' motion on this basis.

## VI.    The State Sufficiently States a Claim for Unfair Methods of Competition

Defendants' criticism of the FTC's 2022 UMC Policy Statement and false assertion that the State must allege a violation of state or federal antitrust laws are unfounded.  Defs.' Mem. at 31–33.  As Defendants concede, Defs.' Mem. at 29–30, Rhode Island courts have traditionally applied the S&H standard discussed above to determine whether a plaintiff has stated a claim for unfair competition, namely: (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as established by statutes, the common law, or

otherwise—whether, in other words, it is within at least the penumbra of some common-law statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; *or* (3) whether it causes substantial injury to consumers (***or competitors or other businessmen***). *Ames*, 767 A.2d at 681. While allegations that satisfy any of these factors would be sufficient, the State's Complaint addresses all of them. Thus, even if the Court does not consider the 2022 UMC Policy Statement, the State nonetheless sufficiently states a claim for unfair methods of competition.

### A.  Defendants' Methods of Competition Are Unfair Because They Violate the S&H Standard

While Defendants contend that the State's claim for unfair methods of competition fails because the State did not allege an enumerated practice prohibited under the DTPA, Defs.' Mem. at 30, they later acknowledge—as they must—that the State's claim fits into Section 6-13.1-1(6)(xiii)'s catch-all, which prohibits "engaging in any act or practice that is unfair or deceptive to the consumer." R.I. Gen. Laws § 6-13.1-1(6)(xiii). For many of the same reasons expressed above, Defendants' methods of competition are unfair because they violate the S&H standard.

The State has already shown that Defendants' rebate and formulary practices are unfair because they offend public policy, are immoral, unethical, oppressive, or unscrupulous, and cause substantial injury to consumers. *See supra*, Section V.

In addition, the State alleges that Defendants' practice of preferring the highest-cost drugs, which afforded them with the highest rebates, over drugs that may be less expensive to health plans or consumers—particularly when Defendants represent that they do the opposite—further violates the third factor of the S&H standard, because it harms competitors or other businessmen by shutting out low-cost competitors from the market. Compl. ¶¶ 169–180, Section II. For example, in 2023, Defendants favored the extremely high-cost Humira to the exclusion of FDA-approved

biosimilars with list prices ranging from 5% to 85% below Humira's list price which only benefited themselves. *Id.* ¶ 174. If Defendants had switched to a low list price biosimilar instead, it is estimated that Defendants would have lost 87% of profit from rebates and other fees and specialty pharmacies (some of which Defendants own) would have lost 90% of profit. By contrast, health benefit plans would have saved 80% in lower drug costs and administrative fees and consumers would have saved 76% in cost-share payments. *Id.* ¶ 175. This dynamic is contrary to normal competitive markets where having multiple competitors usually drives prices down (not up). *Id.* ¶ 130.

The FTC issued a notice to PBMs and drug manufacturers in 2022 warning them that this exact conduct may violate Section 5 of the FTC Act, which bars unfair and deceptive practices and unfair methods of competition like the DTPA:

> Nothing prevents drug manufacturers, PBMs, and health plans from negotiating good-faith rebates and fees for legitimate services that increase value to payers and patients. However, when dominant drug manufacturers or intermediaries stifle or foreclose competition from significantly less expensive generic and biosimilar alternatives, the Commission has the legal authority to investigate these practices and take enforcement action against unlawful conduct.
>
> [I]nducing PBMs or other intermediaries to place higher-cost drugs on formularies instead of less expensive alternatives in a manner that shifts costs to payers and patients may violate the prohibition against unfair methods of competition or unfair acts or practices under Section 5 of the FTC Act.[10]

---

[10] Fed. Trade Comm'n, *Policy Statement of the Federal Trade Commission on Rebates and Fees in Exchange for Excluding Lower-Cost Drug Products* (July 16, 2022), at 4–5 https://www.ftc.gov/system/files/ftc_gov/pdf/Policy%20Statement%20of%20the%20Federal%2 0Trade%20Commission%20on%20Rebates%20and%20Fees%20in%20Exchange%20for%20Ex cluding%20Lower-Cost%20Drug%20Products.near%20final.pdf.

