**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF RHODE ISLAND, by and through PETER F. NERONHA, ATTORNEY GENERAL, | |
| *Plaintiff,* | |
| v. | CASE NO.: 1:25-cv-00306-MRD-PAS |
| CAREMARKPCS HEALTH, L.L.C., ZINC HEALTH SERVICES, L.L.C., EXPRESS SCRIPTS, INC., ASCENT HEALTH SERVICES LLC, OPTUMRX, INC., and EMISAR PHARMA SERVICES LLC, | |
| *Defendants.* | |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION PURSUANT TO RULE 12(b)(1)
<u>AND FOR FAILURE TO STATE A CLAIM PURSUANT TO RULE 12(b)(6)</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...............................................................................................................1

ARGUMENT ....................................................................................................................3

I.    The DTPA Safe Harbor Bars the State's Claims. ...............................................3

    A.    The DTPA Safe Harbor in Effect Prior to July 9, 2021 Bars the State's Claims for Conduct Before that Date...........................................3

    B.    The DTPA Safe Harbor in Effect After July 9, 2021 Bars the State's Claims for Conduct Since that Date...........................................5

II.    The State Fails To Allege A "Vendor-Consumer" Relationship With Defendants. ...........................................................................................................8

III.    The State's DTPA Claims Against The PBM Defendants Are Time-Barred..................10

IV.    The State Fails to State a Claim for Deceptive Acts and Practices (Count I)...................14

    A.    The Complaint Fails to Allege Deceptive Statements. ...........................................14

    B.    The Complaint Fails to Allege Material Misstatements. ...................................16

V.    The State Fails to State a Claim for Unfair Acts and Practices (Count II). ......................20

    A.    The Complaint Fails to Allege a Violation of Public Policy. ...............................20

    B.    The Complaint Fails to Allege Immoral, Unethical, Oppressive, or Unscrupulous Conduct...........................................................................22

    C.    The Complaint Does Not Allege Substantial Injury to Consumers......................24

VI.    The State Fails to State a Claim for Unfair Method of Competition (Count III). ...............................................................................................................27

    A.    The 2022 UMC Statement Does Not Apply. ........................................................28

    B.    The Court Should Give "Due Consideration" to Federal Court Precedent Aligning UMC Claims with Antitrust Principles..................................30

    C.    The State Fails to State a UMC Claim Under the DTPA. ....................................32

VII.    The State Fails to State a Claim as to Most Medicines.....................................................36

CONCLUSION.................................................................................................................37

## <u>TABLE OF AUTHORITIES</u>

### CASES

*1-800 Contacts, Inc. v. FTC*,
   1 F.4th 102 (2d Cir. 2021) ...................................................................................31

*Am. States Inc. Co. v. LaFlam*,
   69 A.3d 831 (R.I. 2013) ....................................................................................12

*Ames v. Oceanside Welding & Towing Co.*,
   767 A.2d 677 (R.I. 2001) ..............................................................................21, 30

*Appleton v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
   145 F.4th 177 (1st Cir. 2025).................................................................................9

*Atl. Ref. Co. v. FTC*,
   381 U.S. 357 (1965)............................................................................................31

*Azurity Pharms, Inc. v. Edge Pharma, LLC*,
   45 F.4th 49 (1st Cir. 2022)..................................................................................14

*Barraford v. T & N Ltd.*,
   778 F.3d 258 (1st Cir. 2015)...............................................................................11

*Boudreau v. Automatic Temperature Controls*,
   212 A.3d 594 (R.I. 2019) ...................................................................................13

*Caldwell v. Cambra*,
   --- F. Supp. 3d ---, 2025 WL 2617906 (D. Mass. Sept. 10, 2025)........................32

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
   973 P.2d 527 (Cal. 1999) ...................................................................................31

*Chavers v. Fleet Bank (RI), N.A.*,
   844 A.2d 666 (R.I. 2004).....................................................................................7

*City of Miami v. Eli Lilly & Co.*,
   2022 WL 198028 (S.D. Fla. Jan. 21, 2022) ........................................................16

*Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*,
   996 F.3d 243 (4th Cir. 2021) ..............................................................................34

*Connecticut v. Sandoz, Inc.*,
   2025 WL 3043397 (D. Conn. Oct. 31, 2025) ................................................11, 12

*Dipto LLC v. Manheim Invs., Inc.*,
   2021 WL 5908994 (S.D. Cal. Dec. 14, 2021).......................................................9

*E.I. du Pont de Nemours & Co. v. FTC*,
  729 F.2d 128 (2d Cir. 1984)...................................................................29

*Edwards v. N. Am. Power & Gas, LLC*,
  120 F. Supp. 3d 132 (D. Conn. 2015)......................................................24

*Forsyth v. Humana, Inc.*,
  114 F.3d 1467 (9th Cir. 1997) ................................................................16

*FTC v. LendingClub Corp.*,
  2018 WL 11436309 (N.D. Cal. Oct. 3, 2018)..........................................27

*FTC v. Texaco, Inc.*,
  393 U.S. 223 (1968)................................................................................31

*Gearhart v. Express Scripts, Inc.*,
  422 F. Supp. 3d 1217 (E.D. Ky. 2019) .....................................................9

*Gent v. CUNA Mut. Ins. Soc'y*,
  611 F.3d 79 (1st Cir. 2010)......................................................................23

*Harris Cnty. v. Eli Lilly & Co.*,
  2020 WL 5803483 (S.D. Tex. Sept. 29, 2020) .........................................16

*Harris Cnty. v. Eli Lilly & Co.*,
  2022 WL 479943 (S.D. Tex. Feb. 16, 2022) ............................................16

*Hawai'i ex rel. Lopez v. CaremarkPCS Health, L.L.C.*,
  2024 WL 4625719 (D. Haw. Oct. 30, 2024) ..................................... *passim*

*In re Amitiza Antitrust Litig.*,
  2024 WL 4250224 (D. Mass. Aug. 21, 2024) ...........................................25

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
  2015 WL 3988488 (N.D. Ill. June 29, 2015)............................................31

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
  44 F.4th 959 (10th Cir. 2022) ...................................................................1

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
  336 F. Supp. 3d 1256 (D. Kan. 2018)......................................................14

*In re EpiPen Direct Purchaser Litig.*,
  No. 0:20-cv-00827-ECT-JFD (D. Minn.)..................................................37

*In re Insulin Pricing Litig.*,
  2025 WL 2573405 (D.N.J. Sept. 5, 2025) .......................................16, 19, 21, 24

*In re Insulin Pricing Litig.*,
   2025 WL 2573409 (D.N.J. Sept. 5, 2025) ...........................................................8, 19, 21, 24

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   582 F.3d 156 (1st Cir. 2009)..........................................................................................24

*In re Int'l Harvester Co.*,
   104 F.T.C. 949 (1984).....................................................................................................26

*In the Matter of Grubhub, Inc.*,
   No. 2023157 (Dec. 17, 2024)..........................................................................................29

*Kelley v. Cowesett Hills Assocs.*,
   768 A.2d 425 (R.I. 2001) .......................................................................................8, 9, 10

*LabMD, Inc. v. FTC*,
   894 F.3d 1221 (11th Cir. 2018) ......................................................................................22

*LaBonte v. New England Dev. R.I.*,
   93 A.3d 537 (R.I. 2014) ..................................................................................................22

*Laccinole v. Appriss, Inc.*,
   453 F. Supp. 3d 499 (D.R.I. 2020)...............................................................................8, 10

*Laccinole v. Navient Sols., LLC*,
   589 F. Supp. 3d 261 (D.R.I. 2022)....................................................................................8

*Laccinole v. Students for Life Action Inc.*,
   2022 WL 3099211 (D.R.I. Aug. 4, 2022)..........................................................................8

*Lacey v. Maricopa Cnty*,
   693 F.3d 896 (9th Cir. 2012) ..........................................................................................16

*Leslie v. Quest Diagnostics, Inc.*,
   2018 WL 1535235 (D.N.J. Mar. 29, 2018).......................................................................25

*Long v. Dell, Inc.*,
   984 A.2d 1074 (R.I. 2009) ................................................................................10, 17, 25

*Lynch v. Conley*,
   853 A.2d 1212 (R.I. 2004) ................................................................................................3

*Matter of Cliffdale Assocs., Inc.*,
   103 F.T.C. 110, 1984 WL 565319 (1984) .......................................................................18

*Matter of Mass. Bd. of Registration in Optometry*,
   110 FTC 549, 1988 WL 1025476 (1988) ........................................................................21

*McKenna v. Curtin*,
    2016 WL 7015699 (D.R.I. Dec. 1, 2016) ............................................................32

*Mendes v. Factor*,
    41 A.3d 994 (R.I. 2012) ......................................................................................14

*MSP Recovery Claims, Series, LLC v. Sanofi-Aventis U.S. LLC*,
    2020 WL 831578 (D.N.J. Feb. 20, 2022) ............................................................8

*O'Reilly v. Town of Glocester*,
    621 A.2d 697 (R.I. 1993) ....................................................................................4

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) ..........................................................................................31

*Park v. Ford Motor Co.*,
    844 A.2d 687 (R.I. 2004) ..................................................................................10

*Polanco v. Lombardi*,
    231 A.3d 139 (R.I. 2020) ..................................................................................12

*Pres. at Boulder Hills, LLC v. Kenyon*,
    312 A.3d 475 (R.I. 2024) ..................................................................................13

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
    421 F.3d 1 (1st Cir. 2005) ..................................................................................21

*Rex v. Wardroper*,
    4 Burr. 1963 (1766) ..........................................................................................12

*Rodrigues v. State*,
    985 A.2d 311 (R.I. 2009) ....................................................................................4

*Ryan v. Roman Cath. Bishop of Providence*,
    941 A.2d 174 (R.I. 2008) ..................................................................................13

*Schuster v. Wynn Ma, LLC*,
    118 F.4th 30 (1st Cir. 2024) ..............................................................................22

*SEC v. Tambone*,
    597 F.3d 436 (1st Cir. 2010) ..............................................................................35

*State v. Briggs*,
    58 A.3d 164 (R.I. 2013) ......................................................................................4

*State v. Lead Ind. Assn., Inc.*,
    2001 WL 345830 (R.I. Super. Apr. 2, 2001) ..........................................4, 11, 12

v

*Tomasella v. Nestle USA, Inc.*,
    962 F.3d 60 (1st Cir. 2020)................................................................................22

*Zanni v. Town of Johnston*,
    224 A.3d 461 (R.I. 2020)...............................................................................4, 5

## OTHER AUTHORITIES

32 C.F.R. § 199.17................................................................................................6

48 C.F.R. § 1602.170-16.......................................................................................6

15 U.S.C. § 45(n)...............................................................................................25

38 U.S.C. § 1320..................................................................................................6

42 U.S.C. § 1395..................................................................................................5

42 U.S.C. § 1396..................................................................................................5

Fed. R. Civ. P. 12...............................................................................................37

