## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF RHODE ISLAND,
    Plaintiff,

v.

CAREMARKPCS HEALTH, LLC, et al.,
    Defendants.

)
)
)
)
)
)
)
)
)
)
)

C.A. No. 25-cv-306-MRD-PAS

## MEMORANDUM AND ORDER

Melissa R. DuBose, United States District Judge.

The State brought the instant Deceptive Trade Practices Act ("DTPA") action against three Pharmacy Benefits Managers—OptumRx, Inc. ("OptumRx"), Express Scripts Inc. ("Express"), & CaremarkPCS Health LLC ("Caremark") — ("PBM Defendants"), and their associated Group Purchasing Organizations — Zinc Health Services, LLC ("Zinc"), Ascent Health Services, LLC ("Ascent"), and Emisar Pharma Services LLC ("Emisar") — ("GPO Defendants") on May 27, 2025.[1] ECF No. 1. Before the Court is Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Rule 12(b)(1) and for Failure to State a Claim Pursuant to Rule 12(b)(6). ECF No. 40. For the following reasons, the motion is **DENIED**.

---

[1] PBM Defendants and GPO Defendants will be referred to herein collectively as "Defendants."

## I.     BACKGROUND

### A. Factual Background

This case represents the State's attempt at fighting back against the "skyrocketing cost" of prescription drugs in Rhode Island due to the Defendants' alleged activities in the pharmaceutical market. *See generally* ECF No. 1-1. The State complains that Defendants target Rhode Islanders through a predatory and fraudulent scheme of inflating drug prices for their own gain at the expense of both consumers and local pharmacies. *Id.* The Defendants in this case are three of the country's largest pharmacy benefits managers—PBMs—and their associated group purchasing organizations—GPOs.[2] *Id.* "When PBMs first entered the market, they primarily provided electronic claims processing services to efficiently and economically process a high volume of relatively small dollar claims." *Id.* ¶ 32. Now, as alleged by the State, PBMs work as middlemen between health benefits plans (health insurance companies) and drug consumers, as well as between prescription drug manufacturers and health benefits plans, pharmacies, and drug consumers. *Id.* at 20–21. As the State sees it, "PBMs are involved in and benefit at almost every step in [the] complex system [of prescription drug distribution]—often profiting through methods that are secret and unknown to consumers or even their own clients." *Id.* ¶ 32. Regarding GPO Defendants, the State alleges that, "[b]eginning in 2019, the PBM Defendants began utilizing the GPO Defendants to conduct negotiations with

---

[2] GPO Defendant Zinc negotiates on behalf of PBM Defendant Caremark; GPO Defendant Ascent negotiates on behalf of PBM Defendant Express Scripts; and GPO Defendant Emisar negotiates on behalf of PBM Defendant OptumRx.

manufacturers and collect and distribute rebates and other fees from manufacturers[.]" *Id.* ¶ 6. Given the intentionally self-contained nature of the PBM and GPO relationship, as well as that between all Defendants, drug manufacturers, wholesalers, partnered chain pharmacies, and health benefits plans, Defendants are alleged to benefit from little to no competition and unfettered power to control the pharmaceutical market for their own gain. *See generally id.*

The State's complaint provides, in great detail, the alleged scheme Defendants use to maximize profits and mask their negative impact on the pharmaceutical market. *Id.* Here is a vastly simplified version. The State alleges that Defendants' role as an intermediary between all the parties involved in pharmaceutical distribution enables them to sneakily raise both consumer prices and their own profits through an almost untraceable system of rebates, kickbacks, and fees. *Id.* at 11, 13, 19, 65, 72, 78. In part, this is achieved by Defendants favoring more expensive designer drugs at the expense of more affordable, and sometimes safer, options. *Id.* at 11, 69. To do this, Defendants use formularies, or their chosen list of drugs covered by their health benefits plans.[3] *Id.* at 14, 21-22. To get added to a PBM's formulary, drug manufacturers are incentivized to offer rebates both to PBMs and the GPOs who negotiate on their behalf. *Id.* at 22, 37-38. In addition to these rebates, Defendants charge miscellaneous fees for formulary placement. *Id.* at 38, 40. To offset these costs, drug manufacturers are compelled to increase their list prices. *Id.* at 42, 48,

---

[3] The complaint further explains: "[a] health benefit plan will not typically reimburse any part of the cost for a drug that is not included in the PBM-designed formulary." ECF No. 1-1 ¶ 34. A health benefit plan is health insurance.

3

51. This affects not only the consumers who have health insurance and thus, depending on their provider, are beholden to their insurance company's associated PBMs' list of formularies, but also consumers without insurance who must pay for that same drug out-of-pocket. *Id.* at 48, 50, 53. Even beyond this framework, the State alleges Defendants engage in other deceptive and covert practices to benefit themselves at the expense of consumers. *Id.* at 11, 23, 58. Because Defendants' activities are alleged to be highly opaque, it is impossible to deduce the extent of their systems or the specifics of their operations. *See generally Id.*

## B. Procedural Background

On May 27, 2025, the State filed its complaint in the Rhode Island Superior Court for Providence County. On June 27, 2025, the Defendants removed this case to this Court. *See generally id.* In its complaint, the State brings three counts against Defendants, all under the Rhode Island DTPA. ECF No. 1-1 at 84–92. These counts include: Violation of R.I. Gen. Laws § 6-13.1-2 Deceptive Acts and Practices ("Count I"); Violation of R.I. Gen. Laws § 6-13.1-2 Unfair Acts and Practices ("Count II"); and Violation of R.I. Gen. Laws § 6-13.1-2 Unfair Methods of Competition ("Count III").