The FTC's Statement also noted that exclusionary rebates that foreclose competition from less expensive alternatives—like the ones Defendant negotiate—may constitute unreasonable agreements in restraint of trade under Section 1of the Sherman Act; unlawful monopolization under Section 2 of the Sherman Act; or exclusive dealing under Section 3 of the Clayton Act.

Because the DTPA is modeled after its federal counterpart, the FTC's analysis equally applies here and establishes that Defendants' conduct is unfair under state law.

Moreover, for many of the same reasons laid out by the FTC, Defendants' formulary and rebate practices implicate several enumerated prohibited practices. *See* R.I. Gen. Laws § 6-13.1-1(6)(v) ("[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have"); § 6-13.1-1(6)(xi) ("[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"); § 6-13.1-1(6)(xii) ("[e]ngaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding"); § 6-13.1-1(6)(xiv) ("[u]sing any other methods, acts, or practices that mislead or deceive members of the public in a material respect").

Separately, the State alleges that the PBM Defendants—which collectively control 80% of the PBM market—engage in unfair methods of competition by leveraging their enormous power to force independent pharmacies to accede to take-it-or-leave-it contractual terms that severely harm independent pharmacies, even drive them out of business altogether, while benefitting the PBM affiliated pharmacies. Compl. ¶ 181. For example, the PBM Defendants commonly reimburse independent pharmacies (but not their own pharmacies) near or even below their acquisition costs (*i.e.*, the price pharmacies pay to purchase drugs from wholesalers) to fill prescriptions. *Id.* ¶¶ 188–202, 213. As a result, independent pharmacies are going out of business across the state. Between 2010 and 2021, Rhode Island had a pharmacy closure rate greater than 35% and experienced a net loss of pharmacies—meaning more pharmacies closed than opened. Independent pharmacies were particularly impacted. *Id.* ¶ 185.

The PBM Defendants also contractually prohibit independent pharmacies from providing mail-order services that would compete with the PBM Defendants' affiliated mail-order pharmacies. *Id.* ¶ 204. The PBM Defendants then heavily incentivize consumers to fill everyday prescriptions at mail-order pharmacies and ***require*** consumers to fill specialty drugs (which carry the highest cost to consumers and highest rebates to PBMs) at their mail-order specialty pharmacies. *Id.* ¶¶ 202, 205. The PBM Defendants self-determine which drugs are "specialty drugs." *Id.* Thus, the PBM Defendants can (and do) steer high-profit prescriptions to their mail-order specialty pharmacies by over-designating drugs—particularly high-cost drugs—as "specialty drugs." *Id.* ¶¶ 203–216. As a result, the PBM Defendants' affiliates face little to no competition in the mail-order pharmacy market. *Id.* ¶ 207. The FTC found that the PBM Defendants take advantage of their exclusive position by marking up numerous specialty generic drugs by thousands of percent, and many others by hundreds of percent. *Id.* ¶ 213. On top of these mark ups, consumers pay a higher cost-share payment for specialty drugs (*e.g.*, $35 for preferred brand-name drugs and $100 for specialty drugs). *Id.* ¶ 54. Consumers also experience frustration when dealing with affiliated mail-order pharmacies, including missed deliveries and medications that are spoiled through improper handling—that undermine their care and create health risks. *Id.* ¶ 214

These practices constitute unfair methods of competition under the DTPA because they offend Rhode Island's established public policy; are immoral, unethical, oppressive, and unscrupulous; and cause substantial injury to consumers, competitors, and other businessmen. *See Ames*, 767 A.2d at 681; *see also supra*, Section V.

***First***, like Defendants' rebate and formulary practices, the PBM Defendants' pharmacy-related practices offend Rhode Island's established public policy of making affordable and

effective medications accessible to consumers and preventing PBMs from driving up drug costs, *id*. ¶¶ 162–167, because they increase drug costs as described above. They also offend Rhode Islands' policy of ensuring that its residents have access to needed pharmaceuticals by causing local pharmacies to close. *See* R.I. Pub. Laws ch. 363 § 2 (2004) (Preamble to Pharmacy Freedom of Choice—Fair Competition and Practices).