Fed. R. Evid. 201...............................................................................................23

Ala. Code § 8-19-6............................................................................................25

Alaska Stat. § 45.50.545....................................................................................25

MD Code Ann., Com. Law § 13-105..................................................................25

R.I. Gen. Laws § 6-13.1-2....................................................................................9

R.I. Gen. Laws § 6-13.1-3.............................................................................25, 30

R.I. Gen. Laws § 6-13.1-4....................................................................................5

R.I. Gen. Laws § 6-13.1-5.2.................................................................................9

R.I. Gen. Laws § 6-36-12...................................................................................12

R.I. Gen. Laws § 27-18-33.2................................................................................7

R.I. Gen. Laws § 27-19-26.2................................................................................7

R.I. Gen. Laws § 27-20-23.2................................................................................7

R.I. Gen. Laws § 27-20.1-15.1.............................................................................7

R.I. Gen. Laws § 27-41-38.2................................................................................7

R.I. Pub. Laws ch. 206 (2021) ..................................................................................4

R.I. Pub. Laws ch. 329 (2021) ..................................................................................4

R.I. Pub. Laws ch. 363 § 2 (2004) ..........................................................................33

Federal Trade Commission Act ..............................................................3, 7, 29, 30, 31

Rhode Island Constitution.........................................................................................4

Rhode Island Deceptive Trade Practices Act...................................................... *passim*

Dept. of Health & Hum. Servs., May 27, 2025,
　　https://www.medicaid.gov/medicaid/spa/downloads/RI-25-0004.pdf ......................6

Dissenting Statement of Comm'r Christine S. Wilson, Commission File No. P.221202,
　　https://tinyurl.com/3h3whf72 (Nov. 10, 2022)................................................29, 30

Federal Trade Commission, *Policy Statement of the Federal Trade Commission on
　　Rebates and Fees in Exchange for Excluding Lower-Cost Drug Products* (June 16,
　　2022), https://tinyurl.com/3spxhpy9..............................................................20

Federal Trade Commission, *Policy Statement Regarding the Scope of Unfair Methods of
　　Competition Under Section 5 of the Federal Trade Commission Act* (Nov. 10, 2022),
　　https://www.ftc.gov/system/filesiftc_gov/pdf/P221202Section5Po1icyStatement.pdf...........27

Federal Trade Commission, *Statement of Enforcement Principles Regarding "Unfair
　　Methods of Competition"* (Aug. 13, 2015), https://tinyurl.com/yc5kz8sf..............................29

State of Rhode Island, Exec. Off. of Health & Hum. Servs., *Public Notice of Proposed
　　Amendment to the Rhode Island Medicaid State Plan*, Jan. 24, 2025,
　　https://eohhs.ri.gov/sites/g/files/xkgbur226/files/2025-
　　01/Pharmacy%20VBP%20SRA%20Public%20Notice%20-%20post.pdf..............................6

## INTRODUCTION

In its Opposition, the State retreats from the core of its Complaint. After alleging that rebates are "coercive, exploitative, and restrictive" "kickbacks" (Compl. ¶ 179–80), the State now admits that the "use of" rebates and formularies by PBMs is proper (Opp. 26) and not "inherently unlawful" (Opp. 29). The State does not dispute that it hires PBMs and *requires* its PBM to negotiate rebates to reduce the State's net costs and pass through the money obtained as rebates. The State also does not dispute that it is not alone in requiring this PBM activity, as numerous federal laws require PBMs to do the same for other clients. The State even admits that the same market forces that led the Tenth Circuit to find that an "exclusive rebate agreement *lowered* prices in the epinephrine auto-injector market" apply here. Opp. 30 (citing *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 987, 990 (10th Cir. 2022)). And the State similarly concedes that PBMs create and manage pharmacy networks as part of the same "standard industry practices" in which they negotiate rebates for their clients. *Id.* at 26.

Yet the State's claims in this case still turn on the idea that these well-established, competition-promoting practices that are so beneficial to PBM clients that state and federal governments often *mandate* them, are somehow also "deceptive" and "unfair." That cannot be. For multiple reasons, none of the arguments in the State's Opposition overcomes its failure to state a claim against Defendants in this litigation.

At the threshold, the State's admitted participation in the challenged conduct, along with the many state and federal laws that require it, foreclose any Rhode Island Deceptive Trade Practices Act ("DTPA") claim. The DTPA's safe harbor implements the common-sense proposition that a DTPA claim cannot be brought about a business practice the state or federal government has authorized or subjected to a more specific regulatory regime. A complex set of laws and regulations governs the pharmaceutical industry. To the extent the State wishes those

laws were different, its remedy rests in the legislative and political processes. It cannot unilaterally shoehorn new policy into a consumer protection statute. The State claims that a July 2021 amendment to the DTPA's safe harbor changed that basic proposition, but the July 2021 amendment cannot apply retroactively to salvage the vast majority of the State's claims. Even if it could, the safe harbor still applies under that amendment.

The State also fails to plead that the conduct it complains of implicates a "vendor-consumer" relationship as required by the Rhode Island Supreme Court for DTPA claims. The State's opposition instead demonstrates that it continues to complain of business-to-business transactions between PBMs and health plans or between PBMs and pharmacies. The State contends it is exempt from the vendor-consumer relationship requirement solely because it is a State, but it identifies no legal basis for such a proposition.

In addition, the State's admitted participation in the conduct it sues about forecloses its claims on statute-of-limitations grounds. The State asks that the Court disregard the already-generous 10-year statute of limitations that applies to its claim, but it relies on *ipse dixit* and misinterpretation of Rhode Island law to suggest that the State can resurrect otherwise untimely claims identical to those that individuals and businesses in Rhode Island could have brought themselves.

The State also continues its retreat from its allegations in arguments about its particular theories of liability:

- As to the State's "deception" theory (Count I), it offers no defense of nearly all the supposed misrepresentations the State alleged and Defendants argued were legally insufficient. Instead, the State focuses on just three vague statements—from the very end of the time period the State sues about—that are exactly the sort of vague claims about cost savings that the State's own authorities admit are neither actionable nor material.

- The State's "unfairness" theory (Count II) boils down to a claim that State-authorized rebate and formulary conduct led to higher prices, but that is not an unfairness theory as a matter of law.

- And as for its final claim (Count III), the State runs from its allegations about Defendants' pharmacy-network practices. The State based that claim entirely on an alleged violation of a policy statement the FTC issued in 2022 regarding the FTC Act, but it hardly responds to Defendants' arguments that this vague and controversial policy is wrong under federal law, and the State offers no basis for expanding that error to the DTPA. Instead, the State pretends it never pleaded a claim for violation of the FTC's policy statement and argues a distinct "unfairness" theory it did not originally allege. Even under the analysis that would have applied had the State made such allegations, the State falls short.

Finally, even if any part of the Complaint survives, the State offers no meaningful justification for its effort to open the doors of discovery to every medication that exists while making specific allegations about only a few. The State's attempt to sue based on unidentified drugs constitutes nothing more than a fishing expedition, and this Court should reject it.

## ARGUMENT

I. **The DTPA Safe Harbor Bars the State's Claims.**

A. **The DTPA Safe Harbor in Effect Prior to July 9, 2021 Bars the State's Claims for Conduct Before that Date.**

The State does not even try to defend its DTPA claim under the burden-shifting framework applicable to the DTPA's safe harbor before the July 9, 2021 amendment. Opp. 5–9.[1] Nor could it. The state and federal government meticulously monitor and regulate Defendants' rebate negotiations through laws, contracts, and audits. Mot. 7–12. Instead, the State contends, in

---

[1] Under that framework, Defendants need only demonstrate that the complained of activities "are subject to monitoring or regulation by a state or federal government agency," before the burden shifts to the State to establish that "the specific acts at issue are not covered by the exemption." *Lynch v. Conley*, 853 A.2d 1212, 1214 (R.I. 2004). Defendants identified myriad ways in which the State itself and the federal government did far more than subject Defendants "to monitoring or regulation" with respect to the rebate, formulary, and pharmacy-network matters the State sues about. *See* Mot. 7–13. The State makes no attempt to rebut those points under *Lynch*.

contravention of longstanding, settled Rhode Island case law, that the 2021 amendment retroactively transformed Defendants' previously exempt conduct into unlawful conduct under the DTPA. *See* Opp. 6.

"[The Rhode Island Supreme Court] consistently has held that statutes and their amendments are applied prospectively, absent clear, strong language, or by necessary implication that the Legislature intended a statute to have retroactive application." *State v. Briggs*, 58 A.3d 164, 169 (R.I. 2013) (quoting *Rodrigues v. State*, 985 A.2d 311, 318 (R.I. 2009) (cleaned up)). The State identifies no such language. And there is none. To the contrary, the 2021 amendment says that it "shall take effect upon passage," P.L. 2021, ch. 206, § 1; P.L. 2021, ch. 329, § 1[2]— language the Rhode Island Supreme Court has held "indicates an intent toward prospective application only," *Briggs*, 58 A.3d at 169; *see State v. Lead Ind. Assn., Inc.*, 2001 WL 345830, at *10 (R.I. Super. Apr. 2, 2001) (State argued similarly that a 1970 amendment to the DTPA should be applied retroactively and the Court disagreed).

That straightforward interpretation is also consistent with the Rhode Island Constitution. If a statute "creates, defines, or regulates substantive legal rights, it must be construed to operate prospectively." *Zanni v. Town of Johnston*, 224 A.3d 461, 466–467 (R.I. 2020). Retroactively holding Defendants liable for conduct that was permitted at the time it occurred would violate due process because it unfairly prejudices "the reliance interest of the parties on the preexisting law." *O'Reilly v. Town of Glocester*, 621 A.2d 697, 706 (R.I. 1993). Though the State claims, in a footnote, that the retroactive effect it seeks is simply "procedural" (Opp. 5 n.3), it refutes itself (Opp. 6) by arguing that this "procedural" amendment broadened the universe of activities subject

---

[2]    *See* R.I. Pub. Laws ch. 206 (2021) (S 684 Sub. A), https://webserver.rilegislature.gov/PublicLaws/law21/law21206.htm; R.I. Pub. Laws ch. 329 (2021) (H 6142 Sub. A), https://webserver.rilegislature.gov/PublicLaws/law21/law21329.htm.

to DTPA liability.  *See Zanni*, 224 A.3d at 466 (amendments "may be construed to apply retroactively" when they "neither enlarge[] or impair[] substantive rights but prescribe[] the methods for enforcing such rights").  The 2021 amendment, therefore, does not apply to pre-amendment conduct.  Claims based on conduct occurring before July 9, 2021 are subject to the burden-shifting test that applied before the amendment passed.  Because the State cannot—indeed, has not even tried to—prevail under that test, all conduct that took place before July 9, 2021 is protected by safe harbor and must be excluded from the State's claims.