Pending before the Court is the Defendants' collective motion to dismiss the complaint in its entirety. ECF No. 40. The motion is fully briefed and the Court heard argument on February 12, 2026. As such, the motion is ripe and ready for disposition.

## II.    LEGAL STANDARD

### A.  Rule 12(b)(1)

"When a court is confronted with motions to dismiss under both [Federal] Rules [of Civil Procedure] 12(b)(1) and 12(b)(6), it ordinarily ought to decide the former before broaching the latter." *Deniz v. Mun. of Guaynabo*, 285 F.3d 142, 149 (1st Cir. 2002) (citations omitted).  Rule 12(b)(1) governs dismissal for lack of subject matter jurisdiction.  When considering a Rule 12(b)(1) motion, the Court "must construe the complaint liberally, treating all well-pleaded facts as true and drawing all reasonable inferences in favor of the plaintiffs." *Viqueira v. First Bank*, 140 F.3d 12, 16 (1st Cir. 1998).  If a defendant challenges the court's subject matter jurisdiction, the plaintiff bears the burden of proving jurisdiction.  *Johansen v. United States*, 506 F.3d 65, 68 (1st Cir. 2007).  "[I]t is black-letter law that jurisdiction must be apparent from the face of the plaintiffs' pleading." *PCS 2000 LP v. Romulus Telecomms., Inc.*, 148 F.3d 32, 35 (1st Cir. 1998).

### B.  Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must state a plausible claim.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with "enough facts to state a claim to relief that is plausible on its face." *Id.* at 555, 570.  In considering a motion to dismiss, the court must draw all reasonable inferences in the plaintiff's favor and determine whether the complaint, when taken in the light most favorable to the

5

plaintiff, sets forth sufficient facts to support the claim for relief. *Clorox Co. P.R. v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 30 (1st Cir. 2000); *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 508 (1st Cir. 1998).

## III.   DISCUSSION

This DTPA action is shrouded in a cloud of secrecy.  The State alleges that Defendants "are involved in and benefit at almost every step in [the] complex system [of prescription drug manufacturing, sales, and distribution]—often profiting through methods that are secret and unknown to consumers or even their own clients."  ECF No. 1-1 ¶ 32.  As explained *supra*, Defendants are alleged to use their "opaque contractual relationships" with various actors in the prescription drug chain, including each other, to maximize profit while disadvantaging "many independent pharmacies and the consumers they serve."  *Id.* ¶ 190.  The fact that Defendants leverage their clandestine relationships is well documented beyond just this case and has been alleged in numerous lawsuits across the country.  *See, e.g., Anne Arundel Cnty., Md. v. Express Scripts, Inc.*, No. CV MJM-24-90, 2025 WL 254807, at *1 (D. Md. Jan. 21, 2025) (explaining that the defendants in the case, which include OptumRx, Caremark, and Express Scripts, "exert substantial, but opaque, influence over the prescription-drug supply chain"); *In re Insulin Pricing Litig.*, No. 2:23-md-03080 (BRM)(LDW), 2025 WL 2551738, at *11 (D.N.J. Sept. 5, 2025) (acknowledging both parties' statements about the complexity of the payment flows, including PBM's admission that a "flood of litigation" is underway and that "their own internal coding and record-keeping" is indecipherable); *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592

U.S. 80, 83 (2020) (stating, "[PBMs] are a little-known but important part of the process by which many Americans get their prescription drugs."); *In re Nat'l Prescription Opiate Litig.*, No. 19-OP-45853, 2024 WL 4912429, at *20 (N.D. Ohio Aug. 22, 2024) (discussing allegations that PBM Defendants OptumRx and Express Scripts intended to conceal from the public what the PBMs were actually doing with respect to prescription opioids). As alleged by the State, the incomprehensible system in which Defendants operate is the very mechanism that enables the scheme which forms the basis for the State's claims. That all said, without the benefit of discovery, the Court accepts that the State has engaged in a good faith effort to allege plausible claims under the DTPA. As the Court considers these claims, along with the threshold issues governing its subject matter jurisdiction, it remains mindful of the challenges posed by Defendants' alleged use of secrecy to evade the reach of the law. After considering the parties' papers and arguments, as well as the early stage of this litigation, the Court concludes that this case is of the kind that is best resolved after discovery, after all secrets are revealed, and everyone involved has the benefit of transparency.

The Court also acknowledges, at the outset, that this case presents many novel issues. There is little guiding Rhode Island case law in which courts have analyzed similar claims under the DTPA, especially after the 2021 amendment relevant to this case, and even fewer brought by the State's Attorney General. Thus, many of the issues now before this Court are issues of first impression for the Circuit.

7

With that established, Defendants move to dismiss this action on the grounds that the Court lacks subject matter jurisdiction and that the State has failed to state a claim under the DTPA. *See generally* ECF No. 40. Defendants argue that this Court lacks subject matter jurisdiction because: (1) the DTPA's safe harbor provision bars the action, (2) this action is time-barred, and (3) because the State has failed to establish the requisite vendor-consumer relationship under the DTPA. *Id.* at 2. Defendants then assert that the State has failed to state a plausible claim for each of the counts asserted in its complaint. *Id.* The Court will address each issue in turn, disposing first of the jurisdictional challenges and then reviewing the State's claims on the merits.