*Second*, the PBM Defendants' pharmacy-related practices are immoral, unethical, oppressive, and unscrupulous because they force independent pharmacies to work for free (or, at a loss). Compl. ¶¶ 188–202. For example, one local pharmacist lost $50 every time he filled a prescription. *Id*. ¶ 200. When he asked a consumer to fill that prescription elsewhere, Express Scripts sent the pharmacist a cease-and-desist letter warning him to stop the practice or risk being removed from Express Scripts' network, which given Express Scripts' market share, would have been a crushing blow. *Id*. Further, the PBM Defendants' practice of requiring independent pharmacies not to compete with their affiliates in the mail-order pharmacy market (and therefore also in the mail-order specialty pharmacy market) in exchange for being part of their pharmacy network and then steering business to the mail-order pharmacy market is immoral, unethical, oppressive, and unscrupulous, because independent pharmacies have virtually no option but to accept the PBM Defendants' take-it-or-leave-it contractual terms. *Id*. ¶¶ 203–214, 181.

*Third*, the PBM Defendants' pharmacy-related practices cause substantial injury to consumers, competitors, and other businesses. In addition to the myriad ways these practices harm consumers, which are described above, these practices also harm competitors and other businesses, because the PBM Defendants' use their significant power in the PBM market to: (1) starve their affiliates' competitors in the pharmacy market through low reimbursement—forcing many to close their doors, *id*. ¶¶ 188–202, 214–216; (2) require contractual terms with health plans and network

pharmacies that force their pharmacy competitors not to compete in the mail-order pharmacy market and then steer business to the mail-order pharmacy market (including the mail order specialty pharmacy market), where the PBM Defendants' affiliates can (and do) raise prices, *id*. ¶¶ 203–216.

As explained above, the State is not required to allege that the injury caused by the PBM Defendants' pharmacy-related practices is not "reasonably avoidable" by consumers and not outweighed by any countervailing benefits to consumers or competition. *See supra*, Section V. Nonetheless, the State alleges that consumers have "no visibility" into the PBM Defendants' practice of under-reimbursing independent pharmacies and thus cannot avoid the practice. Compl. ¶ 199; *see also supra*, Section VI.C. Consumers also cannot avoid the PBM Defendants' practice of steering consumers to their affiliated mail-order pharmacies because the PBM Defendants engage in exclusionary tactics to prohibit independent pharmacies from competing in the mail-order pharmacy market. They also *require* consumers to fill prescriptions for specialty drugs through the PBM Defendants' affiliated mail-order pharmacies, depriving consumers of the choice of using independent pharmacies. *Id*. ¶¶ 203–216.

Defendants' practices also lack any countervailing benefit to consumers or competition. Consumers pay the same cost-share payment regardless of the amount the PBM Defendants pay pharmacies to fill prescriptions. Compl. ¶¶ 50–54. Likewise, Defendants' practice of steering business to their affiliated pharmacies does not benefit consumers or competition. It increases drug costs in many instances, further restricts consumers' choice of pharmacy, and exposes consumers to numerous impediments that could have serious health implications (*e.g.*, late deliveries, spoiled medications). *Id*. ¶¶ 203–216. It also destroys competition, turning the mail-

order pharmacy market (and by extension the specialty pharmacy market) into an oligopoly ruled by the PBM Defendants' affiliates. *Id.*

For these reasons alone, the Court should deny Defendants' Motion to Dismiss with respect to the State's claim of unfair methods of competition.

### B. The Court Should Give "Due Consideration and Great Weight" to the FTC's 2022 UMC Statement as Required by the Deceptive Trade Practices Act

The State references the FTC's 2022 UMC Statement in the Complaint because the DTPA requires courts to give "due consideration and great weight" to the FTC's interpretations of Section 5(a) of the FTC Act—a fact Defendants acknowledge in their argument regarding unfair acts and practices but ignore here. R.I. Gen. Laws § 6-13.1-3; Defs.' Mem. at 23 ("[The FTC's current unfairness standard] is highly probative here because the Rhode Island legislature has directed that 'due consideration and great weight shall be given to the interpretations of the Federal Trade Commission Act' in interpreting the DTPA") (quoting R.I. Gen. Laws § 6-13.1-3). Moreover, the considerations in the FTC's 2022 UMC Statement are not "novel" as Defendants assert, they are the same considerations underlying the S&H standard and the FTC's traditional enforcement criteria. Defs.' Mem. at 29–30.