> **B.      The DTPA Safe Harbor in Effect After July 9, 2021 Bars the State's Claims for Conduct Since that Date.**

Even under the 2021 amendment, the State's claim is barred by the DTPA's safe harbor.  At the threshold, the State argues that the amendment created a "presumption" that the safe harbor does not apply.  Opp. 6.  But the State cites no authority to support that novel position.  And the text of the amendment forecloses it.  By its terms, the 2021 amendment applies if (1) "business activities are subject to regulation by a state or federal agency" and (2) the activity "is in compliance with orders . . . or rules of, or a statute administered by, a federal or state government agency."  R.I. Gen. Laws § 6-13.1-4(b).  Defendants meet both criteria.

*Business activities subject to regulation by a State or Federal agency.*  The State *concedes* PBM's business activities, including their use of "certain tools like drug rebates, formularies, and pharmacy networks," are subject to regulation by federal agencies.  Opp. 7.  That includes the core practices at issue.  The State does not dispute, for instance, that the allegedly inflated manufacturer list prices that form the cornerstone of its allegations, *e.g.*, Compl. ¶ 128, are calculated pursuant to federal law requiring that those prices *not* take rebates that reduce the net cost of drugs into account, Mot. 7 (citing 42 U.S.C. §§ 1395w-3a(c)(6)(B), 1396r-8(a)(1), 1396r-8(k)(1)(B)(i)(IV)).  Nor does the State dispute that Congress *envisions* that PBMs will negotiate rebates with

manufacturers for certain health plans. *Id.* (citing 38 U.S.C. § 1320b-23(b)(2)). The State never disputes that Rhode Island ***itself*** mandates that its PBM negotiate rebates and pass them to the State. *Id.* at 7–8 (citing State of Rhode Island, Exec. Off. of Health & Hum. Servs., *Public Notice of Proposed Amendment to the Rhode Island Medicaid State Plan*, Jan. 24, 2025, https://eohhs.ri.gov/sites/g/files/xkgbur226/files/2025-01/Pharmacy%20VBP%20SRA%20Public%20Notice%20-%20post.pdf; Dept. of Health & Hum. Servs., May 27, 2025, https://www.medicaid.gov/medicaid/spa/downloads/RI-25-0004.pdf.).

And the State also does not dispute that the FEHBA and TRICARE programs also require PBMs to negotiate rebates for those health plans. Opp. 6–7. The State's only response is that the control that federal agencies exercise over those FEHBA and TRICARE programs is "irrelevant" because "[c]ontractual obligations with a government agency are insufficient to invoke the safe harbor." Opp. 7. That approach would elevate form over substance for government authorization via regulation to exempt conduct that government authorization via contract does not. The FEHBA and TRICARE contracts at issue here provide highly detailed, binding requirements that PBMs must follow. *See* Mot. 9–12. And, critically, those contractual obligations are a result of the federal government's implementation of the Federal Employee Health Benefits Acquisition Regulation, 48 C.F.R. § 1602.170-16, and the Department of Defense's TRICARE regulations, 32 C.F.R. § 199.17. That the government chose to establish requirements on PBMs through contract rather than a separate notice-and-comment regulation does not make them any less "relevant" to the safe harbor.

Regarding pharmacy networks, the State similarly does not dispute that Rhode Island law extensively regulates the "business relationship between pharmacy services providers/group health insurers/health services organizations" and PBMs. State of Rhode Island General Assembly,

S 2467, January 2016, Section 27-18-33.2, at 8.  Rhode Island statutes impose obligations related to pricing information, inclusion of products, and mandates an investigation and appeals process over which "[t]he department of health shall exercise oversight and enforcement."  R.I. Gen. Laws §§ 27-18-33.2(d)(6), 27-19-26.2(d)(6), 27-20-23.2(d)(6), 27-20.1-15.1(d)(6), 27-41-38.2(d)(6).

*Activity in compliance with government orders or rules, or a government-administered statute.*  The State agrees that the regulations at issue authorize Defendants' conduct—*i.e.*, negotiating rebates, passing them through at least in part, using formularies, and constructing pharmacy networks.  But, the State claims, the regulations at issue do not authorize Defendants to do those things "unfairly" (Opp. 9), "deceptively," (Opp. 7–9), or in ways that are "to the detriment of consumers and health plans" (Opp. 7).

That argument proves too much.  If the State were correct, the DTPA safe harbor would never apply.  A DTPA claim, by definition, alleges that a defendant engaged in an otherwise permissible business practice in a way that was deceptive or unfair.  The DTPA safe harbor exempts such allegations from liability where the presence of state and federal regulation provides a more appropriate remedy and oversight for allegations of deceptive and unfair conduct in connection with the regulated practices.  *See Chavers v. Fleet Bank (RI), N.A.*, 844 A.2d 666, 674 (R.I. 2004) ("Because the [agency] has the power to monitor [defendant]'s credit-card solicitations to ensure compliance with [the Federal Trade Commission Act], [defendant] is not subject to liability under the DTPA" even where plaintiff alleged the solicitations were "deceptive and misleading").  Notwithstanding the State's arguments to the contrary, the DTPA safe harbor bars its claims.

## II.     The State Fails To Allege A "Vendor-Consumer" Relationship With Defendants.

The State does not dispute that it has failed to allege the existence of a "vendor-consumer" relationship between Defendants and either the State itself or the health plans and pharmacies on whose behalf it purports to sue.  *See* Opp. 9–13.[3]  That gap is fatal to the State's DTPA claim.

As Defendants explained in their opening brief, the Rhode Island Supreme Court held in 2001 that the plaintiff in a DTPA case must "establish that he or she is a consumer."  *Kelley v. Cowesett Hills Assocs.*, 768 A.2d 425, 431 (R.I. 2001).  After *Kelley*, in other words, "the parties must have a 'vendor-consumer' relationship" for any DTPA claim to be brought.  *Laccinole v. Students for Life Action Inc.*, 2022 WL 3099211, at *4 (D.R.I. Aug. 4, 2022); *accord Laccinole v. Navient Sols., LLC*, 589 F. Supp. 3d 261, 269 (D.R.I. 2022); *Laccinole v. Appriss, Inc.*, 453 F. Supp. 3d 499, 506 (D.R.I. 2020).  That rule applies here.  Indeed, since Defendants filed their motion, the court overseeing the MDL concerning materially indistinguishable insulin-rebates cases dismissed a New York consumer-protection claim based on that state's version of the vendor-consumer limitation.  *See In re Insulin Pricing Litig.*, 2025 WL 2573409, at *9 (D.N.J. Sept. 5, 2025).

The State's principal response is that it is exempt from alleging a vendor-consumer relationship.  But the State cites no legal authority to support its position.  Instead, the State relies on the lack of an explicit vendor-consumer requirement in the statutory provision that gives the

---

[3] The State's only argument is that health plan cases Defendants cited did not find that "the laws were inapplicable to the underlying transactions" because "[a]ll but one" were decided on standing grounds.  Opp. 10–11 & n.7.  The point of those cases—which the State never disputes—is that transactions between health plans and PBMs are not the kinds of "consumer" transactions that give rise to consumer-protection claims.  Mot. 15.  That is true in states that apply a consumer-related standing limitation as well as those Defendants cited that place such transactions outside the scope of the consumer-protection statute entirely.  *See MSP Recovery Claims, Series, LLC v. Sanofi-Aventis U.S. LLC*, 2020 WL 831578, at *11 (D.N.J. Feb. 20, 2022).

Attorney General standing to bring DTPA claims.  Opp. 9–10 (citing R.I. Gen. Laws § 6-13.1-5). But the parallel statutory provision that authorizes private actions under the DTPA does not mention *Kelley*'s vendor-consumer requirement, either.  *See* R.I. Gen. Laws § 6-13.1-5.2.  That is because—as in other states—the vendor-consumer requirement is not a standing doctrine, but a limitation on the kinds of transactions that can give rise to a DTPA claim.  *Kelley*, 768 A.2d at 431 ("The role of the respective parties in this case cannot reasonably be construed to establish a consumer/vendor relationship *necessary to invoke the Act*." (emphasis added)); *see also, e.g.*, *Gearhart v. Express Scripts, Inc.*, 422 F. Supp. 3d 1217, 1224 (E.D. Ky. 2019) (requiring vendor-consumer relationship under Kentucky law which, as here, does not explicitly state the requirement); *Dipto LLC v. Manheim Invs., Inc.*, 2021 WL 5908994, at *15 (S.D. Cal. Dec. 14, 2021) (dismissing claim where "there was no transaction between [plaintiff] and the Defendants" because "[e]ven if [plaintiff] is a third-party beneficiary . . ., he is still not a 'consumer'" under the consumer protection statute).  Here, neither the literal "parties" to this case (the State and the Defendants) nor the "parties" to the transactions at issue (health plans or pharmacies and the Defendants) have the required vendor-consumer relationship.

The State's remaining arguments (Opp. 12–13) apply equally to claims brought by private plaintiffs.  They are, therefore, simply veiled requests for the Court to reject the Rhode Island Supreme Court's decision in *Kelley*.  But a state Supreme Court has "the final authority" on a matter of state law, and "its decisions bind both lower state courts and federal courts sitting in diversity." *Appleton v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 145 F.4th 177, 184 (1st Cir. 2025). The State relies on the definition of "trade" and "commerce" in Section 6-13.1-1(5) (Opp. 12), but those terms appear in parts of the DTPA that narrow the kinds of transactions that can be subject to DTPA liability in ***any*** suit—whether by the Attorney General or a private party.  *See* R.I. Gen.

Laws § 6-13.1-2.  And those definitions, this Court has observed, do not change the basic rule that: "To invoke the protection of the DTPA, 'a plaintiff <u>must</u> establish that he or she is a consumer.'" *Appriss*, 453 F. Supp. 3d at 506 (quoting *Kelley*, 768 A.2d at 431).  Whether "privity of contract" between plaintiff and defendant is required for a DTPA claim (Opp. 12–13) is also irrelevant to the *Kelley* requirement, which is not a standing rule but a substantive narrowing of the types of transactions that are actionable under the DTPA.  *See supra* pp. 8–10.  And the general purpose of the DTPA (Opp. 12–13 (citing *Park v. Ford Motor Co.* 844. A.2d 687, 692 (R.I. 2004); *Long v. Dell, Inc.*, 984 A.2d 1074, 1081 (R.I. 2009))), cannot overturn the Rhode Island Supreme Court's interpretation of the DTPA's scope in *Kelley*.  The State's failure to allege a vendor-consumer relationship dooms its claims.

## III.    The State's DTPA Claims Against The PBM Defendants Are Time-Barred.

The State argues that it also is exempt from the 10-year statute of limitations applicable to DTPA claims.  Opp. 13.  That is wrong for many reasons.