### A. Jurisdictional Challenges

#### 1. The DTPA's Safe Harbor Provision

The parties dispute whether the DTPA's safe harbor provision, R.I. Gen. Laws § 6-13.1-4, bars this Court from hearing this action. The DTPA's safe harbor provision limits the legislation's reach to "actions or transactions permitted under laws administered by the department of business regulation or other regulatory body or officer acting under statutory authority of this state or the United States." R.I. Gen. Laws § 6-13.1-4(a). As of July 7, 2021, the DTPA provides that when an action is brought by the Attorney General, the safe harbor provision only applies if "(1) [t]he person's business activities are subject to regulation by a state or federal agency; and (2) [t]he activity or conduct is in compliance with orders, including insurance bulletins, or rules of, or a statute administered by, a federal or state government

8

agency.[4]   R.I. Gen. Laws § 6-13.1-4(b)(1–2).  "Person" is defined in the DTPA as: "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity."  R.I. Gen. Laws § 6-13.1-1(3).

Defendants aver that the DTPA's safe harbor provision bars this action because their rebate negotiation and pharmacy practices are subject to oversight and regulation by federal and state law, Congress, and government contracts.[5]  *See* ECF No. 40 at 16–23.  The State refutes this, asserting "Defendants [] fail to identify (as they must) any regulation permitting the practices that the State alleges are unlawful."  ECF No. 50 at 14.

Having considered the rules and laws discussed by the parties in conjunction with the State's allegations, the Court finds it would be premature to decide this issue

---

[4] Defendants argue that because the State allegations date back to 2012, an old iteration of the DTPA's safe harbor provisions should be applied here instead of the legislation as amended on July 7, 2021.  ECF No. 55 at 11-12.  Under the old version of the safe harbor provision, a defendant need only "demonstrate that the *general activities* complained of are subject to *monitoring* or regulation by a state or federal government agency."  *Lynch v. Conley*, 853 A.2d 1212, 1214 (R.I. 2004) (emphasis added).  Because the Court denies Defendants' request that this Court dismiss this action due to the DTPA safe harbor provision for lack of adequate information, the Court finds it unnecessary to determine whether the new iteration of the safe harbor provision applies retroactively at this time.  With the benefit of discovery, a more conclusive timeline of events will inevitably be revealed and the Court will be in a better position to make a determination on the issue of retroactivity.

[5] Defendants cite the following statutes, regulations, and contractual relationships as barring this action under the DTPA's safe harbor provision:  42 U.S.C. § 1395w-3a(c)(6)(B); 42 U.S.C. § 1396r-8(a)(1); 42 U.S.C. § 1396r-8(k)(1)(B)(i)(IV); 42 U.S.C. § 1320b-23; 85 Fed. Reg. 76666 (Nov. 30, 2020) & 88 Fed. Reg. 90125-01 (Dec. 29, 2023); the Department of Defense's contract with Express Scripts via TRICARE Health Plans; Federal Employees Health Benefits Act ("FEHBA"); R.I. Gen. Laws § 27-18-33.2; R.I. Gen. Laws § 27-19-26.2; R.I. Gen. Laws § 27-20-23.2; R.I. Gen. Laws § 27-20.1-15.1; and R.I. Gen. Laws § 27-41-38.2.

9

without more information.  The DTPA's safe harbor provision only applies if the complained-of activities or conduct conforms with any governing state and/or federal enactments.  While Defendants have identified legislation and regulations that contemplate the practices the Plaintiffs allege Defendants have used, such as rebate negotiations and formulary development as well as statutes that establish reporting and transparency requirements for PBMs, it is unclear to the Court whether Defendants are in compliance with the rules and laws on which they rely.  Therefore, the Court cannot deduce exactly what Defendants' business flow entails beyond the allegations that it involves manipulation of the rebate and formulary system to raise drug prices in an allegedly fraudulent manner as well as a preference for designer drugs, all maintained through a lack of transparency and allegedly false representations.  ECF No. 1-1 ¶¶ 1, 5, 67, 139.  Said another way, none of the regulations or laws cited by Defendants directly contemplate the alleged tactics used by Defendants to perpetuate their scheme.  Also relevant is that many of these tactics are yet to be revealed due to the covert nature of Defendants' operations.  As such, the Court agrees with the State's position that "[w]hile the[] regulations [cited by Defendants] allow [them] to utilize certain tools like drug rebates, formularies, and pharmacy networks, they do not give Defendants *carte blanche* to engage in deceptive and unfair practices in using those tools to the detriment of consumers and health plans."  ECF No. 50 at 15.  Thus, until the Court has a better handle on Defendants' practices, it cannot conclusively determine whether the DTPA's safe harbor provision applies.

Because subject matter jurisdiction may be raised at any time during the litigation, *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004), and because of courts' general preference to resolve matters on the merits, *Keane v. HSBC Bank USA for Ellington Tr., Series 2007-2*, 874 F.3d 763, 765 (1st Cir. 2017), no party will be prejudiced by reserving a decision on this issue until after the close of discovery. *Cf. Adler v. Her Campus Media, LLC*, 411 F. Supp. 3d 121 (D. Mass. 2019) (denying a motion to dismiss where the facts alleged were insufficient to determine the validity of the asserted affirmative defenses, which included a safe harbor provision challenge). Accordingly, Defendants' motion to dismiss is denied on this basis.

### 2.   Statute of Limitations

The Defendants argue that DTPA claims are subject to Rhode Island's general 10-year statute of limitations for civil actions, as defined in R.I. Gen. Laws § 9-1-13(a), and that "[b]ecause the State filed its Complaint on May 27, 2025, the statute of limitations bars claims that accrued prior to May 27, 2015." ECF No. 40 at 26 (citing R.I. Gen. Laws § 9-1-13(a)). The State disagrees, arguing that under the plain language of the DTPA, there is no statute of limitations for a claim brought by the Attorney General. ECF No. 50 at 21. The DTPA provides that "[*w*]*henever* the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act, or practice declared to be unlawful by § 6-13.1-2 ... the Attorney General may bring an action[.]" R.I. Gen. Laws § 6-13.1-5(a) (emphasis added). The State interprets this language to mean that it is not subject to any

11

statute of limitations for actions it brings under the statute.  ECF No. 50 at 21–22. This Court agrees.