Defendants' attempt to paint the FTC's 2022 UMC Statement as a drastic departure from long-standing precedent lacks foundation.[11]  According to the FTC's 2022 UMC Statement, a method of competition is unfair if it goes beyond competition on the merits. *See* FTC's 2022 UMC Statement at 8–9. The 2022 UMC Statement provides two key criteria to consider when evaluating

---

[11] Defendants misconstrue two cases regarding the FTC's role in interpreting Section 5. Defs.' Mem. at 32. In *Ryan, LLC v. Federal Trade Commission*, 746 F. Supp. 3d 369, 384 (N.D. Tex. 2024), the court held that the FTC lacks substantive rulemaking authority through the FTC Act. But, in *Ryan*, the FTC issued a substantive rule based on its Section 5 authority (the non-compete rule). *Id.* That holding has no bearing here. Additionally, *Est. of Charania v. Shulman*, 608 F.3d 67, 74 (1st Cir. 2010) was not an unfair competition case. Defs.' Mem. at 32.

whether conduct goes beyond competition on the merits: (1) the conduct may be coercive, exploitative, collusive, abusive, deceptive, predatory, or involve the use of economic power of a similar nature; and (2) the conduct must tend to negatively affect competitive conditions, which may include conduct that tends to foreclose or impair the opportunities of market participants, reduce competition between rivals, limits choice, or otherwise harms consumers. *Id*. at 9. The S&H standard's focus on whether conduct is "immoral, unethical, oppressive, or unscrupulous" or "causes substantial injury to consumers (or competitors or other businessmen)"— overlaps significantly with the FTC's 2022 UMC Statement. *Compare Sperry & Hutchinson*, 405 U.S. at 244–45 n.5 *with* FTC's 2022 UMC Statement at 8–9. Thus, Defendants' practices constitute unfair methods of competition under the FTC's 2022 UMC Statement for the same reason that they constitute unfair methods of competition under the S&H standard. *See supra*, Section VI.A.

Further, there are clear parallels between the FTC's 2022 UMC Statement and historical FTC cases involving unfair methods of competition, showing the FTC has used the same enforcement criteria for decades. For example, *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 140 (2d Cir. 1984), explains that the FTC has traditionally exerted its authority to prohibit unfair methods of competition to attack collusive, predatory, restrictive, or deceitful conduct that substantially lessens competition. This language is repeated almost word-for-word in the FTC's UMC Statement. *See* FTC's 2022 UMC Statement at 9. The court in *E.I. du Pont* also provides several examples of the Supreme Court affirming the FTC's findings that certain practices—many of which are analogous to Defendants' practices here—constitute unfair methods of competition,

including scheming to control prices by cutting off supplies to those selling at a discount.  *See E.I. du Pont*, 729 F.2d at 137 n.7.[12]

### C.    The State Does Not Have to Allege that Defendants' Conduct Violated Federal Antitrust Laws

Defendants argue that the State's claim for unfair methods of competition fails because the State does not allege anticompetitive conduct and harm in a relevant market as required by federal antitrust laws.  Defs.' Mem. at 33–34.  Their argument incorrectly assumes that the State must plead the elements of an antitrust claim the State has not made and ignores the plain allegations in the State's Complaint.[13]

The State is the plaintiff, and as the plaintiff, may choose to pursue its theories of liability as it chooses.  *Danca v. Private Health Care Sys., Inc.*, 185 F.3d 1, 4 (1st Cir. 1999) ("[T]he plaintiff is the 'master' to decide what law he will rely upon.") (internal citation omitted).  Nor does a claim of unfair competition collapse into a federal antitrust claim.  *Contra* Defs.' Mem. at 35–40.  As Defendants concede and their cited authority acknowledges, Section 5's prohibition against unfair methods of competition is broader than federal antitrust laws.  *See* Defs.' Mem. at 33–34 (citing *Chuck's Feed & Seed Co., Inc. v. Ralston Purina Co*., 810 F.2d 1289, 1293 (4th Cir.