First, the State's strained interpretation of the DTPA's language is wholly unsupported. Ignoring the provisions of Rhode Island law that govern statutes of limitations, the State instead relies on the provision of the DTPA that authorizes the Attorney General to bring suit "*[w]henever* the attorney general has reason to believe that any person is using, has used, or is about to use any method, act or practice declared to be unlawful by [the DTPA]."  Opp. 13.  The State's apparent theory is that the word "whenever," exempts the Attorney General from any statute of limitations that may otherwise apply to this claim.  *Id.*  The State cites no authority for this view.  And the State's view is inconsistent with basic canons of statutory construction.  When the legislature intends to abolish a limitations period, it does so explicitly in clear language.  That is because statutes of limitations are significant provisions that have a meaningful effect on parties' substantive rights.  If the legislature meant to abolish the statute of limitations for all DTPA actions

brought by the State, it would have done so in clear, unambiguous terms, not through a single word at the beginning of a sentence talking about an entirely different issue (the Attorney General's standing to sue). *See Barraford v. T & N Ltd.*, 778 F.3d 258, 266–67 (1st Cir. 2015) (affirming dismissal on statute of limitations grounds and rejecting the plaintiff's reading "into the mere authorization to bring suit" an "ability to postpone indefinitely" because "ones does not normally hide elephants in mouseholes").

Second, the State cannot invoke *nullum tempus* for claims brought in its *parens patriae* capacity. *See* Mot. 15–16; *Lead Ind. Assn.*, 2001 WL 345830, at *12 (where conduct is "alleged to affect consumers, the general public or residents of the State," the State "is not making a claim in its governmental capacity to preserve a public right" and "may not invoke the nullum tempus doctrine"). While the State correctly observes that the *Lead Industries* court found *nullum tempus* unavailable "in common law tort claims for individual citizens" including about "fraudulent misrepresentations" (Opp. 14), the case spoke more broadly than that. In fact, the *Lead Industries* court analyzed the same 10-year statute of limitations under § 9-1-13, refused to apply *nullum tempus* to all the claims on behalf of residents of the State the defendant argued were time-barred, and stated a broad reason as to why:

> To the extent that these torts are alleged to affect consumers, the general public or residents of the State, they could have been filed by any private litigant against the defendants. Accordingly the State is not making a claim in its governmental capacity to preserve a public right.

*Id.* at *12. Just over one month ago, another court echoed this idea: "The *nullum tempus* doctrine, however, does not apply to the States' *parens patriae* claims" including under Rhode Island law "[b]ecause any *parens patriae* claims brought by the State are similar to those that could have been filed by private litigants." *Connecticut v. Sandoz, Inc.*, 2025 WL 3043397, at *56 (D. Conn.

Oct. 31, 2025) (citing R.I. Gen. Laws § 6-36-12)).  The State is suing for the same alleged harms and actions that private parties within the State could sue about.  Compl. ¶¶ 217–48.

The State argues that Defendants have misinterpreted *Lead Industries* as the case did not dismiss a DTPA claim.  Opp. 14.  But, as the State acknowledges, the only reason *Lead Industries* did not address the DTPA was because defendants did not "raise[]" the issue (Opp. 14), arguing instead that the State did not have standing to bring its DTPA claim in the first place.  *See Lead Ind. Ass'n*, 2001 WL 345830, at *9.  In any event, *Sandoz* applied the rule to a state-law antitrust claim and said nothing about limiting the rule to certain claims.  The State also cites an 1867 case relying on a 1766 English case preserving a claim "in favor of the Crown," *State v. Pawtuxet Tpk. Co.*, 8 R.I. 521, 524 (1867) (citing *Rex v. Wardroper*, 4 Burr. 1963 (1766)), but that 150-year-old case does not say anything relevant about *nullum tempus* in the context of *parens patriae* claims, and both *Lead Industries* and *Sandoz* addressed *Pawtuxet* in refusing to apply the doctrine.  The State is not exempt from the 10-year statute of limitations, and therefore its claims related to allegations prior to 2015 are time-barred.

Third, neither accrual rules nor tolling doctrines can salvage the State's time-barred claims.  The State asks the Court to toll the accrual of its claim until the date the State claims it discovered its injury.  Opp. 14.  But it is undisputed that "the applicable statute of limitations begins to run at the time of the injury," *Am. States Inc. Co. v. LaFlam*, 69 A.3d 831, 840 (R.I. 2013).  And the Rhode Island Supreme Court has "cautioned that tolling a statute of limitations based upon the discovery rule should occur only in certain narrowly defined factual situations," such as "medical malpractice actions, drug product liability actions, and improvements to real property."  *Polanco v. Lombardi*, 231 A.3d 139, 146–47 (R.I. 2020).  The State cites no statute or case law supporting that this is one of those limited cases.

Nor can the State pursue a fraudulent-concealment theory of tolling. For one, the State makes no viable allegations of any fraudulent misrepresentation. *See* Part IV, *infra*. Even if it had, the State cannot show that Defendants fraudulently concealed the existence of the State's causes of action because the State would have known of the injury long ago. *Ryan v. Roman Cath. Bishop of Providence*, 941 A.2d 174, 184 (R.I. 2008); *see also Boudreau v. Automatic Temperature Controls*, 212 A.3d 594, 602 (R.I. 2019) ("plaintiff cannot benefit from the tolling provisions" where the defendant "put plaintiff on notice" of the challenged conduct). The State highlights that the MDL court overseeing rebate-related claims about insulin found a constructive notice date for claims based on a Senate report. Opp. 14–15. But even if that decision were relevant to the State's claim of ***fraudulent*** concealment tolling, it did not address the situation presented here, where the State undisputedly ***participates*** in the rebate-negotiation practices it challenges (Mot. 7–8) and the Legislature itself regulated the pharmacy-network practices at issue (Mot. 11–12). As another court addressing a rebate-related claim brought by a state found, such circumstances mean the State "surely would have known" of its claims. *See, e.g.*, Mot. Ex. A, *California v. Eli Lilly & Co.*, No. 23STCV00719 (Cal. Super. Ct. June 18, 2024), at 4–5. Further, while the State cites the Senate Report in its Complaint (Compl. ¶ 41, n.15) it does not make any allegation that this was the first time it was put on notice of the alleged behavior it attributes to Defendants.

Finally, the continuing violation doctrine is likewise inapplicable. The Rhode Island Supreme Court has applied the continuing violation doctrine "only once, in the context of claims for conversion and unjust enrichment," *Boudreau* 212 A.3d at 602, and has repeatedly declined to adopt the doctrine in other contexts, *see, e.g.*, *Pres. at Boulder Hills, LLC v. Kenyon*, 312 A.3d 475, 485 (R.I. 2024) (declining to apply the doctrine for a case "premised on a continuing pattern

of conduct"); *Mendes v. Factor*, 41 A.3d 994, 1005 (R.I. 2012) ([T]his Court has not adopted the continuing course of conduct doctrine, and we decline to do so in the context of this case."). The State cites no authority that would justify the unprecedented extension of the continuing violation doctrine to this case.[4]

## IV.    The State Fails to State a Claim for Deceptive Acts and Practices (Count I).

The State's opposition narrows the deceptive-acts claim it brought in Count I. The State does not dispute that this claim relates solely to its "theory of improper rebating and formulary practices" and has nothing to do with "any pharmacy-practice allegations." Mot. 18. The State focuses on just three alleged statements, making general claims that PBMs save money for the health plans that hire them, casting aside any argument on the other allegedly deceptive statements it claimed the PBMs made. *See* Opp. 17; Compl. ¶¶ 69–73. But even as to the three statements the State focuses on, the State fails to show that those statements are anything but non-actionable statements of opinion, which, in any event, the State cannot allege were material.

### A.    The Complaint Fails to Allege Deceptive Statements.

The State concedes that it cannot base its deceptive-acts claim on statements making "general claim[s] of superiority . . . so vague and indeterminate that [they] will be understood as a mere expression of opinion." Opp. 16 (quoting *Azurity Pharms, Inc., v. Edge Pharma, LLC*, 45 F.4th 479, 503 (1st Cir. 2022). The State admits that this rule forecloses claims based on opinions about a product's price, *see* Opp. 16 ("amazing prices"), or quality, *see id*. (whether other products were "not ideal for use in the hospital setting"). And the State does not dispute Defendants' cited case law applying these principles to foreclose deceptive-acts claims based on "general statements

---

[4] The State cites an irrelevant decision arising under federal antitrust law, which, unlike Rhode Island law, has at times recognized a continuing-violation doctrine. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1299 (D. Kan. 2018).

about big-picture concepts such as trust, security, reputation, and safety," or "[r]epresentations that a business could offer money savings."  Mot. 20.

In light of those concessions, the State does not defend allegations concerning statements that PBMs promote health outcomes (Compl. ¶ 73(d)), improve access to care (¶ 69(c)), meet consumers' needs (¶¶ 69(3), 69(f), 70(f)), or promote effective medicines (¶ 73(3)).  The State did not even attempt to rebut Defendants' arguments as to the vast majority of the statements identified in the Complaint.  Mot. 19–20.  Nor does the State identify a single alleged misrepresentation attributable to the GPO Defendants.  The State has thus abandoned its claims in Count I as to the GPO Defendants entirely.

Instead, the State defends its deceptive-acts theory based solely on three alleged representations—one each for CVS, OptumRx, and Express Scripts.  *See* Opp. 17 (citing Compl. ¶¶ 69(a), 70(a), and 73(a)).  Those alleged representations are all recent—from 2021 (CVS), 2023 (OptumRx), and 2024 (Express Scripts).  Compl. ¶¶ 69(a) n.31, 70(a) n.38, and 73(a) n.47.  As a result, the State cannot pursue Count I for the time period from 2012, *id.* ¶ 223, through the date of each PBM's alleged representation, or against any GPO Defendant at all.  The Court should, at a minimum, dismiss in part as to those periods of time and as to the GPO Defendants entirely.

Even for the time periods after they were made, the representations the State identifies are non-actionable opinion claims about a product and its price.  *See* Opp. 17 ("PBMs . . . secure [] drug[s] at a lower cost for their plan sponsors" and "achieve lower prescription drug costs for clients").  They are just as vague and indeterminate as the "amazing prices" statement the State concedes is non-actionable puffery.  Opp. 16.  And the State offers no response to Defendants' argument that representations about "controlling costs" or that "employers and employees can save

money" are not actionable.  Mot. 20 (quoting *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1481 (9th Cir. 1997), *overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012).