Rhode Island law supports an approach of adopting the plain and ordinary language of a statute when it is not ambiguous.  *State v. Poulin,* 66 A.3d 419, 423 (R.I. 2013).  In such cases when the Court "examine[s] an unambiguous statute, there is no room for statutory construction and [the Court] must apply the statute as written."  *Olamuyiwa v. Zebra Atlantek, Inc.*, 45 A.3d 527, 534 (R.I. 2012) (quoting *In re Harrison*, 992 A.2d 990, 994 (R.I. 2010)).  Here, the DTPA unambiguously provides that the Attorney General may bring an action "whenever" he or she believes an entity is violating or has violated the statute.  R.I. Gen. Laws § 6-13.1-5(a). "Whenever" is an enabling word that signals the legislature's intent not to subject the Attorney General to a statute of limitations.  As supported by the Merriam-Webster Dictionary, "at whatever time" is the plain meaning of the word "whenever." *Whenever*, Merriam-Webster, https://perma.cc/KF4A-3P2R.  Furthermore, the term "whenever" ordinarily indicates a lack of restriction, or in this context, a lack of a time-bar limitation.  To read a statute of limitations into the DTPA's Attorney General provision, even one generally applied to other civil actions contemplating different kinds of claims, would render the term meaningless.[6]  As such, the Court agrees that the Attorney General's claims against Defendants are not time-barred

---

[6] The State argues that, even if its claims were subject to a general statute of limitations, their claims would survive under the doctrines of *nullum tempus* and equitable tolling. ECF No. 50 at 21–22.  Because the Court has determined the Attorney General is not subject to any statute of limitations for DTPA claims, the Court will not opine on the applicability of these doctrines.

under the plain language of the DTPA.  Defendants' motion to dismiss is denied on this basis.

### 3. Vendor-Consumer Relationship

The parties disagree about whether the Attorney General is required to allege a vendor-consumer relationship when bringing an action under the DTPA. *See* ECF No. 40 at 23–25; ECF No. 50 at 17–21.  Defendants aver that "[t]o invoke the protection of the DTPA, 'a plaintiff *must* establish that he or she is a consumer.'" ECF No. 40 at 23 (quoting *Kelly v. Cowesett Hillas Assocs.*, 768 A.2d 425, 431 (R.I. 2001)) (emphasis added).  But, in making this argument, Defendants rely entirely on cases decided before the DTPA was amended to consider actions brought by the Attorney General. *Id.* at 23.  The State argues that Defendants' position conflates the DTPA's standard for claims brought by a private citizen with that for claims brought by the Attorney General.  ECF No. 50 at 17.  The State is correct.  Defendants' reading of the DTPA disregards the provision of the statute that enables the Attorney General to bring claims on behalf of the state if he or she has "reason to believe that any person is using, has used, or is about to use any method, act, or practice declared to be unlawful by § 6-13.1-2[.]" R.I. Gen. Laws § 6-13.1-5(a).  Nothing in this section requires a showing of a vendor-consumer relationship between the Attorney General and the allegedly offending entity.  While Defendants are right that the section of the DTPA that contemplates lawsuits brought by private individuals requires the person filing suit to be an individual "who purchases or leases goods or services *primarily for personal, family, or household purposes*," this requirement does not extend to the

13

Attorney General under the legislation's plain language. R.I. Gen. Laws § 6-13.1-5.2 (emphasis added).

Furthermore, despite Defendants' contention otherwise, the DTPA does not require a direct relationship between consumers and the alleged bad actors in either a private action or one brought by the State. As the State argues, there is nothing in the statute to suggest a privity requirement "as long as there is a connection between the deceptive trade practice and the harm to the plaintiff." *Chen v. Subaru of Am.*, 58 A.3d 910, 911 (R.I. 2012). Indeed, the DTPA broadly defines "trade" and "commerce" to include: "the advertising, offering for sale, sale, or *distribution of any services* and any property, tangible, or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situate, and include any trade or commerce *directly or indirectly* affecting the people of this state." R.I. Gen. Laws § 6-13.1-1(5) (emphasis added). Here, the State has alleged that Defendants have engaged in trade and commerce practices through their involvement in every step of the prescription drug chain and that this involvement has directly and indirectly affected the people of Rhode Island, for example, as prescription drug consumers and members of health benefits plans. This considered, the State has met its burden. Accordingly, Defendants' motion to dismiss on this basis is denied.

## B. Sufficiency of Plaintiff's Stated Claims

### 1. Count I: Deceptive Acts

In Count I of its complaint, the State alleges Defendants violated the DTPA by unlawfully engaging in "deceptive acts." ECF No. 1-1 ¶¶ 217–27. To allege a

14

"deceptive acts" claim under the DTPA, a plaintiff must show "(1) a representation, omission, or practice, that (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." *Long v. Dell, Inc.*, 93 A.3d 988, 1003 (R.I. 2014) (quoting *F.T.C. v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006)). In developing this test, the Rhode Island Supreme Court adopted the standard from the Federal Trade Commission's ("FTC") interpretation of § 5(a) of the Federal Trade Commission Act. *Id.* Here, Defendants claim the State has failed to meet its burden as to each of these elements.