---

[12] Defendants try to distinguish the cases cited in *E.I. du Pont* (and repeated in Paragraph 241 of the State's Complaint) by claiming they are not "examples of unfair competition" because they "actually assess antitrust allegations."  Defs.' Mem. at 33–34 n.9.  That is false; all these cases address unfair methods of competition.  Defendants' effort to dismiss the cases as "decided over 50 years ago, and merely rubber stamp the outcome of an FTC adjudication[,]" *id*., also fails.  Defendants rely on cases from the same (and even earlier) time periods, and the notion that the Supreme Court acts as a "rubber stamp" to the FTC is belied by the Supreme Court's analysis in those cases.

[13] Nonetheless, these practices violate the spirit of Rhode Island's Antitrust Law and Sections 1 and 2 of the Sherman Act, because they: (1) unreasonably restrain trade by preventing independent pharmacies from competing in the mail-order or specialty market, R.I. Gen. Laws § 6-36-4; 15 U.S.C. § 1; and (2) are used to establish, maintain, or use a monopoly, or attempt to establish a monopoly, of the mail-order and specialty pharmacy market to exclude competitors (namely, independent pharmacies), R.I. Gen. Laws § 6-36-5; 15 U.S.C. § 2.

1987) ("An anticompetitive practice need not violate the Sherman Act or the Clayton Act in order to violate the FTC Act."); *Sperry & Hutchinson v. FTC*, 432 F.2d 146, 150 (5th Cir. 1970) ("Competitive practices need not be specific, established violations of one of the existing antitrust laws to be 'unfair' within the meaning of the Federal Trade Commission Act."); *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 136–37 (2d Cir. 1984) ("Although the Commission may under § 5 enforce the antitrust laws, including the Sherman and Clayton Acts, it is not confined to their letter.  It may bar incipient violations of those statutes and conduct which although not a violation of the letter of the antitrust laws, is close to a violation or is contrary to their spirit.")).

*First*, Defendants are incorrect that the State must define a relevant market.  Nothing in the DTPA requires a plaintiff to define a relevant market.  Section 5 also does not require a separate showing of market power or market definition when the evidence indicates that such conduct tends to negatively affect competitive conditions.  *See, e.g.*, FTC's 2022 UMC Statement at 10; *Atlantic Refining v. F.T.C.*, 381 U.S. 357, 371 (1965)  (it is "unnecessary to embark upon a full scale economic analysis of competitive effects."); *Texaco v. F.T.C.,* 393 U.S. 223, 230 (1968) (holding that "[i]t is enough that the Commission found that the practice in question unfairly burdened competition for a not insignificant volume of commerce."); *L.G. Balfour Co. v. FTC*, 442 F.2d 1, 19–20 (7th Cir. 1971) (no extensive market analysis necessary in an exclusive dealing contract case under Section 5).  Defendants' cited authority is inapposite because, like most of the cases Defendants cite, it involves antitrust law—not unfair methods of competition—thus, market definition was a key element of those claims.  Defs.' Mem. at 35 (citing *Lee v. Life Ins. Co. of N. Am.*, 829 F. Supp. 529, 534 (D.R.I. 1993) (interpreting Sherman Act claims); *Ohio v. Am. Express*

*Co.*, 585 U.S. 529, 540 (2018) (same)).[14]  Nonetheless, Plaintiffs have identified the at-issue markets as the brand-name prescription drug market and the mail-order pharmacy market (including the mail-order specialty pharmacy market).  Compl. ¶¶ 168–216; 235–248.