The State relies instead on misdirection, citing two unpublished, out-of-circuit district court decisions involving different laws and different allegations.  First, *Harris Cnty. v. Eli Lilly & Co.*, 2020 WL 5803483, at *5 (S.D. Tex. Sept. 29, 2020) found adequate allegations of deceptive acts under Texas law where plaintiff had viewed allegedly fraudulent list prices by pharmaceutical manufacturers and received direct solicitations from a PBM, neither of which the State alleges here.  Second, *City of Miami v. Eli Lilly & Co.*, 2022 WL 198028, at *8 (S.D. Fla. Jan. 21, 2022) found adequate allegations of deceptive acts under Florida law without grappling with each alleged representation because defendants did "not explain in what ways the statements that the City identified [were] puffery."[5]  Again, that is not the case here.  The recent decision in the MDL addressing insulin rebates does not support the State's position, either.  That decision allowed a claim to proceed because of what it found were "objective and verifiable misrepresentations" involving specific figures and quotes not present in the representations the State sues about.  *In re Insulin Pricing Litig.*, 2025 WL 2573405, at *9 (D.N.J. Sept. 5, 2025).  The statements that the State challenges contain no such representations.

### B.    The Complaint Fails to Allege Material Misstatements.

Even if the three statements on which the State bases its claim constituted a deceptive act (they do not), they are not material.  The State agrees it must allege that the particular "deceptive acts and practices" it sues about are material.  Opp. 18.  And it admits this requires allegations that

---

[5] The State did not try to explain how any allegations in the Complaint compare to those in either *City of Miami* or *Harris County*.  Opp. 17–18.  In any event, those cases were wrongly decided and ultimately dismissed.  *See Harris Cnty. v. Eli Lilly & Co.*, 2022 WL 479943, at *1 (S.D. Tex. Feb. 16, 2022) (backing away from many rulings in the 2020 decision); Order of Dismissal, *City of Miami*, No. 21-cv-22636 (S.D. Fla. May 16, 2022), ECF No. 126.

the representation is "likely to affect" a consumer's "choice of, or conduct regarding, a product." *Id*. Yet, the State has identified no way in which those statements could "mislead *consumers* acting reasonably." *Long,* 93 A.3d at 1003 (emphasis added).

The State does not dispute that it makes no allegation "that any consumer's decision about whether to purchase a pharmaceutical product plausibly could be affected by the PBMs' statements about the complex pharmacy benefit management services they provide to their clients." Mot. 21–22. To the contrary, the State concedes repeatedly that individual "consumers do not directly purchase services"—neither medications nor PBM services—"from Defendants" at all. Opp. 19–20. There is no allegation that the specific cost-savings statements about which the State sues would be material to any patient.[6] The recent decision dismissing Hawaiʻi's similar case held that an even broader array of alleged statements about PBM services were not material because individual consumers do not purchase those services. *See Hawaiʻi ex rel. Lopez v. CaremarkPCS Health, L.L.C.*, 2024 WL 4625719, at *5–7 (D. Haw. Oct. 30, 2024). The State bizarrely says it was "misleading" for Defendants to cite *Hawaiʻi* because the State was allowed to try to amend its complaint (Opp. 20), but that is irrelevant. For one, contrary to the State's assertions, the definition of "consumer" is not at issue here. As the State concedes, the *Hawaiʻi* court "found that Hawaiʻi failed to plead factual allegations showing how the representations were material to consumers." Opp. 20. The State commits the same pleading error here. Further, the *Hawaiʻi* court did not say that amendment would fix this (or any other) issue. And the State fails to mention

---

[6] The State says that "Defendants' actions are funded by and targeted to increase the likelihood of securing that purchase/service." Opp. 19. Whatever this may mean, it does nothing to point to any allegation that the three cost-savings opinions the State sues about are "likely to affect" any patient's purchasing decision regarding any product.

that the viability of that amended complaint has not been adjudicated because the case is on appeal to the Ninth Circuit on other grounds.

Rather than plead materiality, the State asks the Court to exempt it. The State calls Defendants' statements about cost savings "presumptively material" (Opp. 18–19), relying on an FTC presumption. But the State identifies no Rhode Island authority applying the FTC's standard to the DTPA. Courts routinely refuse to apply the FTC presumption to state consumer-protection claims "[i]n the absence of case law from the [state's] Supreme Court addressing whether the FTC's presumption of materiality applies." *See, e.g.*, *Hawai'i*, 2024 WL 4625719, at *6.

Even if the FTC's presumption of materiality applied in Rhode Island, it would not cover the cost-savings opinions the State sues about. The FTC's standard still requires that the seller knew or should have known "that an *ordinary consumer* would need omitted information to *evaluate the product or service*." *Matter of Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 1984 WL 565319, at *49 (1984) (emphases added). The State fails to meet that standard here because, as discussed, it makes no such allegations about the cost-savings representations on which it relies. Nor does the State's invocation of the FTC's standard regarding "health, safety, or other areas with which the *reasonable consumer* would be concerned" (Opp. 18) offer it any help as the statements it sues about have nothing to do with safety or health and the State offers no allegation that an individual consumer would be concerned with general PBM cost-savings opinions.

The State makes other arguments that bear no relation to the cost-savings statements it sues about. It claims materiality is "obvious" because Defendants' representations are about "safety or efficacy of drugs." Opp. 18–19. But the State does not sue about any representation regarding safety, efficacy, or any particular medication at all. *See supra* pp. 14–16. It claims materiality could exist because "consumers may also be able to change PBMs by selecting a different health

plan from those offered by their employer or on the individual market with a different PBM." Opp. 19.  But the State makes no factual allegations supporting that contention or any connection between the cost-savings opinions it sues about and any likelihood that an individual consumer would change their health insurance based on a general statement like "rebates are a longstanding tool used by PBMs to negotiate with drug manufacturers to achieve lower prescription drugs costs for clients."  Compl. ¶ 73(a).  And its assertion that "consumers *may* have decided to pay cash for a generic drug rather than use their insurance," again fails to connect the cost-savings statements the State sues about (which relate to claims about costs saved for ***health plans***) to any hypothetical decision by a patient.  Nor does *In re Insulin Pricing* support the State's argument.  *See* Opp. 20. That decision applied Illinois law to find more specific alleged misrepresentations material because, the State alleged, the PBMs "intended Illinois diabetics to rely" on those statements "in purchasing insulin at an artificially inflated price, thinking they were actually receiving a discount."  2025 WL 2573405, at *10.  The State makes no argument to connect that patient concern to the general claims about PBM cost savings ***for health plans*** it sues about.

*     *     *

Lacking allegations that the statements on which it sues were material to individual consumers, the State changes gears and reframes its claim to focus on health plans.  *See* Opp. 20. But it cannot plead that those statements were material to health plans, either.  The State's theory of materiality as to health plans appears to be that health plans "pay increased costs for prescription drugs due to Defendants' deceptive practices."  Opp. 20.  That fact does nothing to show that a sophisticated health plan would have found the general statements the State sues about to be material when they have a broad range of tools at their disposal to assist them in evaluating the PBMs with which they contract.  And in any event, the State's focus on a representation about

19

lower or higher costs only underscores that the statements it sues about are nonactionable opinion statements, akin to the "amazing prices" statement the State concedes is not actionable (Opp. 16) or the "controlling costs" and "can save money" statements it does not dispute are not actionable (Mot. 20).

## V.    The State Fails to State a Claim for Unfair Acts and Practices (Count II).

As it did for Count I, the State also narrows the unfair-acts claim it brought in Count II. According to the State, Count II relates solely to Defendants' alleged rebate and formulary practices and thus has nothing to do with any pharmacy-network allegations. Compl. ¶¶ 228–34. Yet the State acknowledges, as it must, that the "use of" rebates and formularies is entirely proper and certainly not inherently unfair. Opp. 26; *see also id*. 29 ("[T]he State is not claiming that rebates are inherently unlawful."); Compl. ¶ 43 ("PBMs are then supposed to pass through [rebates] to their health benefit plan clients."). No longer challenging these practices as per se "unfair," the State shifts to a theory that the ways in which Defendants used rebates and formularies became "unfair" if they resulted in higher list prices for the affected medications. Opp. 23–27. The State cannot satisfy any of the three *Sperry* factors required to plead such a claim.[7]

### A.    The Complaint Fails to Allege a Violation of Public Policy.

The State concedes that the DTPA's public-policy factor requires, at a minimum, that the alleged unfair practice fall "within at least the penumbra of some common-law, statutory, or other

---

[7] Elsewhere in its brief, the State suggests (Opp. 33–34) that a "notice" from the FTC issued in 2022 "establishes" that aspects of Defendants' rebate and formulary conduct are unfair under Rhode Island law, without saying which of the *Sperry* factors, if any, the State contends the notice relates to. That notice—which itself "does not operate to bind the FTC"—simply suggests that "when dominant drug manufacturers or intermediaries stifle or foreclose competition from significantly less expensive generic and biosimilar alternatives," it "may violate" federal antitrust law. Federal Trade Commission, *Policy Statement of the Federal Trade Commission on Rebates and Fees in Exchange for Excluding Lower-Cost Drug Products* (June 16, 2022), at  2 n.3, 4–5, https://tinyurl.com/3spxhpy9. Those non-binding musings about antitrust law do nothing to meet the State's pleading burden.

established concept of unfairness." Opp. 22 (quoting *Ames v. Oceanside Welding & Towing Co.*, 767 A.2d 677, 681 (R.I. 2001)). And the State does not dispute that public-policy considerations may not be the primary basis for an unfairness determination. *See* Mot. 23. Regardless, the State's claim falls short of this requirement.

The State does not identify any statutory provision that even purports to apply to the rebate or formulary matters it challenges here. *See id.* at 24. Instead, it relies on a generalized public policy of controlling the cost of healthcare, pointing to a handful of laws that relate in some way to the cost of healthcare. Opp. 22–23. That is precisely the "generalized desire to make healthcare affordable" that Defendants argued is too broad and vague support a DTPA claim. *See* Mot. 23. *Hawaiʻi* rejected this same attempt to ground an unfairness claim in laws that did not relate to the rebate and formulary practices at issue in that case. *See Hawaiʻi*, 2024 WL 4625719, at *9 (requiring identification of a "specific public policy"). That accords with settled law in Rhode Island and elsewhere. *See Ames*, 767 A.2d at 681 (requiring a public policy be "established by statutes, the common law, or otherwise"); *see also Matter of Mass. Bd. of Registration in Optometry*, 110 FTC 549, 1988 WL 1025476, at *55 (1988) (requiring a public policy to be "clear and well-established," meaning "declared or embodied in formal sources such as statutes").[8]

Lacking any reasonable basis to invoke a specific public policy, the State argues the public policy is derived from the DTPA's prohibition on deceptive acts. Opp. 23. At the threshold, that theory cannot save the State's unfairness claim because the State did not plead it. *See Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 7 n.2 (1st Cir. 2005) (additional allegations

---

[8] The *In re Insulin Pricing* decision on this point has no bearing here. That decision rested on Illinois and Montana law to conclude that the alleged conduct fell within those states' respective public policy goals preventing a "public health crisis." 2025 WL 2573405, at *11. That court erred and the *Hawaiʻi* court got it right—such "conclusory," not "specific," articulations of supposed public policies are not enough to state a legal claim. *See* 2024 WL 4625719, at *9.

in memorandum in opposition to motion to dismiss were "not properly before" the court). Even setting that dispositive flaw aside, the State's deception-as-unfairness theory collapses as a matter of statutory interpretation. Nothing in the DTPA's text suggests that a plaintiff who pleads a deception claim has automatically pled an unfairness claim. And such a reading would violate the canon of statutory construction that "the Legislature is presumed to have intended each word or provision of a statute to express a significant meaning." *LaBonte v. New England Dev. R.I.*, 93 A.3d 537, 543 (R.I. 2014).