### a. *Representation, Omission, or Practice Likely to Mislead Consumers*

The parties first dispute whether the State has sufficiently alleged that Defendants made or engaged in a representation, omission, or practice likely to mislead consumers.[7] "For conduct to be deceptive it must, among other things, be likely to mislead a reasonable consumer." *Laccinole v. Assad*, C.A. No. 14-404 S, 2016 WL 868511, at *8 (D.R.I. Mar. 7, 2016). Here, the State alleges that PBM Defendants[8] make specific representations that they work to lower drug costs for consumers, when in fact, they raise drug prices for their own gain. ECF No. 50 at 11. As identified by the parties, the specific statements at issue include:

---

[7] For clarity's sake and consistent with the parties' briefing, discussion of the first two elements has been combined.

[8] Defendants assert that the State has "abandoned its claims in Count I as to the GPO Defendants entirely." ECF No. 55 at 23. The complaint is devoid of allegations supporting GPO Defendants' involvement in the State's deceptive acts claim. Accordingly, Defendants' motion is **GRANTED** as it relates to Count I and GPO Defendants. Count I, to the extent it has been asserted against GPO Defendants, is dismissed.

- Caremark's statement on the CVS Health website: "PBMs [] negotiate with manufacturers to secure [drugs] at a lower cost for their plan sponsors and their members."  ECF No. 1-1 ¶ 69(a).

- Caremark's statement on the CVS Health website: "PBMs help ensure that beneficiaries have access to the prescriptions they need to stay healthy, at a price they can afford."  *Id.* ¶ 69(c).

- Caremark's statement on the CVS Caremark website: "Your health is [CVS Caremark's] priority. As a pharmacy benefit manager (PBM), we manage prescription plans to help make them more cost-effective—so you can get what you need when you need it."  *Id.* ¶ 69(f).

- Express Scripts' statement on Evernorth Health Services website: "PBMs help get the lowest net cost for their clients and consumers."  *Id.* ¶ 70(a).

- Express Scripts' statement on its Twitter account: "Express Scripts negotiates with drug manufacturers to increase competition and lower costs for patients."  *Id.* ¶ 70(d).

- Express Scripts' statement on the Express Scripts website: "You can depend on Express Scripts for care that fits your specific needs."  *Id.* ¶ 70(f).

- OptumRx's statement on the OptumRx website: "Rebates are a longstanding tool used by PBMs to negotiate with drug manufacturers to achieve lower prescription drug costs for clients."  *Id.* ¶ 73(a).

- OptumRx's statement on the OptumRx website: "PBMs … help consumers and customers access the most effective medicines at the most affordable costs."  *Id.* ¶ 73(e).

- OptumRx's statement on the OptumRx website: "[PBM benefit programs] save money and help promote better health outcomes."  *Id.* ¶ 73(d).

- Caremark's statement on the CVS Health website: "[P]eople are more likely to take their prescribed medications when they know they can afford them – and that can lead to better health outcomes."  *Id.* ¶ 154.

- Express Scripts' statement on the Express Scripts website: "As your pharmacy benefit manager ('PBM'), Express Scripts helps you stress less and save more. We take care of you, so you can focus on what really matters." *Id.* ¶ 155.

- OptumRx's statement on the OptumRx website: "Optum Rx routinely delivers a far lower price. And lower prices matter."  *Id.* ¶ 156.

16

As Defendants see it, these allegations are too broad to meet the demands of the DTPA.  Quoting a First Circuit Lanham Act case, Defendants argue "'a general claim of superiority over [comparable products] that is so vague and indeterminate that it will be understood as a mere expression of opinion' is non-actionable as a matter of law."  ECF No. 40 at 29–30 (quoting *Azurity Pharms., Inc. v. Edge Pharma, LLC*, 45 F.4th 479, 503 (1st Cir. 2022)).  Next, pointing to a District of Massachusetts case, Defendants elaborate that "[l]ikewise, 'general statements about big-picture concepts such as trust, security, reputation, and safety are non-actionable.'"  *Id.* at 30 (quoting *Costa v. FCA US LLC*, 542 F. Supp. 3d 83, 101 (D. Mass. 2021).  Defendants continue that the statements are non-actionable because they are general statements implicating their reputation and are opinion based.  Thus, it is their position that the State's claim must fail.

Relying on the same First Circuit Lanham Act case as Defendants, the State responds that "[r]epresentations are non-actionable puffery only when they are: (1) 'grossly exaggerated advertising claims that no reasonable buyer would believe was true'; or (2) 'a general claim of superiority over a comparative product that is so vague and indeterminate that it will be understood as a mere expression of opinion.'"  ECF No. 50 at 24 (quoting *Azurity*, 45 F.4th at 503).  The State therefore maintains its deceptive acts allegations are sufficient because, when viewed collectively, they "outline[] representations by the PBM Defendants that are 'specific and measurable claims and claims that may be literally true or false,' and thus are not puffery."  *Id.*

17

at 24–25 (quoting *F.T.C. v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 11–12 (1st Cir. 2010)).

Applying the operative test identified by the parties, this Court concludes that the State has met its burden here.  The State alleges that PBM Defendants have published statements claiming that their involvement in the pharmaceutical network lowers drug prices for consumers, whereas in reality, PBM Defendants work to increase drug prices and promote more expensive designer drugs for their own gain. ECF No. 1-1 ¶¶ 69–73; ECF No. 50 at 25.  Thus, the State plausibly alleges PBM Defendants' statements are misleading.  The statements detailed in the complaint are not so grossly exaggerated that no reasonable consumer would believe them.  *See Azurity*, 45 F.4th at 503.  ECF No. 1-1 ¶¶ 69–73.  For example, a reasonable customer may believe PBM Defendants' statement that PBMs help customers access medicines at affordable costs.  ECF No. 1-1 ¶ 73(e).  Also, the alleged statements, overall, are not so vague that they would be impossible to fact-check.  *Id.*  To illustrate, one could do research to find out if "PBMs help get the lowest net cost for their clients and consumers."  *Id.* ¶ 70(a).  Consequently, the alleged statements do not amount to puffery, but rather, actionable representations that are likely to mislead consumers. The State has met its pleading burden as to the first two factors of the deceptive acts test.