Defendants are also wrong that their conduct cannot constitute unfair methods of competition because they operate in the PBM market rather than the brand-name prescription drug market or the mail-order pharmacy market (even though Defendants' services impact the brand-name prescription drug market and the PBM Defendants' affiliates operate in the mail-order pharmacy market).  Defs.' Mem. at 35–36.  Defendants rely on *Official Airline Guides, Inc. v. FTC*, 630 F.2d 920 (2d Cir. 1980) for this proposition, but there was a key difference in that case.  Defs.' Mem. at 36.  In *Official Airline Guides*, 630 F.2d at 925–26, the FTC itself pointed out: "[T]he instant case differs from ordinary monopolization cases where challenged acts or practices were engaged in to benefit the monopolist competitively, either in the market in which the monopoly power existed or in some adjacent market into which the monopolist had extended its operations."  The same is not true here.  The State alleges that Defendants exert their influence to benefit themselves in two ways.  First, Defendants use their power in the PBM market to shut out competitors in the brand-name prescription drug market that do not pay kickbacks to Defendants in the form of high rebates and other fees.  Compl. ¶¶ 181–202.  Second, the PBM Defendants use their leverage over their network pharmacies to weaken (or eliminate) the pharmacies' ability to compete with the PBM Defendants' affiliated pharmacies.  *Id.* ¶¶ 203–216.  The FTC has long

---

[14] Defendants also rely on *Hawai'i*, 2024 WL 4625719, at *2, 11.  However, in *Hawai'i*, the court found the state failed to plead sufficient allegations concerning the relevant market but noted the deficiency may be cured by an amendment.  *Id.* at 11.  Unlike the DTPA, courts interpreting Hawaii's consumer protection law found that it was necessary to define some relevant market (although perhaps not the same analysis required for antitrust claims), such as, for example, "other air conditioner options . . . available to Hawai'i consumers."  *Id.*

held that it can be an unfair method of competition to "[utilize] economic power in one market to curtail competition in another" as Defendants do here. *Atlantic Refining*, 381 U.S. at 370.

**Second**, contrary to Defendants' contentions, Defs.' Mem. at 37–40, the State alleges the defendants engage in anticompetitive practices and that their practices harm competition. *See supra*, Section VI.A. Defendants cite *Anoush Cab, Inc. v. Uber Techs., Inc.*, 8 F.4th 1, 19 n.6 (1st Cir. 2021) to support their argument that laws prohibiting anticompetitive conduct are designed to protect competition, not competitors, but the plaintiffs in *Anoush Cab* did not assert a claim for unfair methods of competition. Moreover, the Rhode Island Supreme Court has instructed courts to interpret the DTPA to consider whether a practice causes "substantial injury to **consumers (or competitors or other businessmen)**." *Ames*, 767 A.2d at 681 (emphasis added). Nonetheless, the State alleges harm to competition in addition to harm to consumers, competitors, or other businesses. Compl. ¶ 179 ("Defendants' conduct tends to negatively affect competitive conditions because: (1) it incentivizes drug manufacturers to compete for formulary placement by inflating WAC prices to counteract high rebates and other fees and deters drug manufacturers from lowering the artificially inflated [list] prices; (2) it stifles the ability of less expensive drugs to enter the market (*e.g.*, biosimilars), and (3) many consumers are forced to purchase drugs with high WAC prices and pay higher out-of-pocket costs based on the artificially inflated WAC prices."); ¶ 247 ("The PBM Defendants' conduct tends to negatively affect competitive conditions because it: (1) disadvantages independent pharmacies by reimbursing them near, or under acquisition cost for many drugs while systematically blocking them from business with higher profit margins, reducing their ability to provide services to consumers and compete in the pharmacy market; (2) significantly reduces and, in some instances, eliminates competition in the mail order and specialty

pharmacy business by forcing consumers to use the PBM Defendants' affiliated pharmacies; and (3) drives up costs for consumers, particularly with respect to specialty drugs.").