The State's deception theory fails for the reasons articulated in Part IV. But even if it did not, that theory of liability cannot be the basis for an independent claim of unfairness.

### B. The Complaint Fails to Allege Immoral, Unethical, Oppressive, or Unscrupulous Conduct.

The State does not respond to Defendants' argument that the second *Sperry* factor is "inherently vague and duplicative" of the public-policy and consumer-effect factors. Mot. 23; *see also LabMD, Inc. v. FTC*, 894 F.3d 1221, 1229 (11th Cir. 2018) (noting that the FTC "nix[ed] the third 1964 unfairness factor . . . because it was 'largely duplicative'" (citation omitted)). This Court should give this factor no weight in its unfairness analysis. Even if the factor applied, the State fails to plead that the challenged practices are "immoral, unethical, oppressive, or unscrupulous." *Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 79 (1st Cir. 2020).[9]

Practices the state and federal governments engage in and contract for cannot also be considered "immoral, unethical, oppressive, or unscrupulous" under the same state's law. *Cf.*

---

[9] Defendants referred in their opening brief to *Tomasella*, 962 F.3d at 82, and *Schuster v. Wynn Ma, LLC*, 118 F.4th 30, 42 (1st Cir. 2024) for the proposition that "Rhode Island courts focus on whether a defendant has deceived or otherwise taken advantage of others' assumptions in taking the alleged actions." Mot. 24. In doing so, Defendants referred to those First Circuit decisions as being issued by Rhode Island courts. The State does not dispute the relevance of the First Circuit's interpretation of an identical element of Massachusetts law in those cases.

*supra* pp. 5–7; Mot. 7–12.  The State here admits that using rebates and formularies is common and permissible (Opp. 26, 29), including when a PBM negotiates for rebates to pass through to its health-plan clients, *see id.* at 8, 30 (acknowledging acceptability of rebates passed through to health plans); *see also* Compl. ¶ 38).  Nor does the State credibly dispute the many legal provisions that **require** PBMs to do so in connection with various federal programs.  *See supra* pp. 5–7; Mot. 7–12.[10]  The State also does not dispute that health plan clients (including Rhode Island **itself**) commonly require their PBM to negotiate rebates with manufacturers and pass through those rebates, Mot. 25–26, which also answers the State's accusation that Defendants are simply "blam[ing] . . . their health-plan clients."  Opp. 27.  That rebate negotiations are something federal and state laws **require** Defendants to do **for** their health-plan clients is the reason that the State cannot ever establish that doing so is somehow immoral.

These same factors led the *Hawai'i* court to conclude that nearly identical rebate and formulary-related allegations brought by a State with a similar undisputed participation in rebating conduct could not be considered "unfair."  2024 WL 4625719, at *10.  The State criticizes *Hawai'i* as "out-of-circuit" (Opp. 26), but identifies no relevant difference between Ninth Circuit law and First Circuit law on this point (nor between Hawai'i law and Rhode Island law).  The State then notes that the district court there "gave the Attorney General leave to file an amended complaint." *Id.*  That is irrelevant as that court simply allowed the State to **try** to plead a viable claim, giving no indication it could ever do so.

---

[10] The State says some of those requirements, but not all, cannot be considered because they are somehow "[f]actual" (Opp. 44), but does not dispute that the requirements all arise from statutes and regulations.  *See* Mot. 7–12.  The Court may take judicial notice of the government contracts and federal regulations Defendants cited (Mot. 25–26), the contents of which the State does not dispute.  *See* Fed. R. Evid. 201(b); *Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of official government material "not subject to reasonable dispute").

The State cannot plead this factor by alleging that the rebating conduct it challenges here, in the State's view, caused higher list prices for medications. Opp. 24–25. Pharmaceutical manufacturers—not Defendants—set list prices. *See* Compl. ¶¶ 8, 81, 111, 121. The State's principal authority is distinguishable because it addresses a claim against manufacturer defendants that themselves set the allegedly unfair list prices. *See* Opp. 24 (citing *In re Pharm. Indus. Average Wholesale Price Litig*, 582 F.3d 156, 160–161 (1st Cir. 2009)). The State also cites *Edwards v. N. Am. Power & Gas, LLC*, 120 F. Supp. 3d 132, 143–144 (D. Conn. 2015) (Opp. 25), but that case involved an allegation that a defendant told customers it would charge one price and then charged them a higher price. *See id.* at 143–44. And in *In re Insulin Pricing* (upon which the State relies heavily throughout its Opposition), the court specifically acknowledged that even "unconscionably high price[s]" do not establish a claim for unfairness. 2025 WL 2573405, at *11–12 (citation omitted).

### C.    The Complaint Does Not Allege Substantial Injury to Consumers.

The State admits it must allege that the rebate and formulary conduct it challenges caused a "substantial injury" to consumers. Opp. 27. Given the State also concedes that developing formulary offerings and negotiating rebates with manufacturers is permissible, the State premises its theory of injury on the idea that Defendants' conduct became unfair because it caused pharmaceutical manufacturers to "raise their prices." *Id.* at 28. But the State admits, repeatedly, that manufacturers set prices and PBMs do not. *See* Compl. ¶ 8; Opp. 28. And even if the State could plead a viable theory that the rebates the State ***itself*** requires PBMs to negotiate cause the higher list prices it now bemoans, the State never responds to Defendants' argument that simply

alleging higher prices does not suffice.  Mot. 27–28.[11]  As Defendants explained, courts routinely find allegations like those the State makes here insufficient because "[l]ogically, charging *higher* prices would not deceive or induce a customer to purchase an item he or she would not otherwise purchase."  *In re Amitiza Antitrust Litig.*, 2024 WL 4250224, at *19 (D. Mass. Aug. 21, 2024) (citation omitted); *see also Leslie v. Quest Diagnostics, Inc.*, 2018 WL 1535235, at *4 (D.N.J. Mar. 29, 2018) (collecting cases).  Also, as Defendants explained (and the State did not contest), the *Hawai'i* court found that "speculative injuries" like "harm [to] consumers by increasing the out-of-pocket costs for prescription drugs . . . do not, particularly not by themselves, support an unfair acts or practices claim."  2024 WL 4625719, at *10; *see* Mot. 27.  So too here.

The State's unfair acts and practices claim fails for that reason alone.  But the State also fails to allege other factors that the Court should require of any unfairness theory.  The FTC requires a showing that the substantial injury is not "reasonably avoidable" and is "not outweighed by countervailing benefits to consumers or to competition."  Mot. 23 (quoting 15 U.S.C. § 45(n)).  The State suggests that this standard has been foreclosed by the Rhode Island Supreme Court (Opp. 28–29), but the Supreme Court has never made any such proclamation.  *See Long*, 93 A.3d at 1000 n.12 (noting that "[w]hat effect the FTC's 1980 policy statement and 15 U.S.C. 45(n) have on the unfairness analysis is not before us" and not addressing the new standard).  As Defendants argued (Mot. 23) and the State does not dispute, Rhode Island law explicitly directs courts to give "due consideration and great weight" to FTC interpretations of substantial injury.  *See* R.I. Gen. Laws 6-13.1-3.  Several states follow this approach and apply the FTC's more stringent standard.  *See, e.g.*, Ala. Code § 8-19-6; MD Code Ann., Com. Law § 13-105; Alaska Stat. § 45.50.545.

---

[11]  The State cannot evade this result by recasting its higher-prices theory as one alleging "preferential treatment" for more expensive medications.  Opp. 28.  That is simply another allegation of higher prices.

The State does not, and cannot, dispute that under that standard the State would need to establish that any identified substantial injury is not "reasonably avoidable" by the consumer. Mot. 28. And the State admits that an injury is reasonably avoidable if "the consumers had a free and informed choice." Opp. 29. But the State does not dispute that any health plan in the market may freely choose a different PBM. *See* Mot. 28. Rather, the State argues that health plans lack free choice because there is a "lack of transparency" that "make[s] it impossible for health plans to know whether they are receiving their fair share of rebates and other manufacturer payments." Opp. 29. The State's argument simply reinforces the problem with its theory. If rebates are permissible and health plans can choose a different PBM, then there is nothing stopping a health plan that believes it was supposed to receive a certain "share" of rebates from choosing a different PBM or negotiating for more transparency with its existing PBM. *See In re Int'l Harvester Co.*, 104 F.T.C. 949, 1074 (1984) (FTC "expect[s] the marketplace to be self-correcting" and rely on individuals' ability "to make their own private purchasing decisions"). Indeed, the State never alleges that health plans lack the types of contractual provisions that would allow them even to obtain the supposedly lacking "transparency" without switching PBMs. *Cf.* Compl. ¶ 40 (acknowledging that PBMs' contracts with health plans involve "certain information and data" that health plans could use to evaluate their PBM's performance).

Applying the FTC standard, the State's theory also fails because it does not adequately reckon with any of the benefits of the conduct that the State challenges. Indeed, the State largely concedes these benefits by admitting, repeatedly, that negotiating rebates and developing formularies is permissible conduct. *See* Opp. 7–8, 26, 29–30. The State does not dispute that its own allegations show rebates "impose competitive market pressures on drug manufacturers," Mot. 28 (citing Compl. ¶ 36), because they allow PBMs to aggregate market power when

negotiating with manufacturers to obtain better terms for PBMs' clients than the clients could obtain if negotiating on their own, *id.* at 28–29 (citing Compl. ¶ 43). And the State acknowledges that the result of this is passed-through payments to health plans—indeed, the State itself **demands** that. *Id.* at 29. The State even admits that these same market forces led the Tenth Circuit to find that an "exclusive rebate agreement lowered prices in the epinephrine auto-injector market." Opp. 30 (citing *In re EpiPen*, 44 F.4th at 987, 990). It was the State's burden to make allegations that could show the balance here tips in favor of injury. *See FTC v. LendingClub Corp.*, 2018 WL 11436309, at *12 (N.D. Cal. Oct. 3, 2018). But it has not even attempted to balance the obvious, acknowledged benefits the challenged practices provide with the alleged drawbacks. The State's failure to do so is yet another reason its unfairness claim should be dismissed.