### b. *Materiality*

"[A] representation is material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a

product.'" *Long*, 93 A.3d at 1003 (quoting *F.T.C. v. Patriot Alcohol Testers, Inc.*, 798 F. Supp. 851, 855 (D. Mass. 1992)).  Here, Defendants argue the statements detailed *supra* are immaterial because no reasonable consumer would deem them "important" in the context of prescription drug purchasing.  ECF No. 40 at 30–31.  In Defendants' own words, "[t]he State alleges no facts suggesting that any consumer's decision about whether to purchase a pharmaceutical product plausibly could be affected by the PBMs' statements about the complex pharmacy benefit management services they provide to their clients." *Id.* at 31.  The State responds that under the plain language of the DTPA, consumers need not directly purchase goods or services from a company for the company's acts or practices to be considered material, and the allegedly offending company does not need to have a direct relationship for that company to violate the DTPA.  ECF No. 50 at 26.  Instead, the State cautions that the Court should be mindful that "[t]he FTC considers certain categories of information presumptively material, including express claims and claims or omissions that 'significantly involve health, safety, or other areas with which the reasonable consumer would be concerned.'"  *Id.* (citing FTC Policy Statement on Deception at 5 *appended to In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 174 (F.T.C. 1984) & R.I. Gen. Law § 6-13.1-3).  The State claims that "[a]ll the acts or practices that the State alleges are deceptive (many of which are express representations) and involve the pricing of drugs or the safety or efficacy of drugs … are therefore of obvious

19

importance to consumers, which Defendants know." *Id.* at 26–27 (citing ECF No. 1-1 ¶¶ 154–57, 223–24).

Additionally, the State makes a strong point that nothing in the DTPA's plain language suggests there needs to be a direct consumer-vendor relationship for their deceptive acts claim to survive. *See* R.I. Gen. Laws § 6-13.1-2. The State appeals to the Supreme Court of Rhode Island DTPA case *Chen v. Subaru of America* to support the proposition that the DTPA does not require "privity of contract between the consumer and the alleged deceptive trade practice violator, as long as there is a connection between the deceptive trade practice and the harm to the plaintiff."[9] 58 A.3d at 911. Indeed, PBM Defendants do play a role in drug pricing that does directly affect consumers (i.e. the price they pay for drugs). However, the question remains whether there is a link between PBM Defendants advertising they lower prices while instead raising them and the harm consumers face by those raised prices, given the disagreement about whether consumers are compelled to act because of PBM Defendants' advertisements.

This issue presents a knotty problem, as both sides advance plausible arguments, and guiding precedent appears to be limited. On the one hand, even if PBM Defendants make misleading representations which convince consumers that PBM Defendants lower prices, it is unclear what decisions these consumers would

---

[9] Notably, the Rhode Island Supreme Court was simply quoting language from the Superior Court and never actually opined on this issue. *Chen v. Subaru of Am.*, 58 A.3d 910, 911 (R.I. 2012).

make differently in reliance on those representations. However, the misrepresentations alleged by the State undoubtedly involve health and safety, rendering them presumptively material per the FTC. *See Matter of Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 1984 WL 565319, at 49. Presently, the Court is cognizant of the early stage of this litigation and finds the State's position more convincing. For the purposes of a motion to dismiss, the allegation that consumers make decisions based on the information provided by PBM Defendants is enough. The State's allegations go beyond this, and the Court is satisfied with its pleading as it relates to materiality. *See Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 54 (1st Cir. 2013) ("Although a plaintiff must plead enough facts to make entitlement to relief plausible … [they] need not plead facts sufficient to establish a prima facie case.").

As with many of the issues in this case, the Court will be in a better position to assess materiality and the State's deceptive acts claim overall with the benefit of a developed record. *See Brennan v. Carvel Corp.*, 929 F.2d 801, 813 (1st Cir. 1991) (stating "whether a party has committed an unfair or deceptive act, within the meaning of [Massachusetts consumer protection laws], is a question of fact"). Defendants' motion to dismiss Count I of this action is therefore denied.

2. Count II: Unfair Acts and Practices

Count II of the State's complaint contains an allegation that Defendants unlawfully engaged in unfair practices and acts. ECF No. 1-1 ¶¶ 228–34. The State alleges that Defendants did so by "engaging in a scheme to artificially inflate [] prices for brand-name prescription drugs to extract higher fees." ECF No. 1-1 ¶ 232. In

21

conducting this scheme, Defendants allegedly use rebate and formulary negotiations. *See generally id.* To determine that an act is unlawfully "unfair," the Rhode Island Supreme Court has outlined the following inquiry:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*Ames v. Oceanside Welding and Towing Co.*, 767 A.2d 677, 681 (R.I. 2001) (citing *F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244–45 n.5 (1972)) (the so-called *Sperry* factors). Here, Defendants argue that the State's claim must fail because it has failed to meet its burden as to each of the *Sperry* factors. ECF No. 40 at 32–39. The Court will address each in turn.

### a. *Violation of public policy*

The Court first considers whether the State has sufficiently pled that Defendants' alleged unfair acts "offend[] public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness[.]" *Ames*, 767 A.2d at 681. According to Defendants, "[p]ublic policy considerations may not serve as a primary basis for an unfairness determination, and here, they provide no basis at all." ECF No. 40 at 33. The State disagrees, arguing "Rhode Island has an established public policy of making affordable and effective medications accessible to consumers and preventing PBMs from driving up drug

costs." ECF No. 50 at 30. In making this argument, the State cites several allegations from its complaint which detail how Defendants' actions violate public policy and established law, ECF No. 1-1 ¶¶ 78–141, 162–67, as well as the DTPA's express prohibition against "making false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions." ECF No. 50 at 30–31; R.I. Gen. Laws § 6-13.1-1(6)(xi).