Defendants' other arguments are aimed at whether Defendants' practices cause the harm that the State alleges. Defs.' Mem. at 37–40. Factual challenges to the plaintiff's allegations—particularly ones that do not fall within the four corners of the Complaint and are supported by outside materials—are not within the proper scope of Rule 12(b)(6). *See Rivera*, 575 F.3d at 15 ("Under Rule 12(b)(6), the district court may properly consider only facts and documents that are part of or incorporated into the complaint.") (internal citation omitted); *see also* Defs.' Mem. at 36 n.10, 37 (citing FTC and DOJ, *Improving Health Care: A Dose of Competition* (July 2004), https://tinyurl.com/mvf83zh8. ("FTC's 2004 Report")).[15]

### VII.  The State's Allegations Relate to Defendants' Acts and Practices, Not Specific Drugs

Defendants' request that this Court limit the State's claims to only the prescription drugs identified in the Complaint is wholly without support. In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007), the Supreme Court held that a plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests[.]" *Id.* (internal quotation marks and citation omitted). The State has done that here. It alleges several of Defendants' business practices constitute unfair or deceptive acts or practices or unfair methods of competition, including: (1) the PBM Defendants' deceptive representations regarding their role in the market, Compl., Section II;

---

[15] Defendants fail to acknowledge that in 2022, the FTC cautioned against relying on the FTC's 2004 Report and other earlier issued reports since they may no longer reflect current market conditions. *See* Fed. Trade Comm'n, *Federal Trade Commission Statement Concerning Reliance on Prior PBM-Related Advocacy Statements and Reports That No Longer Reflect Current Market Realities* (July 20, 2023), at 1, https://www.ftc.gov/system/files/ftc_gov/pdf/CLEANPBMStatement7182023%28OPPFinalRevisionsnoon%29.pdf.

(2) Defendants' unfair and deceptive practice and unfair method of competition of preferring expensive, brand-name drugs with the highest rebates over drugs that may be safer, more effective, or cheaper to health plans or consumers, particularly when the PBM Defendants represent that Defendants do the opposite, *id*., Section III, VII.A; (3) the PBM Defendants steering consumers to their affiliated pharmacies, particularly with respect to specialty medications, *id*., Section VII.C; and (4) the PBM Defendants under-reimbursing independent pharmacies to fill prescriptions, *id*., Section VII.B.  These practices are not specific to any particular drug as evidenced by the multiple examples provided throughout the Complaint involving different drugs.  *See id*. ¶ 91 (various insulin products); ¶ 106 (apixaban); ¶ 111 (Ozempic and Wegovy); ¶ 117 (Humira); ¶ 122 (EpiPen); ¶ 143 (Spiriva Handihaler); ¶ 94 (Calquence and Imbruvica); ¶ 197 (Eliquis); ¶ 195 (bupropion and amlodipine).

## CONCLUSION

For the foregoing reasons, the State respectfully requests that this Court deny Defendants' motion.

Dated: October 17, 2025

**RESPECTFULLY SUBMITTED,**

**STATE OF RHODE ISLAND**
**PETER F. NERONHA**
**ATTORNEY GENERAL**

By Its Attorneys,

*/s/ Sarah W. Rice*
Sarah W. Rice
Assistant Attorney General
Dorothea R. Young
Jordan Broadbent
Special Assistant Attorneys General
150 South Main Street
Providence, RI 02903
Tel. (401) 274-4400
srice@riag.ri.gov

dyoung@riag.ri.gov
jbroadbent@riag.ri.gov

/s/ *Robert J. McConnell*
Robert J. McConnell
**MOTLEY RICE LLC**
40 Westminster St., 5th Floor
Providence, RI 02903
Tel. (401) 457-7700
Fax. (401) 457-7708
bmcconnell@motleyrice.com

/s/ *Elizabeth Paige Boggs*
Linda Singer
*Admitted Pro Hac Vice*
Elizabeth Paige Boggs
*Admitted Pro Hac Vice*
Devin X. Williams
*Admitted Pro Hac Vice*
**MOTLEY RICE LLC**
401 9th Street, NW, Suite 630
Washington, DC 20004
Tel. (202) 386-9626
Fax. (202) 386-9622
lsinger@motleyrice.com
pboggs@motleyrice.com
dwilliams@motleyrice.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 17, 2025, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties in this case by operation of the Court's CM/ECF system.  Parties may access this filing through the Court's system.

/s/ <i>Elizabeth Paige Boggs</i><br>
Elizabeth Paige Boggs