## VI. The State Fails to State a Claim for Unfair Method of Competition (Count III).

Count III of the Complaint alleges that Defendants' pharmacy-network practices involved unfair **methods** of competition, as distinct from Count II, which alleges Defendants' rebate and formulary practices were "unfair acts or practices" under the DTPA. *Compare* Compl. ¶¶ 228–34, *with* ¶¶ 245–48. The State did not challenge Defendants' pharmacy-network practices in Counts I or II, or under any other part of the DTPA. *See id.* ¶¶ 217–27. The State's sole theory in Count III is that Defendants' pharmacy-network practices run afoul of a 2022 policy statement by the Federal Trade Commission ("2022 UMC Statement"). *Id.* ¶ 239 (citing Federal Trade Commission, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act* (Nov. 10, 2022), https://www.ftc.gov/ system/filesiftc_gov/pdf/P221202Section5Po1icyStatement.pdf). That claim fails because the DTPA does not incorporate the unworkable, vague standards from the FTC's policy statement. And to the extent the Court applies the FTC interpretations the State favors, it should also apply

27

the extensive federal precedent requiring unfair-methods claims to allege antitrust-related conduct that the State fails to allege here.

In the face of Defendants' Motion, the State runs from the claim it pleaded and suggests it now wants to plead a claim about Defendants' pharmacy-network practices under the distinct provision of the DTPA applicable to Count II—*i.e.*, an unfairness claim relying on the *Sperry* factors and related FTC gloss. An opposition brief is not the place to amend a complaint, but Count III fails either way—whether as an unfair-methods claim (which the State pleaded and Defendants address in Part VI.A-B) or as an unfairness claim (which Defendants address in Part VI.C). And insofar as the State recycles its Count II challenge to Defendants' rebate and formulary practices in Count III, that duplicative theory fails for the same reasons Count II fails. *See supra* pp. 20–27.

### A.    The 2022 UMC Statement Does Not Apply.

Count III of the Complaint asks the Court to hold Defendants liable under the test for assessing unfair methods of competition set forth in the 2022 UMC Statement. Compl. ¶¶ 235–48. The State abandons that position in its Opposition and says the 2022 UMC Statement is merely "persuasive information." Opp. 21 n.9. If the State no longer pursues a claim for violation of the 2022 UMC Statement, then it has abandoned Count III as pleaded.

Even if the State could pursue its claim under the 2022 UMC Statement, the claim would fail because the DTPA does not incorporate the 2022 UMC Statement. The State suggests the 2022 UMC Statement is identical to the *Sperry* test discussed under Count II above. *See* Opp. 38–39. It is not. The State cannot credibly dispute that the 2022 UMC Statement adopts a far more expansive view of "unfairness" than *Sperry*. After all, the FTC's policy purports to reach any conduct that "tends to negatively affect competitive conditions" even absent actual injury, market definition, or other hallmarks of antitrust law. Compl. ¶ 247. And the 2022 UMC Statement is

just that: a non-binding policy statement issued without notice and comment procedures. It also departs from prior FTC guidance that UMC claims should be evaluated "under a framework similar to the rule of reason" applicable to antitrust claims. Federal Trade Commission, *Statement of Enforcement Principles Regarding "Unfair Methods of Competition"* (Aug. 13, 2015), https://tinyurl.com/yc5kz8sf. Indeed, the 2022 UMC Statement was controversial even within the FTC precisely because it took a novel and expansive view of existing law under the FTC Act.[12]

The State relies on *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 140 (2d Cir. 1984) to argue that the 2022 UMC Policy statement is not "novel" and that "the FTC has used the same enforcement criteria for decades." Opp. 38–39. But that case only refutes the State's position. In *E.I. du Pont*, the Second Circuit warned against FTC attempts to "break new ground by enjoining otherwise legitimate practices" and held that "[i]n the absence of proof of violation of the antitrust laws or evidence of collusive, coercive, predatory, or exclusionary conduct, business practices are not 'unfair' in violation of § 5 unless those practices either have an anticompetitive purpose or cannot be supported by an independent legitimate reason." *Id.* at 137, 140. In contrast, under the 2022 UMC Statement, "[e]ven when conduct is not facially unfair"— that is, if it is not "coercive, exploitative, collusive, abusive, deceptive, predatory . . . [or] otherwise restrictive or exclusionary"—"it may [still] violate Section 5." 2022 UMC Statement at 9. The

---

[12] The current FTC Chairman has expressed his disagreement with the 2022 UMC Statement. *See* Statement of Comm'r Andrew N. Ferguson, *In the Matter of Grubhub, Inc.*, No. 2023157, at 3–4, https://tinyurl.com/6vb3zkur (Dec. 17, 2024) (concluding that the 2022 UMC Statement defies established law, is of "incredible breadth," and "purport[s] to declare *ipse dixit* the elements of an unfair-method-of-competition claim"); *see also* Dissenting Statement of Comm'r Christine S. Wilson, Commission File No. P.221202, at 9–12, https://tinyurl.com/3h3whf72 (Nov. 10, 2022) ("[T]he Policy Statement adopts an 'I know it when I see it' approach premised on a list of nefarious-sounding adjectives, many of which have no antitrust or economic meaning" and "provides no methodology to explain which adjectives may apply in any given set of circumstances.").

2022 UMC Statement is a drastic departure from established federal law, and it certainly goes

beyond the Rhode Island Supreme Court's idea of unfairness.  *See Ames*, 767 A.2d at 681 (adopting

*Sperry* test).

Nor should the Court adopt the 2022 UMC Statement's novel test here.  *See* Mot. 31–32.

The "indicia of unfairness" standard would lead to an unclear, unworkable analysis when layered

on top of the text of the DTPA, which says nothing of the conflict it would pose to existing caselaw.

*See* Dissenting Statement of Comm'r Christine S. Wilson, Commission File No. P.221202, at 9–

12.  And even if the 2022 UMC Statement were premised on a viable interpretation of *federal* law,

the State still has identified no basis to expand such a tenuous policy statement to the Rhode Island

DTPA—because none exists.[13]

### B. The Court Should Give "Due Consideration" to Federal Court Precedent Aligning UMC Claims with Antitrust Principles.

In the event the Court allows the State to proceed under Rhode Island law alleging a

retroactive violation of the 2022 UMC Statement (it should not), it should apply *all* of the federal

law interpreting what constitutes an unfair method of competition.  *See* R.I. Gen. Laws § 6-13.1-3

(directing courts to give "due consideration and great weight . . . to the interpretations of the

Federal Trade Commission and the federal courts relating to § 5(a) of the Federal Trade

Commission Act").  That includes the extensive body of federal-court decisions Defendants cited

holding that an unfair-methods claim should be rejected unless it alleges conduct that violates

traditional antitrust law principles.  Mot. 33–35.

In particular, the Court should look to federal-court precedent that requires a plaintiff

asserting a UMC claim to present a meaningful consideration of market definition, anticompetitive

---

[13] If the 2022 UMC Statement is considered, it should not be applied retroactively to transform conduct that did not violate the DTPA at the time into unlawful conduct.  *See supra* pp. 3–5.

conduct, and harm to competition under antitrust principles. *See, e.g.*, *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *20 (N.D. Ill. June 29, 2015); *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 114 (2d Cir. 2021); *cf. Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999) (noting cases interpreting the FTC Act have required a showing that the conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws . . ., or otherwise significantly threatens or harms competition"). The State's own authorities support such a requirement. For example, the State cites *FTC v. Texaco, Inc.*, 393 U.S. 223 (1968) to argue that "Section 5 . . . does not require a separate showing of market power or market definition when the evidence indicates that such conduct tends to negatively affect competitive conditions." Opp. 41. But it does not mention that the *Texaco* court still assessed whether the defendant had dominant economic power and "unfairly burdened competition for a not insignificant valume [*sic*] of commerce." *Texaco*, 393 U.S. at 230; *see also Atl. Ref. Co. v. FTC*, 381 U.S. 357, 369–71 (1965) (holding it did not need "to embark upon a full-scale economic analysis of competitive effects," but affirming FTC's use of "recognized violations of the antitrust laws" as "a guideline" for enforcing the FTC Act and noting that "[w]hen conduct . . . bear[s] the characteristics of recognized antitrust violations it becomes suspect").

While the State makes sweeping and unsupported assertions about market effects that its claims violate the "spirit" of the antitrust laws (Opp. 40 n.13), it fails to define any relevant market or demonstrate how Defendants' conduct reduces competition rather than merely disadvantaging certain competitors. And because the State fails to offer any properly defined market, it is impossible to assess any anticompetitive effects in that market. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018). The State's conclusory assertion that it has "identified the at-issue markets as the brand-name prescription drug market and the mail-order pharmacy market (including the

mail-order specialty pharmacy market)" (Opp. 42) is not based on any economic allegation regarding the scope of those markets and does nothing to allege how Defendants' practices actually reduce competition in those alleged markets.

### C.    The State Fails to State a UMC Claim Under the DTPA.

The State's new argument—that its unfair-methods claim in Count III is really just another unfairness claim under the *Sperry* factors—also fails. Opp. 31–38. That is not what the State pleaded—which was exclusively a violation of the 2022 UMC Statement. *See* Compl. ¶¶ 235–48. The State's effort to transform its claim through an opposition brief is improper and Count III should be dismissed on this ground alone. *See Caldwell v. Cambra*, --- F. Supp. 3d ---, ---, 2025 WL 2617906, at *15 (D. Mass. Sept. 10, 2025) ("[A] plaintiff cannot amend his complaint by adding new allegations or theories in an opposition to a motion to dismiss."); *McKenna v. Curtin*, 2016 WL 7015699, at *8 n.17 (D.R.I. Dec. 1, 2016), *aff'd*, 869 F.3d 44 (1st Cir. 2017) ("[Plaintiff] cannot amend his complaint through arguments made in opposition to a motion to dismiss.").

Even if the State had pleaded another "unfairness" claim in Count III, it would still fail. Insofar as the State challenges Defendants' rebate and formulary practices in Count III as "unfair" (Opp. 34), that claim is duplicative of Count II and fails for all of the reasons discussed above. *See supra* pp. 20–27.

To the extent the State targets Defendants' pharmacy-network practices, the State makes no argument that those pharmacy-network practices were deceptive. Opp. 34–38. And the State cannot plead any of the *Sperry* factors to support its allegations that those practices were unfair.

*First*, the State (again) does not identify any public policy that applies to the pharmacy-network practices it challenges. Instead, it touts the same generalized public policy of controlling the cost of healthcare it invokes for Count II—an argument that fails for the same reasons above. *See supra* pp. 20–22. The State adds a claimed policy of "ensuring that its residents have access

to needed pharmaceuticals." Opp. 36. But the State grounds that (equally vague) policy in a provision about health insurance, which the relevant law's preamble makes clear was targeted at concerns over "the high cost of health insurance premiums, particularly on small businesses in Rhode Island." R.I. Pub. Laws ch. 363 § 2 (2004). The same law also *requires* independent pharmacies to be "reimbursed on the same methodological basis" as network pharmacies and obligates them to "accept as the insurer's payment in full the price required of pharmacies in the insurer's restricted pharmacy network," further undermining the State's claims that PBMs' reimbursements to pharmacies are somehow unfair. *Id.* § 27-29.1-5.