The State has met its burden as to the public policy *Sperry* factor. This issue presents a question of fact. While there is little caselaw (as the Court has previously mentioned) interpreting Rhode Island's DTPA, when reviewing similar claims brought under Massachusetts' consumer protection laws, the First Circuit has recognized that "the finder of fact determines 'what constitutes an unfair trade practice,' but its determination is nevertheless 'subject to [a reviewing] court's… legal gate-keeping function.'" *Tomasella v. Nestlé USA, Inc.*, 962 F.3d 60, 79–80 (1st Cir. 2020) (quoting *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 69 (1st Cir. 2009)). Therefore, whether Rhode Island has a public policy against Defendants' behaviors would be better determined after discovery. For now, the State has alleged more than enough to establish that Defendants' behaviors violate Rhode Island public policy. To cite a few examples:

- "Rhode Island has a public policy in favor of making affordable and effective medications accessible to consumers and preventing PBMs from driving up drug costs. This public policy is evidenced through multiple laws among other things. For example, in 2023, Rhode Island passed legislation capping consumers' out-of-pocket costs for specialty drugs at $150 per 30-day supply. *See* R.I. Gen. Laws § 27-18-50.2." ECF No. 1-1 ¶¶ 162–63.

- "The Office of the Health Insurance Commissioner reiterated Rhode Island's policy in a recently released report analyzing pharmacy spending, concluding: 'It is important for Rhode Islanders to get the care and medications they need to live the healthiest lives possible, but at prices that are not burdensome and a deterrent to access.'" *Id.* ¶ 166 (citing Office of the Health Insurance Commissioner, Chartbook: Rhode Island OHIC, at 23-27 (2025)).

- "In contravention of Rhode Island's public policy, Defendants' business practices have the intent and/or effect of artificially increasing prescription drugs costs for Defendants' own financial gain, and this offends the policy of the State of Rhode Island because, among other things, it: (1) raises consumers' out-of-pocket drug costs; (2) results in utilization of high cost brand-name drugs over cheaper and equally effective alternatives; and (3) blocks consumers from meaningfully accessing cheaper and, in some instances, safer alternatives." *Id.* ¶ 167.

Accordingly, this Court finds the State has plausibly pled the first *Sperry* factor.

### b. *Immoral, unethical, oppressive, or unscrupulous conduct*

The Court next considers whether Defendants' allegedly unfair acts are properly classified as immoral, unethical, oppressive, or unscrupulous. *Ames*, 767 A.2d at 681. Again, the Rhode Island Supreme Court has suggested that this factor poses a question of material fact that should be determined by a fact finder. *See Long*, 93 A.3d at 1001. Generally, Defendants argue that the State has failed to satisfy this second *Sperry* factor because the complained of acts are "standard industry practice in which employers, unions, government entities, and others participate in an effort to lower the drug prices set by manufacturers." ECF No. 40 at 35. Defendants continue that the rebate and formulary negotiations at issue are actually an "*obligation* enshrined in federal policy," *id.*, and that "[p]ractices the state and federal governments engage in, and contract for cannot also be considered 'immoral, unethical, oppressive, or unscrupulous' under the same state's law," ECF No. 55 at

30.   According to the State, Defendants' argument is "reliant on facts wholly outside the complaint and cannot be considered on a motion to dismiss."  ECF No. 50 at 34. The State also avers that "Defendants have not shown any so-called standard industry practices by which they are allegedly abiding other than utilizing rebates, formularies, and pharmacy networks."  *Id.*  Nevertheless, the State maintains that, considering the allegations in the complaint and the fact that Defendants have rendered drug prices "a complete black box," its allegations are sufficient to satisfy the second *Sperry* factor.  *Id.* at 35.

Crucial to the disposition of this factor (and the State's entire case) is the distinction between rebate and formulary negotiations generally and the unlawful manner in which Defendants allegedly conduct these negotiations.  It is clear from the complaint that the latter is at issue here.  While Defendants are correct that negotiating rebates may not be immoral or unethical, the State alleges that Defendants use deceptive and fraudulent means to effectuate their scheme. Undoubtedly, the use of deception constitutes immoral and unscrupulous behavior. The First Circuit has suggested that "trick[ing] consumers [and] tak[ing] advantage of their assumptions for capital gain" is sufficiently immoral and unethical to satisfy this prong.  *See Tomasella*, 962 F.3d at 82.  That is essentially the crux of the State's entire case: that PBM Defendants use their inordinate bargaining power and unchecked middleman position to manipulate rebate negotiations and implement hidden fees negotiations to inflate drug prices for their own gain while consumers are forced to pay higher prices to compensate for the difference, all the while being none

25

the wiser.  The State has plausibly pled allegations that speak to the second *Sperry* factor.

### c.  *Substantial injury*

Per the final *Sperry* factor, the Court must decide whether the State has alleged that Defendants' unfair acts have caused substantial injury to consumers. *Ames*, 767 A.2d at 681.  When analyzing similar claims, courts in the First Circuit have acknowledged that "substantial injury" typically involves monetary harm.  *See, e.g., F.T.C. v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 299 (D. Mass. 2008), *aff'd*, 624 F.3d 1 (1st Cir. 2010).  Further, that "an injury may be deemed substantial 'if it does a small harm to a large number of people, or if it raises a significant risk of concrete harm.'"  *Id.*  (quoting Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980), *appended to In the Matter of Int'l Harvester Co.*, 104 F.T.C. 949 (1984)).