**Second**, for the reasons discussed above, the factor concerning "immoral, unethical, oppressive, or unscrupulous conduct" is so vague and duplicative that the Court should not apply it. *See supra* pp. 22–24. Regardless, the State tellingly cannot cite a single decision showing that Defendants' alleged pharmacy-related conduct meets this test. The State argues this factor is met because Defendants "force independent pharmacies to work for free (or, at a loss)." Opp. 36. The State cites an unnamed pharmacist who claimed to have lost $50 when filling prescriptions for an unspecified drug, who was asked by the pharmacy network's PBM to stop refusing to fill patients' medications. *Id.* But the State's cited example—even if true—actually shows a PBM doing what the State claims are its two favored public policies: the PBM in question *furthered* "access to needed pharmaceuticals" (Opp. 36) by ensuring its network did not refuse to meet patients' needs and *controlled* rising costs in the course of doing so. Conversely, if the State were to use the DTPA to ensure the profitability of independent pharmacies, that would *raise* prices for consumers—the opposite of the statute's purpose.

The State also asserts a separate theory that the PBM Defendants prohibit independent pharmacies from offering mail-order services. Such routine conditions on a business relationship

cannot be "immoral, unethical, oppressive, or unscrupulous" simply because the State wishes they were different.  And the State ignores that Defendants support plan sponsors in their design of benefit plans—including with respect to mail-order pharmacies—to help control costs by leveraging better reimbursement terms.  *See* Compl. ¶ 47; *Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 253–54 (4th Cir. 2021) (noting Express Scripts is the mail-order pharmacy (in addition to the PBM) for the Department of Defense's TRICARE program).

The State cannot meet this factor for its theory about specialty drugs, either.  The State bases this theory on the idea that Defendants misclassified medications as specialty drugs.  *See* Compl. ¶ 46.  But it concedes "[t]here is no uniform definition for specialty drugs," and alleges "[d]rugs are generally considered 'specialty drugs' if they are high cost, used to treat complex, chronic, or rare medical conditions, or require special handling (*e.g.*, chemotherapy drugs)."  *Id.* The State cites no authority supporting the idea that a misclassification in the face of this definitional uncertainty is "immoral, unethical, oppressive, or unscrupulous."

*Third*, the State has not alleged that Defendants' pharmacy-related practices caused any substantial injury to consumers, much less one that is not reasonably avoidable nor outweighed by countervailing benefits.  *See supra* pp. 24–27.  With respect to injury, the State cannot show that independent pharmacies have experienced a substantial injury.

The State bases its injury argument on the claim that Rhode Island had a 35% pharmacy closure rate from 2010 to 2021.  Compl. ¶ 11.  But the State makes no allegation suggesting that all (or even some) of those closures resulted from any conduct on the part of Defendants, as opposed to other market forces like changing consumer preferences or broader retail industry trends.  The State's cited closure metric also measures pharmacy closure rates beginning in 2010, well before the challenged conduct allegedly began (which the State alleged was in 2012, *see id.*

34

¶ 242) but now argues was even more recent ("for at least the past five years," Opp. 15 n.8). The State's *ipse dixit* theory of harm is simply "too meager, vague, [and] conclusory to remove the possibility of relief from the realm of mere conjecture." *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc).

Nor can the State show a substantial injury to individual patients. Patients are not subject to any of the pharmacy-related requirements that Defendants allegedly impose on pharmacies that join their networks. And even if the State's pharmacy-closure theory were adequately pleaded, it does not connect any closures related to Defendants' pharmacy-network conduct to an actual effect on consumers.

The State also cannot show that Defendants' pharmacy-related practices were not reasonably avoidable. *See supra* pp. 25–26. The State argues that retail consumers have "no visibility" into pharmacy reimbursement practices and "cannot avoid" requirements in PBM-pharmacy contracts related to specialty drugs. Opp. 37. But there is a mismatch between the harms the State alleges and what it asserts that consumers cannot avoid—the contractual provisions to which the State is referring are between PBMs and health plans or PBMs and pharmacies. It is irrelevant whether consumers are unable to "avoid" things that do not affect them in the first place. For example, the State's allegation that Defendants "steer[ed]" mail order and specialty business is premised on terms in Defendant's contracts with health plans—not individual consumers. *See* Compl. ¶ 47 (alleging that "PBMs typically have exclusivity clauses in their contracts with health benefit plans that require consumers to utilize the PBMs' own mail-order pharmacies").

Nor can the State argue that health plans are unable to avoid the supposed injuries from PBMs creating pharmacy networks. After all, this is one of the things that a health plan *hires a PBM to do*. *See* Compl. ¶¶ 4, 45. Health plans also have access to their own claims data and

market expertise and negotiate detailed contract terms with PBMs in a competitive bidding process, including transparency provisions, audit rights, and performance guarantees.  In addition to their own experience and broad contractual rights, health plans can (and do) hire third-party consultants that provide advice regarding their selection of PBMs.  *See, e.g.*, *id.* ¶¶ 192 n.156 (citing consultants), 193 n.159 (same).  Health plans thus have both visibility into the contractual terms and the ability to avoid terms they do not like.

The State also fails to allege that independent pharmacies cannot reasonably avoid any injury the State could concoct.  *See id.* ¶ 48 ("Agreements with pharmacies determine the amount PBMs will pay to fill prescription drugs").  Pharmacy reimbursement rates are negotiated between PBMs and pharmacies—both sophisticated business entities—and reflect market forces in a competitive industry.  Independent pharmacies—like health plans—can negotiate different terms, despite the State's (incorrect and unsupported) assertion that pharmacies consider their PBM agreements to be "take it or leave it contracts of adhesion."  Compl. ¶ 48.  To the contrary, the State itself admits that "PBMs *negotiate* and contract with retail pharmacies."  *Id.* ¶ 45 (emphasis added).

The State also fails to meaningfully address countervailing benefits to consumers or competition.  *See* Opp. 37–38.  The State's cursory dismissal of this requirement without engagement with market realities only highlights the fundamental deficiencies in its Complaint, as it ignores legitimate quality, storage, delivery, safety, fraud prevention, drug interaction, and efficiency justifications for channeling certain medications through mail-order or specialized pharmacies with appropriate capabilities.

## VII.    The State Fails to State a Claim as to Most Medicines.

The State admits the scope of its Complaint—and the discovery it proposes to seek—is vast.  The State challenges rebating, formulary, and pharmacy-network practices with respect to

*all* prescription drugs, yet only bothered to make allegations about eight non-insulin drugs in its Complaint. *See* Opp. 45. The State claims that it can do so because its general allegations are about conduct that is "not specific" to each drug (Opp. 44–45), but that simply admits the State's pleading defect. The State does not respond to Defendants' arguments that its claims turn on (1) individual negotiations "with hundreds of drug manufacturers" resulting in different "rebates for thousands of prescription drugs," and (2) allegations that various conduct led to "inflated prices" for each drug. Mot. 40–41.[14] The State's inability to identify *which* medications were affected, *how* they were affected, or *what* specific actions caused them to be affected forecloses its claim as to non-pleaded medications. Otherwise, the case would become a fishing expedition that could span countless aspects of the pricing of thousands of medications and rebate negotiations concerning thousands of medications, targeting hundreds of third-party manufacturers. Discovery has gone on for *years* in similar cases that involved just a single medication. *See, e.g.*, *In re EpiPen Direct Purchaser Litig.*, No. 0:20-cv-00827-ECT-JFD (D. Minn.).

## CONCLUSION

For these reasons and those in the opening brief, the Court should dismiss the Complaint as to all Defendants pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Dated: December 1, 2025

---

[14] This breadth and complexity of the pricing and management of prescription drugs further underscores that the State raises what are quintessentially policy differences best resolved through the political branches rather than judicial intervention. For the reasons stated above, such industry-wide broadside attacks fail to state a claim under the DTPA.

/s/ Rebecca Briggs
Rebecca Briggs (#8114)
**HINCKLEY, ALLEN & SNYDER LLP**
100 Westminster Street, Suite 1400
Providence, RI 02903
Tel:  (401) 274-2000
Fax:  (401) 277-9600
rbriggs@hinckleyallen.com

Enu Mainigi*
Craig D. Singer*
R. Kennon Poteat III*
Adam J. Podoll*
Daniel Dockery*
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
emainigi@wc.com
csinger@wc.com
kpoteat@wc.com
apodoll@wc.com
ddockery@wc.com
(*admitted *pro hac vice*)

*Counsel for CaremarkPCS Health, L.L.C. and Zinc Health Services, L.L.C.*


/s/ Nicole J. Benjamin
Nicole J. Benjamin (#7540)
John A. Tarantino (#2586)
ADLER POLLOCK & SHEEHAN P.C.
100 Westminster Street, 16th Floor
Providence, RI  02903
Tel:  401-274-7200
Fax:  401-751-0604
nbenjamin@apslaw.com
jtarantino@apslaw.com

Jason R. Scherr (*pro hac vice*)
Douglas A. Hastings (*pro hac vice*)
Elise M. Attridge (*pro hac vice*)
Lindsey T. Levy (*pro hac vice*)
MORGAN LEWIS & BOCKIUS, LLP
1111 Pennsylvania Ave. NW
Washington, DC 20004
Tel: 202-739-3000
Fax: 202-739-3001
jr.scherr@morganlewis.com
douglas.hastings@morganlewis.com
elise.attridge@morganlewis.com
lindsey.levy@morganlewis.com

*Counsel for Express Scripts, Inc. and Ascent Health Services LLC*

/s/ Brooks R. Magratten
Brooks R. Magratten, Esq., #3585
Pierce Atwood LLP
One Citizens Plaza, 10th Floor
Providence, RI 02903
Tel.: 401-490-3422
Fax: 401-588-5166
bmagratten@PierceAtwood.com

Brian D. Boone (*pro hac vice*)
**ALSTON & BIRD LLP**
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
Tel.: (704) 444-1000
Fax: (704) 444-1111
Brian.Boone@alston.com

Kelley Connolly Barnaby (*pro hac vice*)
**ALSTON & BIRD LLP**
950 F Street NW
Washington, DC 20004
Tel.: (202) 239-3300
Fax: 202-239-3333
Kelley.Barnaby@alston.com

Elizabeth Broadway Brown (*pro hac vice*)
Jordan E. Edwards (*pro hac vice*)
**ALSTON & BIRD LLP**
1201 West Peachtree Street
Atlanta, GA 30309
Tel.: (404) 881-7000
Fax: (404) 881-7777
Liz.Brown@alston.com
Jordan.Edwards@alston.com

*Counsel for OptumRx, Inc. and Emisar Pharma Services LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 1, 2025, a copy of the foregoing was

filed electronically.  Notice of this filing will be sent to all parties in this case by operation of the

Court's CM/ECF system.  Parties may access this filing through the Court's system.

*/s/ Rebecca Briggs*

Rebecca Briggs