Here, as articulated by the State, the complaint contains allegations that "Defendants give preferential treatment on their formularies to expensive, brand-name drugs with the highest rebates and other fees over drugs that may be safer, more effective, or cost less to health plans or consumers to line their own pockets (not reduce costs for clients or consumers)."  ECF No. 50 at 35–36 (citing ECF No. 1-1 ¶¶ 82–109, 133–141).  The State also alleges that Defendants' unfair acts have harmed "thousands of Rhode Island residents."  ECF No. 1-1 ¶ 104. These allegations are sufficient to meet the demands of the third *Sperry* factor.  Taken together, the

State has plausibly alleged all the *Sperry* factors and have therefore sufficiently stated a claim in Count II.

### 3. Count III: Unfair Methods of Competition

Count III of the State's complaint is an unfair methods of competition ("UMC") claim. ECF No. 1-1 ¶¶ 235–248. The Federal Trade Commission provides that "a method of competition is unfair if it goes beyond competition on the merits." *Id.* ¶ 239 (citing Federal Trade Commission, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act*, at 8-9 (Nov. 10, 2022), [https://perma.cc/ZYN9-YSLH]) (referred to herein as "2022 UMC Statement"). The State alleges that PBM Defendants engaged in unfair methods of competition by "giving preferential treatment to drugs with the highest rebates when there are multiple drugs in a therapeutic class." *Id.* ¶ 242. The State continues, "[f]or at least the last five years, if not longer, the PBM Defendants have used their significant leverage to force independent pharmacies to accept unfair contract terms that materially disadvantage independent pharmacies and consumers." *Id.* ¶ 245.

Rhode Island courts have recognized that "in enacting the DTPA, the Legislature intended to declare unlawful a broad variety of activities that are unfair or deceptive, as well as to provide a remedy to consumers who have sustained financial losses as a result of such activities." *Park v. Ford Motor Co.*, 844 A.2d 687, 692 (R.I. 2004). The statute has been interpreted by the Rhode Island Supreme Court to remedy any type of loss, "no matter how large or small, as a result of an unlawful

27

trade practice[.]" *Id.* at 693. R.I. Gen. Laws § 6-13.1-1(6) enumerates twenty-one "[u]nfair methods of competition and unfair or deceptive acts or practices." The State argues that Defendants' formulary and rebate practices implicate several of these enumerated prohibited practices, including the catch-all provision. ECF No. 50 at 42. Specifically, the State cites the following enumerated practices:

- R.I. Gen. Laws § 6-13.1-1(6)(v): "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have."

- R.I. Gen. Laws § 6-13.1-1(6)(xi) "Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."

- R.I. Gen. Laws § 6-13.1-1(6)(xii) "Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding."

- R.I. Gen. Laws § 6-13.1-1(6)(xiv) "Using any other methods, acts, or practices that mislead or deceive members of the public in a material respect."

*Id.*

In addition to these specifically enumerated practices, the DTPA has a catch-all provision, R.I. Gen. Laws § 6-13.1-1(6)(xiii), which adds "[e]ngaging in any act or practice that is unfair or deceptive to the consumer," to this list. As both parties suggest, if the Court were to find the complained of behavior meets the requirements for either of the State's other two counts, particularly its unfair acts claim under the *Sperry* factors, then the State's allegations fit into this catch-all provision. Defendants provide that "the closest option [for which enumerated practice the State's claim may fit into] is Section 6-13.1-1(6)(xiii)'[s] catch-all, which prohibits 'engaging in any act or practice that is unfair or deceptive to the consumer.'" ECF

28

No. 40 at 40.  For its part, the State asserts that its allegations fit squarely into the catch-all provision because it has met its burden to allege Defendants' activities "violate the [*Sperry*] standard."  ECF No. 50 at 40.

Reviewing the State's claims under the lens of both the enumerated practices listed by the DTPA and its catchall provision, it is clear that it has met its burden to allege an UMC claim.  The Complaint contains allegations that directly meet the definitions of the enumerate practices identified by the State (R.I. Gen. Laws § 6-13.1-1(6)(v), R.I. Gen. Laws § 6-13.1-1(6)(xi), R.I. Gen. Laws § 6-13.1-1(6)(xii), and R.I. Gen. Laws § 6-13.1-1(6)(xiv)).  Furthermore, this Court has already concluded the State's allegations meet the demands of the Sperry factors.  *See supra.*  On this alone, the Court is satisfied that the State has stated a plausible UMC claim and thus denies Defendants' motion as to Count III.

As a final point, the Defendants also argue that "[i]f the Court finds that the State has adequately pleaded any DTPA claim (it should not), it should limit any claims to the particular prescription drugs about which the State makes specific factual allegations."  ECF No. 40 at 50.  Citing *Bell Atlantic Corp. v. Twombly*, the State counters that this assertion is "wholly without support."  ECF No. 50 at 52.  The State explains that its claims are not drug specific but rather focus on Defendants' broader practices.  *Id.* at 52–53.  This issue gets at the scope of this case and the characterization of the State's claims.  The State's claims are not focused on the drugs themselves, but rather Defendants' wider practices and activities.  While some of the allegations used by the State to support their claims may reference specific drugs,

29

this case is broader than that. Considering both *Twombly* and the State's theory of its case, the Court will not, at this time, make any drug-specific determinations

## IV. CONCLUSION

The Defendants' motion to dismiss is **DENIED**, except as to GPO Defendants, who for the reasons stated in footnote 8, are **DISMISSED** from Count I.

IT IS SO ORDERED.

_____
Melissa R. DuBose
United States District Judge

03/26/2026

30