# EXHIBIT B

**to the State of Rhode Island's Motion to Amend Complaint**

SUPERIOR~~IN THE UNITED STATES DISTRICT~~ **COURT** ~~OF~~
**FOR** THE ~~STATE~~DISTRICT **OF RHODE ISLAND**
~~FOR THE COUNTY OF PROVIDENCE~~

| | |
|---|---|
| ~~STATE OF RHODE ISLAND, by and through PETER F. NERONHA, ATTORNEY GENERAL,~~<br><br>~~*Plaintiff*~~<br><br>~~v.~~<br><br>~~CAREMARKPCS HEALTH, L.L.C., ZINC HEALTH SERVICES, LLC, EXPRESS SCRIPTS, INC., ASCENT HEALTH SERVICES LLC, OPTUMRX, INC., and EMISAR PHARMA SERVICES LLC,~~<br><br>~~*Defendants*.~~ | ~~C.A. NO.:~~ |

| | |
|---|---|
| STATE OF RHODE ISLAND, by and through PETER F. NERONHA, ATTORNEY GENERAL,<br><br>*Plaintiff,*<br><br>v.<br><br>CAREMARKPCS HEALTH, L.L.C., ZINC HEALTH SERVICES, LLC, EXPRESS SCRIPTS, INC., ASCENT HEALTH SERVICES LLC, OPTUMRX, INC., and EMISAR PHARMA SERVICES, LLC,<br><br>*Defendants.* | CIVIL NO.: 25-cv-00306-MRD-PAS |

**FIRST AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................................1

PARTIES...........................................................................................................................6

    *Plaintiff State of Rhode Island* ........................................................................................6

    *Defendants CaremarkPCS Health, L.L.C. and Zinc Health Services, LLC* ...........................6

    *Defendants Express Scripts, Inc. and Ascent Health Services LLC* ....................................7

    *Defendants OptumRx, Inc. and Emisar Pharma Services LLC* ...........................................8

JURISDICTION AND VENUE.............................................................................................8

BACKGROUND.................................................................................................................9

    *PBMs Are the Middleman in a Complex Drug Pricing System* ..........................................9

    *PBMs Contract with Prescription Drug Manufacturers* ..................................................11

    *PBMs Have Begun Conducting Negotiations with Manufacturers Through GPOs* ..............13

    *PBMs Contract with Pharmacies Including Independent Pharmacies* ................................14

    *Consumers' Out-of-Pocket Costs Are Typically Tied to WAC* .........................................15

FACTUAL ALLEGATIONS..............................................................................................16

    I.       Defendants Conduct Trade and Commerce in Rhode Island....................................16

    II.      The PBM Defendants Deceptively Represent That They Act to Serve Consumers by Lowering Drug Prices and Ensuring Their Access to Safe and Effective Drug Treatments.....................................................................................................19

    III.    Defendants Engage in a Scheme to Artificially Inflate Drug Prices for Their Own Financial Gain........................................................................................................26

          A.    Defendants Exclude Drugs from Their Formularies to Increase Rebates and Other Fees....................................................................................................28

          B.    Defendants' Rebate Tactics Lead to WAC Price Inflation.............................37

          C.    Defendants' Lack of Transparency Allowed Them to Continue Siphoning Off Substantial Portions of Payments from Manufacturers in the Form of Undisclosed Fees ...................................................................................46

    IV.    WAC Prices for Prescription Drugs Have Skyrocketed Over the Last Couple of Decades, Increasing Prices to Consumers ...............................................................49

    V.      Defendants' Deceptive Acts and Practices Are Material to Consumers......................52

    VI.    Defendants' Scheme That Artificially Inflates Drug Prices Violates Established Public Policy In Rhode Island...................................................................................55

    VII.   Defendants Engage in Unfair Methods of Competition ...........................................57

          A.    Defendants' Formulary and Rebate Practices Tend to Negatively Affect Competitive Conditions in the Prescription Drug Market .............................57

i

B.     The PBM Defendants Impose Unfair Contractual Terms on Independent Pharmacies That Negatively Affect Competition and Consumers ................. 61

1.  The PBM Defendants Pay Low Reimbursement Rates – Sometimes Below Pharmacies' Acquisition Costs ................................................. 64

2.  The PBM Defendants Steer Consumers to Their Own Affiliated Pharmacies – Particularly for Specialty Drugs ............................... 69

CLAIMS FOR RELIEF ................................................................................. 74

COUNT ONE ............................................................................................... 74

COUNT TWO .............................................................................................. 77

COUNT THREE .......................................................................................... 78

Defendants' Formulary and Rebate Practices ....................................... 80

PBM Defendants' Pharmacy-Related Practices ..................................... 81

PRAYER FOR RELIEF ............................................................................... 82

INTRODUCTION ........................................................................................ 1

PARTIES ...................................................................................................... 6

Plaintiff State of Rhode Island ............................................................... 6

Defendants CaremarkPCS Health, L.L.C. and Zinc Health Services, LLC ........................... 6

Defendants Express Scripts, Inc. and Ascent Health Services LLC ....................... 7

Defendants OptumRx, Inc. and Emisar Pharma Services LLC ............................ 8

JURISDICTION AND VENUE ..................................................................... 8

BACKGROUND .......................................................................................... 9

PBMs Are the Middleman in a Complex Drug Pricing System ....................... 9

PBMs Contract with Prescription Drug Manufacturers ........................... 12

PBMs Have Begun Conducting Negotiations with Manufacturers Through GPOs ............. 14

PBMs Contract with Pharmacies Including Independent Pharmacies ................. 15

Consumers' Out-of-Pocket Costs Are Typically Tied to WAC ..................... 16

FACTUAL ALLEGATIONS ........................................................................ 17

I.     Defendants Conduct Trade and Commerce in Rhode Island ....................... 18

II.    The PBM Defendants Deceptively Represent That Defendants Act to Serve Consumers by Lowering Drug Prices and Ensuring Their Access to Safe and Effective Drug Treatments ................................................. 20

III.   Defendants Engage in a Scheme to Artificially Inflate Drug Prices for Their Own Financial Gain ................................................. 27

A.     Defendants Exclude Drugs from Their Formularies to Increase Rebates and Other Fees ................................................. 29

ii

B.      Defendants' Rebate Tactics Lead to WAC Price Inflation ............................. 39

C.      Defendants' Lack of Transparency Allowed Them to Continue Siphoning Off Substantial Portions of Payments from Manufacturers in the Form of Undisclosed Fees ................................................................................................ 48

IV.      WAC Prices for Prescription Drugs Have Skyrocketed Over the Last Couple of Decades, Increasing Prices to Consumers ................................................................. 55

V.      Defendants' Deceptive Acts and Practices Are Material to Consumers ................... 57

VI.      Defendants' Scheme That Artificially Inflates Drug Prices Violates Established Public Policy In Rhode Island ................................................................................... 60

VII.      Defendants Engage in Unfair Methods of Competition ........................................... 62

A.      Defendants' Formulary and Rebate Practices Tend to Negatively Affect Competitive Conditions in the Prescription Drug Market .............................. 62

B.      The PBM Defendants Impose Unfair Contractual Terms on Independent Pharmacies That Negatively Affect Competition and Consumers ................. 66

1.   The PBM Defendants Pay Low Reimbursement Rates—Sometimes Below Pharmacies' Acquisition Costs ...................................................... 69

2.   The PBM Defendants Steer Consumers to Their Own Affiliated Pharmacies—Particularly for Specialty Drugs ......................................... 75

CLAIMS FOR RELIEF ............................................................................................................ 80

COUNT ONE ................................................................................................................. 80

COUNT TWO ................................................................................................................ 84

COUNT THREE ............................................................................................................ 85

*Defendants' Formulary and Rebate Practices* ................................................ 87

*PBM Defendants' Pharmacy-Related Practices* ............................................ 88

PRAYER FOR RELIEF ........................................................................................................... 89

The State of Rhode Island, by and through its Attorney General, Peter F. Neronha, ("Rhode Island" or "State"), brings this action pursuant to his statutory authority against CaremarkPCS Health, L.L.C. ("CVS Caremark"), Express Scripts, Inc. ("Express Scripts"), and OptumRx, Inc. ("OptumRx") (collectively, the "PBM Defendants"); and Zinc Health Services LLC ("Zinc"), Ascent Health Services, LLC ("Ascent"), and Emisar Pharma Services LLC ("Emisar") (collectively, the "GPO Defendants"). The PBM Defendants and the GPO Defendants will be referred to collectively as "Defendants."

## INTRODUCTION

1.      Prescription drug pricing in the United States is complex and opaque, allowing Defendants—the three largest pharmacy benefit managers ("PBMs") (the PBM Defendants) in the country and their group purchasing organizations ("GPOs") (the GPO Defendants)—to siphon increasing amounts of money from the pharmaceutical supply chain through an unfair and deceptive scheme that masks Defendants' negative impact on the market while increasing consumers' out-of-pocket costs, limiting consumers' access to effective and less expensive prescription drugs, undercutting independent pharmacies, and maximizing rebates for Defendants' own financial gain at the expense of consumers.

2.      The skyrocketing cost of prescription drugs is a significant burden to Rhode Islanders. Between 2015 and 2019, prescription drug costs grew 114% faster than the average Rhode Islanders' income.[1] According to a 2024 survey of over 1,000 Rhode Island adults, more than 65% of adults making less than $50,000 a year were somewhat or very worried about

---

[1] AARP, *Rx Costs Outpaced Rhode Island Income by 114%*, https://states.aarp.org/rhode-island/rx-costs-outpaced-rhode-islanders-income-by (last visited May 27, 2025).

1

affording prescription drugs.[2] Nearly a quarter of adults in Rhode Island either did not fill a prescription, cut pills in half, or skipped a dose due to concerns about costs.[3]

3.      The State brings this complaint to address Defendants' violations of Rhode Island law that significantly contribute to these high prices, and to ensure that consumers (*i.e.*, patients in need of medical care) can access affordable, safe, and effective drugs and that employers (who are consumers of health benefit plans) are not forced to pay higher-than-necessary drug costs in their self-funded plans, which depresses wages and damages Rhode Island's economy. As laid out specifically below, Defendants have engaged in deceptive acts and practices in violation of Rhode Island's Deceptive Trade Practices Act ("DTPA"), R.I. Gen. Laws §§ 6-13.1-1 through 6-13.1-27 (Count One); engaged in unfair acts and practices in violation of the DTPA (Count Two); and engaged in unfair methods of competition in violation of the DTPA that harmed consumers and negatively impacted competition in the prescription drug market and, in the case of the PBM Defendants, the pharmacy market (Count Three).[4]

4.      The PBM Defendants contract with health benefit plans based in and outside of Rhode Island and with pharmacies to provide services to Rhode Island consumers. They refer to consumers as their "members" and represent that their primary role is to serve members.

5.      The PBM Defendants make numerous deceptive representations, directly and indirectly, to consumers that ~~the PBM~~ Defendants act to serve consumers by lowering drug prices

---

[2] *Rhode Island Survey Respondents Worried about High Drug Costs; Support a Range of Government Solutions*, Healthcare Value Hub (July 15, 2024), https://healthcarevaluehub.org/chess-state-survey/rhode-island/2024/rhode-island-survey-respondents-worried-about-high-drug-costs-support-a-range-of-government-solutions/.

[3] *Id.*

[4] ~~On September 20, 2024, the Federal Trade Commission brought an administrative complaint against the same set of Defendants for engaging in anticompetitive and unfair rebating practices that artificially inflated the list price of insulin drugs. The action is currently on hold due to a lack of commissioners able to participate in the case.~~

and ensuring consumers' access to safe and effective drug treatments. Yet, over time, Defendants have developed a business model that does the opposite.

6.      The PBM Defendants have promised to apply objective medical science and the leverage of large-scale purchasing to select the safest and most effective drugs for consumers and bring down their prices. Instead, Defendants have capitalized on their role as middlemen between drug manufacturers, pharmacies, health insurance plans, and consumers to siphon increasing revenue to themselves, drive up prices to consumers, restrict consumers' choices of prescription drugs and pharmacies, and protect their own role and profits by shrouding them in secrecy and misleading marketing.

6.7.      Beginning in 2019, the PBM Defendants began utilizing the GPO Defendants to conduct negotiations with manufacturers and collect and distribute rebates and other fees from manufacturers—adding anotherthe same functions the PBM Defendants hold themselves out as performing. This new system allows Defendants to reclassify "rebates" as other fees paid by manufacturers and then disguise and attempt to distance these fees by running them through the GPO Defendants. As a former OptumRx executive who helped create Emisar explained: "The intention of the G.P.O. is to create a fee structure that can be retained and not passed on to a client."[5] This additional, **non-transparent** layer to the system, making makes it even more difficult (if not impossible) for health benefit plans to know what rebates and other fees manufacturers are paying to Defendants and whether theythe health benefit plans are receiving their fair share of rebates and other manufacturer paymentsthose fees.

---

[5] Rebecca Robbins & Reed Abelson, *The Middlemen: The Opaque Industry Secretly Inflating Prices for Prescription Drugs*, N.Y. Times (June 21, 2024), https://www.nytimes.com/2024/06/21/business/prescription-drug-costs-pbm.html.

7.8.    Defendants' drug "formularies" (lists of covered drugs, as explained in more detail below) are now so restrictive that they block consumers' access to nearly 40% of drugs on the market—forcing consumers to pay out of pocket for their preferred medication or shift their medications around Defendants' ever-changing formulary decisions instead of their own medical needs.[6]

8.9.    Drug manufacturers are complicit and play a central role in facilitating Defendants' scheme. Over the last decade, manufacturers have systematically increased their drugs' "list price," also known as its "Wholesale Acquisition Cost" or "WAC", in order to pay kickbacks to Defendants in the form of escalating rebates and other fees to secure formulary placement for their products. As a result, list prices have become significantly inflated and bear almost no relationship to the true payment manufacturers receive for their products. This negatively impacts many consumers with cost-share payments tied to a drug's inflated list price (*e.g.*, uninsured consumers and insured consumers with coinsurance or high-deductible plans).[7]

9.10.    Novo Nordisk's CEO admitted that it prices Ozempic and Wegovy—two glucagon-like peptide receptor agonists ("GLP-1s") approved to treat Type 2 diabetes—exponentially higher in the United States than in other countries to offset the rebate and other fees Novo Nordisk pays to the PBM Defendants.[8] For example, Ozempic is sold in the United States for $969 per month, compared to $122 in Denmark and $59 in Germany, while Wegovy is sold in the United States for

---

[6] Geoffrey Joyce, et al., *Medicare Part D Plans Greatly Increased Utilization Restrictions On Prescription Drugs, 2011–20*, 43 Pharm & Med. Tech. 391, 396–97 (2024), https://www.healthaffairs.org/doi/epdf/10.1377/hlthaff.2023.00999.

[7] Even patients with more modest deductibles are still negatively impacted by these inflated prices until they have exhausted their deductibles.

[8] Dani Kass, *Novo Nordisk Tells Sens. Ozempic Costs Are Linked To PBMs*, Law360 (Sept. 24, 2024), https://www.law360.com/health/articles/1871338/novo-nordisk-tells-sens-ozempic-costs-are-linked-to-pbms.

$1,349 per month, compared to $186 in Denmark and $137 in Germany. Thus, if a consumer had a 20% coinsurance requirement (meaning she must pay 20% of the drug's list price without any rebates or other discounts), she would pay $193.80 for Ozempic at the artificially inflated price of $969 but only $24.40 if the price were $122.

10.11.  Defendants also engage in unfair methods of competition that negatively affect competition in the prescription drug market by giving preferential treatment to drugs with the highest rebates, even when there are multiple, equally effective drugs in a therapeutic class. Manufacturers facilitate this practice by paying kickbacks to Defendants. For example, in exchange for higher rebates and other fees, Defendants gave preferential status to Humira—a high-cost biologic used to treat arthritis and other inflammatory disorders—over lower-cost insulin biologics that the U.S. Food and Drug Administration ("FDA") approved to be *fully interchangeable* with the brand-name products, which, in some instances, Defendants excluded from their formularies. This effectively blocks lower-priced competitors from entering the market.

11.12.  The PBM Defendants also engage in unfair methods of competition that harm independent pharmacies—including independent pharmacies in Rhode Island—while providing an advantage to their own pharmacies and negatively affecting competition and consumers. Between 2010 and 2021, Rhode Island had a pharmacy closure rate greater than 35% and experienced a net loss of pharmacies—meaning more pharmacies closed than opened.[9] Independent pharmacies were particularly impacted.[10]

---

[9] Jenny S. Guadamuz, et al., *More US Pharmacies Closed Than Opened in 2018–21; Independent Pharmacies, Those in Black, Latinx Communities Most at Risk*, 43(12) Health Affairs 1703, 1705 (2024), https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2024.00192?journalCode=hlthaff.
[10] *Id.* at 1707.

12.13.  The PBM Defendants use their dominant market power (explained below) to force their unaffiliated pharmacies to accept unfair contractual terms. This includes reimbursing independent pharmacies near or below their acquisition costs for dispensing lower-profit prescriptions and steering prescriptions for higher-profit drugs to the PBM Defendants' own affiliated pharmacies. One local independent pharmacist reported that CVS Caremark only reimburses her $2,200 for drugs that cost over $2,800 despite reimbursing CVS pharmacies over $4,000 for the exact same drug. These practices unfairly lessen independent pharmacies' ability to compete with big, chain pharmacies, ultimately raise prices for consumers, and deny consumers their choice of pharmacy.

## PARTIES

### Plaintiff State of Rhode Island

13.14.  The State of Rhode Island is a sovereign state of the United States. Peter F. Neronha is the duly elected Attorney General and is the chief law enforcement officer and attorney for the State. The Attorney General brings this action on behalf of the State in accordance with his statutory authority.

### Defendants CaremarkPCS Health, L.L.C. and Zinc Health Services, LLC

14.15.  Defendant CaremarkPCS Health, L.L.C. (operating as CVS Caremark) is a Delaware limited liability company that maintains its principal place of business in Rhode Island and is registered to do business in Rhode Island. It is a wholly owned indirect subsidiary of CVS Health Corporation ("CVS Health").

15.16.  Defendant Zinc Health Services, LLC is a Delaware limited liability company with its principal place of business in Rhode Island. CVS Health established Zinc as a group purchasing

6

organization—entities typically used to consolidate the purchasing power of multiple organizations—for its PBM business in 2020. CVS Health co-owns Zinc and appoints three out of the four members of Zinc's Board of Directors. Zinc negotiates rebates with drug manufacturers on behalf of CVS Caremark in addition to other third parties' commercial clients.

16.17. At all relevant times, CVS Caremark and Zinc had agreements with various prescription drug manufacturers related to payments for preferred placement on CVS Caremark's standard formularies and engaged in business in Rhode Island.

17.18. In 2024, CVS Caremark controlled 27% of the national PBM market based on total prescription claims managed.[11]

### Defendants Express Scripts, Inc. and Ascent Health Services LLC

18.19. Defendant Express Scripts, Inc. is a Delaware corporation that maintains its principal place of business in Missouri and is registered to do business in Rhode Island.

19.20. Express Scripts, Inc. is a wholly owned direct subsidiary of Evernorth Health, Inc. and a wholly owned indirect subsidiary of Cigna Corporation. Prior to merging with Cigna Corporation in 2019, Express Scripts, Inc. was the largest independent PBM in the United States.

20.21. Defendant Ascent Health Services LLC is a Delaware limited liability company with its principal place of business in Switzerland. In 2019, Express Scripts established Ascent as a group purchasing organization for its PBM business. Express Scripts co-owns Ascent and appoints three out of the five members of Ascent's Board of Directors. Ascent negotiates rebates with drug manufacturers on behalf of Express Scripts and other third parties' commercial clients.

---

[11] Adam J. Fein, *The Top Pharmacy Benefit Managers of 2024: The Top Pharmacy Benefit Managers of 2024: Market Share and Key Industry Developments*, Drug Channels (Mar. 31, 2025), https://www.drugchannels.net/2025/03/the-top-pharmacy-benefit-managers-of.html.

21.22. At all relevant times, Express Scripts and Ascent had agreements with various prescription drug manufacturers related to payments for preferred placement on Express Scripts' standard formularies and engaged in business in Rhode Island.

22.23. In 2024, Express Scripts controlled 30% of the national PBM market based on total prescription claims managed.[12]

### Defendants OptumRx, Inc. and Emisar Pharma Services LLC

23.24. Defendant OptumRx, Inc. is a California corporation that maintains its principal place of business in California and is registered to do business in Rhode Island. OptumRx is a wholly owned indirect subsidiary of UnitedHealth Group Inc.

24.25. Defendant Emisar Pharma Services LLC is a Delaware limited liability company with its principal place of business in Ireland. Emisar is a wholly owned indirect subsidiary of UnitedHealth Group Inc. that launched in late 2021 as a group purchasing organization. Emisar negotiates rebates with drug manufacturers on behalf of OptumRx's commercial clients.

25.26. At all relevant times, OptumRx and Emisar had agreements with various prescription drug manufacturers related to payments for preferred placement on OptumRx's standard formularies and engaged in business in Rhode Island.

26.27. In 2024, OptumRx controlled 23% of the national PBM market based on total prescription claims managed.[13]

### JURISDICTION AND VENUE

---

[12] *Id.*
[13] *Id.*

27.28.  ~~This~~Defendants CVS Caremark and Express Scripts have asserted that this Court has subject- matter jurisdiction pursuant to ~~R.I. Gen. Laws § 8-2-14.~~the Federal Officer Removal Statute, 28 U.S.C. § 1442.[14]

28.29.  This Court has personal jurisdiction over Defendants because Defendants transact business in Rhode Island and/or have the requisite minimum contacts with Rhode Island necessary to constitutionally permit the Court to exercise jurisdiction, with such jurisdiction also being proper under Rhode Island's long-arm statute, R.I. Gen. Laws § 9-5-33. Defendants engage in business in Rhode Island by administering pharmacy benefit services to Rhode Island consumers.

29.30.  This Court has general jurisdiction over CVS Caremark and Zinc as their principal places of business are in Rhode Island.

~~30.     Venue is proper in this Court pursuant to R.I. Gen. Laws § 8-2-27.~~

## BACKGROUND

### *PBMs Are the Middleman in a Complex Drug Pricing System*

31.     Consumers pay monthly insurance premiums to their employers or insurance companies (third-party payers) that sponsor their health benefit plans. Health benefit plans then contract with PBMs to administer consumers' prescription drug benefits. The relationship between health benefit plans and PBMs is disclosed to consumers. In fact, as described below, PBMs interact directly with consumers. Although PBMs may receive some compensation directly from health benefit plans, they are largely compensated through fees that drug manufacturers and pharmacies pay, as discussed below.

---

[14] Consistent with the First Circuit's ruling in *Gov't of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174 (1st Cir. 2024), the State is not contesting that CVS Caremark and Express Scripts are entitled to a federal forum in which to litigate whether they act as federal officers in this case. However, the State reserves its right to challenge CVS Caremark's and Express Scripts' assertions and defenses and to seek related discovery and remand promptly, if appropriate.

32.    When PBMs first entered the market, they primarily provided electronic claims processing services to efficiently and economically process a high volume of relatively small dollar claims.[15] Now, PBMs, including the PBM Defendants, act as intermediaries between health benefit plans and other entities in the drug distribution chain, such as prescription drug manufacturers and pharmacies (as shown in Figure 1 below).[16] PBMs are involved in and benefit at almost every step in this complex system—often profiting through methods that are secret and unknown to consumers or even their own clients.

*Figure 1: The Role of Pharmacy Benefit Managers*

---

[15] Robin J. Strongin, *The ABCs of PBMs,* The George Washington University (Oct. 27, 1999), at 2, https://www.ncbi.nlm.nih.gov/books/NBK559746/pdf/Bookshelf_NBK559746.pdf.
[16] James T. Kennedy, RPh, and Shellie Keast, PharmD, PhD, *A primer on brand-name prescription drug contracting*, 30(5) J. Manag. Care Spec. Pharm. 507, 508 (2024).

10



33.     In their role as intermediaries, PBMs participate in the complex scheme of pricing and paying for prescription drugs. Various prices and benchmarks are used at different stages in the drug pricing system, including:

- **Wholesale Acquisition Cost ("WAC" or "list price")**: the manufacturer's published list price to wholesalers or direct purchasers (excludes rebates or other discounts)

- **Manufacturer's Net Price**: the revenue a manufacturer receives (*i.e.*, the list price (WAC) minus rebate or other discounts)

- **Average Wholesale Price ("AWP")**: the estimated average price that pharmacies pay to wholesalers (excludes rebates or other discounts), typically the manufacturer's list price (WAC) plus 20%

- **National Average Drug Acquisition Cost ("NADAC")**: the estimated wholesale price retail pharmacies pay to wholesalers, based on invoice prices paid by retailers

- **Negotiated Rate:** the price that PBMs negotiate with manufacturers for brand-name drugs (*i.e.*, WAC minus rebates and other fees paid by manufacturers)

- **Maximum Allowable Cost ("MAC")**: PBMs' self-established upper limit of what they will reimburse pharmacies for generics

- **Reimbursement Rate:** the rate at which PBMs reimburse pharmacies for filling prescriptions

- **Usual and Customary Price ("U&C" or "cash price")**: the price that a pharmacy charges cash-paying consumers

### PBMs Contract with Prescription Drug Manufacturers

34. A drug formulary is a list of generic and brand-name prescription drugs assembled by PBMs and thus covered by health benefit plans. A health benefit plan will not typically reimburse any part of the cost for a drug that is not included in the PBM-designed formulary.

35. Formularies are usually divided into tiers that determine the cost-share amounts (*e.g.*, the copayment or co-insurance) that consumers must pay toward the cost of a prescription. Lower tiers have lower cost-share amounts than higher tiers.

36. PBMs negotiate and contract with manufacturers of brand-name prescription drugs for rebates and other fees in exchange for securing placement on PBMs' drug formularies, and for the position a drug enjoys on the PBMs' formularies—either more advantageous to the manufacturer or less.

37. Unlike traditional point-of-sale rebates, manufacturers pay prescription drug rebates to PBMs, not to the consumers who typically pay the WAC (list price) to the pharmacy, either directly or through their insurance provider.

38. PBMs typically retain a portion of the rebates and other fees discussed below that they receive from prescription drug manufacturers and return the remainder to health benefit plans. The exact amount that PBMs retain depends on their contract with the health benefit plan. However, as discussed below, because of PBMs' lack of transparency, it is extremely difficult to know whether PBMs are actually passing all required payments through to health benefit plans.

12

39.     Generally, manufacturers of brand-name prescription drugs pay higher rebates for preferred formulary placement (namely, a lower tier rather than a higher tier). This is because, upon information and belief, consumers are more likely to fill, and doctors are therefore more likely to write, prescriptions for drugs with lower cost-share amounts (and ask their doctors to prescribe products on lower formulary tiers).

40.     The rebates PBMs negotiate are highly confidential and, for the most part, the exact terms of the agreements between PBMs and prescription drug manufacturers are unknown to others in the supply chain, even to the PBMs' own clients. In fact, PBMs frequently use their contracts with health benefit plans to limit plans' right to certain information and data. Thus, for most of the players in the prescription drug supply chain, including the State and Rhode Island consumers, drug pricing is a black box.

41.     Manufacturers also pay PBMs "administrative fees" for administering rebates. Like rebates, administrative fees are tied to WAC (such that PBMs again benefit from higher drug prices) and paid according to PBMs' confidential contracts with manufacturers. Administrative fees typically range from 3% to 5% of WAC.[17]

42.     "Price protection" is another way that PBMs extract payments from manufacturers. It is a cap on the amount by which prescription drug manufacturers can increase WAC for a particular drug (ranging from 0% to 12%).[18] Any price increase by manufacturers above the established cap triggers additional rebate payments to PBMs known as price protection. And while

---

[17] Staff of U.S. Senate Comm. on Finance, 117th Cong., *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug* (Jan. 14, 2021) at 82, https://www.finance.senate.gov/imo/ media/doc/Grassley-Wyden%20Insulin%20Report%20(FINAL%201).pdf (hereinafter "Senate Finance Committee Insulin Report").
[18] *Id*. at 84.

PBMs present price protection as a means to reduce costs, evidence shows that it has done little to accomplish that, and drug prices have continued to skyrocket despite price protection. Price protection also creates another perverse incentive for PBMs. Drug rebates and other fees paid to a PBM are usually based on list price (WAC). For example, a manufacturer may offer PBMs a rebate of 40% of WAC or an administrative fee of 3% of WAC for a particular drug. Thus, when WAC increases, rebates and fees also increase.

### *PBMs Have Begun Conducting Negotiations with Manufacturers Through GPOs*

43.    Around 2019, PBMs began forming GPOs (sometimes also referred to as rebate aggregators) to conduct their formulary and rebate negotiations and collect rebates and other fees from manufacturers and distribute them to PBMs. As explained above, PBMs are then supposed to pass through an agreed upon percentage of the fees they receive from manufacturers to their health benefit plan clients. GPOs are intended to be entities that combine the purchasing power of multiple organizations to negotiate better prices and terms with suppliers.

44.    Historically, PBMs did not utilize GPOs, presumably because they had enormous bargaining power on their own. As discussed below, it appears that rather than use GPOs to negotiate better prices and terms with suppliers, PBMs use their GPOs to recategorize existing income streams and generate new income streams. Thus, GPOs also serve as an additional, non-transparent layer in an already opaque system, making it even more difficult for health benefit plans to determine whether they received their fair share of rebates and other manufacturer fees or whether PBMs or GPOs are providing value relative to the administrative fees they charge and to their effectiveness in reducing total drug spend.

***PBMs Contract with Pharmacies Including Independent Pharmacies***

45.    In addition to negotiating with prescription drug manufacturers, PBMs negotiate and contract with retail pharmacies to create networks of preferred pharmacies where consumers (which PBMs refer to as their "members") may fill prescriptions for these drugs.

46.    Pharmacies dispense prescriptions through two main formats—retail pharmacies (*i.e.*, brick and mortar) and mail order pharmacies. Retail pharmacies can be large, chain pharmacies (*e.g.*, CVS, Walgreens) or small, independent pharmacies, which are owned and operated by local individuals rather than publicly traded corporations. There is also a rapidly expanding pharmacy segment called specialty pharmacies, which are typically mail-order pharmacies, that dispense specialty drugs. There is no uniform definition for specialty drugs. Drugs are generally considered "specialty drugs" if they are high cost, used to treat complex, chronic, or rare medical conditions, or require special handling (*e.g.*, chemotherapy drugs).

47.    Although PBMs allow consumers to fill their prescriptions at a wide variety of retail pharmacies, PBMs typically have exclusivity clauses in their contracts with health benefit plans that require consumers to utilize the PBMs' own mail-order pharmacies. Thus, as discussed below, PBMs can steer prescriptions for highly-profitable drugs to their own specialty pharmacies by unilaterally designating the drugs as specialty drugs.

48.    Agreements with pharmacies determine the amount PBMs will pay to fill prescription drugs (minus any cost-share amounts that consumers pay directly to pharmacies). Independent pharmacies have very little leverage in their negotiations against PBMs and describe the agreements as take it or leave it contracts of adhesion, meaning that if the independent pharmacy does not accept the offered terms, the only alternative is to leave a network that likely includes high proportions of the independent pharmacy's customers.

49. While the PBMs pay one low cost to independent pharmacies, typically, they mark up the price when seeking reimbursement for those payments from health benefit plans—creating another revenue stream for PBMs, typically referred to as the "spread." For example, a health benefit plan may agree to pay a standard benchmark price for prescription drug claims plus a set discount (*e.g.*, AWP minus 10%). The PBM may then negotiate a lower reimbursement rate with the pharmacy and keep the difference. To avoid confusion, this revenue source will be referred to hereinafter as the "PBM-to-pharmacy spread."

### *Consumers' Out-of-Pocket Costs Are Typically Tied to WAC*

50. Consumers' out-of-pocket costs for drugs are determined by whether they have insurance and the terms of their coverage. Consumers pay, from high to low, either: (1) the cash price of the prescription drug (because consumers are either uninsured or in the deductible phase of coverage), to (2) a cost-share payment based on a percentage of drug costs (*e.g.*, 20% of the drug price), to 3) what is typically the least expensive option, a flat copayment, typically based on the drug's formulary tier. Since out-of-pocket costs for consumers without flat copayments are tied to drugs' list prices, they automatically increase when list prices increase.

51. Consumers without insurance pay the pharmacy's cash price, which is generally marked up above WAC. For example, as of January 2025, the WAC price for Mavyret (AbbVie's blockbuster Hepatitis C medication) is $13,200 per month, but the cash price for Mavyret is $15,950 per month at a Walmart in Providence and $16,333 (or $13,521 with a GoodRx coupon) at a Walgreens in Providence.[19]

52. An increasing number of consumers have high-deductible plans, which require them to pay the cash price for drugs until they meet their deductible—averaging nearly $2,700 a

---

[19] AbbVie Inc., *Mavyret List Price*, https://www.mavyret.com/cost (last visited May 27, 2025).

year for single coverage in 2024, while 36% have a deductible of $3,000 or more.[20] Even those with more modest deductibles are still adversely affected by higher drug costs until their deductibles are exhausted and coverage kicks in.

53.      About 30–50% of insured consumers pay a coinsurance amount, which is a percentage of the full list price (WAC), not reduced by rebates.[21]

54.      Other insured consumers pay a flat copayment amount based on whether the drug is a generic drug, a preferred or non-preferred brand-name drug, or a specialty drug. For example, under the Anchor and Anchor Plus plans (two programs that Rhode Island offers to state government employees), consumers pay a copayment of $10 for generics drugs, $35 for preferred brand-name drugs and $60 for non-preferred brand-name drugs, and $100 for specialty drugs.[22] Copayments are not directly tied to WAC; however, the overall cost of drugs factors into a health benefit plan's decision to set premiums and consumer copayment amounts. In other words, if drug costs increase, a health benefit plan may decide to raise premiums or copayment amounts.

**FACTUAL ALLEGATIONS**

---

[20] Gary Claxton, et al., *Employer Health Benefits 2024 Annual Survey,* KFF (Oct. 9, 2024) at 140, https://files.kff.org/attachment/Employer-Health-Benefits-Survey-2024-Annual-Survey.pdf.
[21] Lisa L. Gill, *The Shocking Rise of Prescription Drug Prices: Here's why prices keep going up, plus how to combat the sticker shock—and still protect your health*, Consumer Reports (Nov. 26, 2019), https://www.consumerreports.org/drug-prices/the-shocking-rise-of-prescription-drug-prices/.
[22] State of Rhode Island - Office of Employee Benefits, *Prescription Coverage*, https://employeebenefits.ri.gov/benefit-programs/active-employees/health-benefits/prescription (last visited May 27, 2025).

**I.      Defendants Conduct Trade and Commerce in Rhode Island**

55.      Defendants engage in trade and commerce by, among other things, administering prescription drug benefits in Rhode Island.

56.      Defendants are part of transactions that are covered by the DTPA. Indeed, the affected consumers are intended third-party beneficiaries of the contractual relationship between their health benefit plans and the PBM Defendants. Moreover, Rhode Island employers, as consumers of health benefit plans, may either have direct contractual relationships with the PBM Defendants or are third-party beneficiaries of the contractual relationship between their health benefit plans and the PBM Defendants.

57.      The PBM Defendants contract with health benefit plans based in and outside of Rhode Island to provide services to Rhode Island consumers. For example, CVS Caremark contracts with the Rhode Island government employee health benefit plans. They are compensated through a combination of fees paid by health benefit plans, which are derived from consumers' premiums, and fees paid by drug manufacturers and pharmacies, which stem from consumers' drug utilization, as discussed above.

58.      As CVS Caremark explains to consumers through its welcome kit: "We manage your prescription drug benefits just like your health insurance company manages your medical benefits."[23]

59.      The PBM Defendants market their services to and interact directly with consumers, including consumers in Rhode Island. As an example of the relationship between the PBM Defendants and these Rhode Island consumers, the PBM Defendants provide identification cards

---

[23] CVS Caremark, *Sample Welcome Kit*, https://benefits.vmware.com/wp-content/uploads/2018/10/CVS-Caremark-Sample-Welcome-Kit_ID-Card.pdf (last visited May 27, 2025).

to these consumers with their company logos to present to pharmacies for the purpose of determining the consumers' prescription drug coverage.

60.     The PBM Defendants also have consumer-facing websites where they ask consumers to create accounts.[24] The websites also direct consumers to contact the PBM Defendants if they have questions regarding their prescription drug benefits.

61.     Indeed, the PBM Defendants acknowledge their important role in serving consumers by advertising that consumers are their members and that their primary role is to serve members.

62.     CVS Caremark represents in the "About Us" section of its website: "Your health is our priority[.] As a pharmacy benefit manager (PBM), we manage prescription plans to help make them more cost-effective – so you can get what you need when you need it."[25] In 2023, Caremark advertised that it served 103 million members.[26]

63.     In a CVS Caremark flyer to consumers enrolled in the Rhode Island government employee health benefit plans, CVS Caremark states: "Having access to high-quality, affordable care is important to you and your family – and it's just as important to us."[27]

---

[24] CVS Caremark, https://www.caremark.com (last visited May 27, 2025); Express Scripts, https://www.express-scripts.com (last visited May 27, 2025); OptumRx, https://www2.optumrx.com/ (last visited May 27, 2025).

[25] CVS Caremark, *About Us*, https://www.caremark.com/about-us.html (last visited May 27, 2025).

[26] CVS Caremark, *About Us*, https://www.caremark.com/about-us.html (last visited May 27, 2025) [https://web.archive.org/web/20231011205254/https://www.caremark.com/about-us.html].

[27] CVS Caremark, *Great News: You could be paying less for your Rx. With the new Savings Advisor tool* (2020), https://employeebenefits.ri.gov/sites/g/files/xkgbur816/files/documents/cvs-savings-advisor.pdf.

64.     Express Scripts promises that it "advocate[s] on behalf of members, removing barriers to access and simplifying every care experience."[28] It also represents that it provides "[p]harmacy benefits that benefit you[.]"[29] Express Scripts states on its website that it serves "1 in 3 Americans."[30]

65.     OptumRx states on its website: "Optum Rx is a pharmacy benefit manager serving more than 65 million members. We provide safe and cost-effective ways for you to access your medications and help you achieve better health outcomes."[31]

66.     Since as early as 2019, the PBM Defendants have utilized the GPO Defendants to conduct fundamental aspects of their service, including engaging in rebate and formulary negotiations with manufacturers. The GPO Defendants also collect payments from manufacturers and distribute them to the PBM Defendants. The GPO Defendants provide these services nationwide, including, ~~upon information and belief,~~ in Rhode Island.

## II.     The PBM Defendants Deceptively Represent That ~~They~~Defendants Act to Serve Consumers by Lowering Drug Prices and Ensuring Their Access to Safe and Effective Drug Treatments

67.     The PBM Defendants make numerous deceptive representations directly and indirectly to consumers regarding ~~their~~Defendants' (meaning both the PBM Defendants' and the GPO Defendants') role in the market. For example, the PBM Defendants deceptively represent that Defendants: (1) ~~they~~ function to lower drug costs; (2) design their formularies ~~are designed~~ to

---

[28] Evernorth Health Services, *Express Scripts By Evernorth*, https://www.evernorth.com/our-solutions/express-scripts-pbm (last visited May 27, 2025).

[29] Express Scripts, *Benefits*, https://www.express-scripts.com/pharmacy-benefits-manager (last visited May 27, 2025).

[30] Evernorth Health Services, *The Value Express Script Delivers*, https://www.evernorth.com/esfacts/key-topics/the-value-express-scripts-delivers (Sept. 5, 2024).

[31] Optum Rx, Inc., *Frequently asked questions*, https://welcome.optumrx.com/cpcty2/frequently-asked-questions (last visited May 27, 2025); *see also* OptumRx, Inc., *Welcome to Optum Rx*, https://welcome.optumrx.com/standard/getstarted (Sept. 5, 2024).

maximize effectiveness and safety and minimize cost; and (3) ~~they are acting~~act in consumers' best interests.

68.     The PBM Defendants make these deceptive representations directly to consumers through their consumer-facing websites, other online materials and, most recently, in the case of Express Scripts, newspaper advertisements. Upon information and belief, the PBM Defendants also make these deceptive representations directly to consumers through other consumer-facing materials, such as welcome kits, benefit handbooks, published formularies, and letters. In addition, upon information and belief, the PBM Defendants make these deceptive representations to health benefit plans with the knowledge and intention that the health benefit plans will pass this misinformation on to consumers.

69.     For example, CVS Caremark falsely represents that its role is to "keep prescription drugs affordable."[32] It also misleadingly claims:

   a.    "MYTH: Rebates negotiated by PBMs are driving up the prices of prescription drugs for consumers and plan sponsorship. FACT: Pharmaceutical manufacturers set the list price for a given drug. PBMs then negotiate with manufacturers to secure the drug at a lower cost for their plan sponsors and their members."[33] This representation is likely to mislead consumers acting reasonably under the circumstances because CVS Caremark conceals the manner in which its tactics incentivize and/or pressure manufacturers to increase the price of their drugs in order to maintain a reasonable profit margin while satisfying the demands of PBMs (including CVS Caremark) for ever-increasing rebates and fees.

   b.    "MYTH: PBMs increase cost-sharing burdens for beneficiaries. FACT: Plan designs are determined by clients – employers and health insurance plans – who decide how they subsidize their members' coverage."[34] This representation is likely to mislead consumers acting reasonably under the

---

[32] CVS Health, *5 Facts to Know About PBMs*, at 1, https://business.caremark.com/content/dam/enterprise/business-caremark/insights/pdfs/2023/PBM-5-facts_r4%20(1).pdf (last visited May 27, 2025).

[33] CVS Health, *Myths vs. Fact Pharmacy Benefit Management* (Jan. 2021), at 2, https://www.cvshealth.com/sites/default/files/cvs-health-myth-vs-fact-pbm-2021-01.pdf.

[34] *Id*. at 3.

21

circumstances because it conceals from consumers the fact that the consumer's share of the costs is sometimes tied to the list price (WAC) of the applicable drugs, and if CVS Caremark pressures a manufacturer to pay higher rebates and fees, resulting in higher drug prices for the manufacturer to maintain a reasonable profit margin, the consumer's cost share rises as well.

c. "MYTH: PBMs lower drug costs by restricting patient access to needed medication. FACT: PBMs help ensure that beneficiaries have access to the prescriptions they need to stay healthy, at a price they can afford."[35] This representation is likely to mislead consumers acting reasonably under the circumstances because CVS Caremark makes certain formulary decisions based primarily on what will increase its revenues, not on providing consumers with the widest range of drugs for their conditions, at the lowest possible cost.

d. "A formulary is your plan's list of covered medications. The formulary is designed to help you get the medication you need at the lowest possible cost."[36] This representation is likely to mislead consumers acting reasonably under the circumstances because the formularies designed by CVS Caremark have the intent and/or effect of increasing the cost to at least a subset of consumers and giving preferential treatment to many drugs based on factors unrelated to costs or the health or safety of the patient.

e. "Formularies have two primary functions: 1) to help provide pharmacy care that is clinically sound and affordable for plans and their plan members, and 2) to help manage drug spend through the appropriate selection and use of drug therapy."[37] This representation is likely to mislead consumers acting reasonably under the circumstances for the reasons stated above.

f. "Your health is our priority[.] As a pharmacy benefit manager (PBM), we manage prescription plans to help make them more cost-effective – so you can get what you need when you need it."[38] This representation is likely to mislead consumers acting reasonably under the circumstances for the reasons stated above.

---

[35] *Id*. at 4.

[36] CVS Caremark, *Your plan's formulary*, https://www.caremark.com/plan-benefits.html (last visited May 27, 2025).

[37] CVS Caremark, *Formulary Development and Management at CVS Caremark*, at 1, https://www.caremark.com/portal/asset/FormDevMgmt.pdf (last visited May 27, 2025).

[38] CVS Caremark, *About Us*, *supra* note ~~23~~24.

22

70.     For example, Express Scripts incorrectly asserts that it "exists to lower the cost of medications."[39] In fact, as described below, Express Scripts' formulary and rebate practices actually increase the cost of medications. Like CVS Caremark, Express Scripts deceptively makes the following assertions, which are likely to mislead consumers acting reasonably under the circumstances for the same reasons as stated with respect to CVS Caremark:

a.     "PBMs help get the lowest net cost for their clients and consumers. Claims that 'higher rebates mean higher prices' have been repeatedly debunked and repeatedly disproven."[40]

b.     "Rebates help defray ever-rising drug costs for Express Scripts clients and consumers"[41]

c.     "Rebates do not raise drug prices, drug makers raise drug prices, and they alone can lower them. Consider the cost of Humalog® (insulin lispro): over the past seven years, the list price for this medication has increased dramatically, yet the net cost has remained relatively constant. Without PBMs, and specifically without Express Scripts, plan sponsors would have paid exponentially more for their prescription drugs."[42]

d.     "FACT: Public disclosure of negotiated rebates will not lower prescription drug costs. #PBMs Express Scripts negotiates with drug manufacturers to increase competition and lower costs for patients."[43]

e.     "Express Scripts revises its [National Preferred Formulary ("NPF")] every year, based on reviews of research about the medical value of medicines and their costs. The process of reviewing the NPF and making yearly updates is designed to give members access to the most effective medicines at the lowest possible prices."[44]

---

[39] Evernorth Health Services, *The Reality of Rebates*, https://www.evernorth.com/esfacts/key-topics/the-reality-of-rebates (Sept. 4, 2024).
[40] *Id.*
[41] *Id.*
[42] Express Scripts, Inc., *The Rebate Debate* (June 29, 2017), https://www.express-scripts.com/corporate/articles/rebate-debate.
[43] @ExpressScripts, Twitter (Apr. 9, 2019, 3:10 PM), https://twitter.com/ExpressScripts/status/1115693403285741568.
[44] Express Scripts, *National Preferred Formulary (NPF)*, https://www.express-scripts.com/frequently-asked-questions/national-preferred-formulary-npf (last visited May 27, 2025).

      f.      "Pharmacy benefits that benefit you[.] Your pharmacy benefits should be as personal as your medication. You can depend on Express Scripts for care that fits your specific needs."[45]

71.      In addition, on September 11, 2024, Express Scripts ran a print advertisement in the Wall Street Journal, declaring:

WE'RE PHARMACISTS.

WE'RE CLINICIANS.

WE'RE RESEARCHERS.

WE'RE NEGOTIATORS.

WE'RE CAREGIVERS.

THAT'S NOT

A MIDDLEMAN.

THAT'S AN

ADVOCATE.

We're Express Scripts by Evernorth. We're not middlemen. We're 18,000 advocates who take pride in being the last line of defense for millions of Americans against rising health costs. Fighting every day to make their medications more affordable and accessible.[46]

72.      Express Scripts also ran a print advertisement in the New York Times on August 29, 2024, with the tagline: "Pharmaceutical companies raise drug prices. We lower them."[47] The advertisement also stated: "In 2023, big pharma increased prices for 60% of all branded drugs. Why? Because they can. At Express Scripts, we fight back. We are the last line of defense for

---

[45] Express Scripts, *Benefits*, *supra* note 2728.
[46] Advertisement for Express Scripts, Wall Street Journal, Sept. 11, 2024, at A18.
[47] Advertisement for Express Scripts, N.Y. Times, Aug. 29, 2024.

nearly 100 million Americans against skyrocketing health costs." These statements are deceptive for the same reasons stated above.

73.    OptumRx is no better. It falsely represents: "PBMs don't cause high drug costs – they're part of the solution."[48] It also misleadingly states:

a.    "Rebates are a longstanding tool used by PBMs to negotiate with drug manufacturers to achieve lower prescription drugs costs for clients."[49]

b.    "Unfortunately, many people do not take their medications as they should, citing cost as a primary reason. Optum Rx is directly addressing this problem by always driving lowest net cost across our book of business."[50]

c.    "A formulary is a list of prescribed medications or other pharmacy care products, services or supplies chosen for their safety, cost, and effectiveness."[51]

d.    "Both PBMs and their clients are aligned on the need to implement benefit designs that promote generics. The reason is simple: the programs save money and help promote better health outcomes."[52]

e.    "Pharmacy benefit managers (PBMs) like Optum Rx help consumers and customers access the most effective medicines at the most affordable costs. We serve as a counterweight to the substantial market power of pharmaceutical manufacturers, who have sole discretion over how they price their products. Through our negotiations with manufacturers and by offering clinical and cost management services, we are lowering the cost of prescription drugs and improving health outcomes for our customers, including employers, unions, health plans, governments and the consumers they serve."[53]

---

[48] OptumRx, *Experts agree: PBMs add value, lower costs* (Oct. 25, 2023) https://www.optum.com/en/business/insights/pharmacy-care-services/page.hub5.pharmacy-benefit-managers-medication-affordability.html (last visited May 27, 2025).

[49] OptumRx Inc., *Regulatory developments affecting pharmacy* (Feb. 2022), https://www.optum.com/business/resources/library/regulatory-updates-q1-2022.html.

[50] OptumRx, Inc*., Experts agree, supra* note 4649.

[51] OptumRx, Inc., *2025 Select Standard Formulary*, https://contenthub-aem.optumrx.com/content/dam/contenthub/onboarding/assets/som/Select-Formulary-2025.pdf (last visited May 27, 2025).

[52] OptumRx, Inc., *Experts agree, supra* note 4649.

[53] OptumRx, Inc., *Pharmacy Care That Provides Affordable Prescription Medications and Therapies*, https://www.unitedhealthgroup.com/ns/optum-rx.html (last visited May 27, 2025).

      f.      "For every $1 spent on their services, PBMs reduce cost by $10."[54]

74.      OptumRx's representations are likely to mislead consumers acting reasonably under the circumstances for the same reasons as stated with respect to Express Scripts and CVS Caremark.

75.      The PBM Defendants' representation that ~~they~~Defendants lower drug prices is belied by the data, which shows that from 1985 to 2024, drug prices have risen three times faster than the rate of inflation (as shown in Figure 2 below).[55]

*Figure 2: Drug Price Increases from 1985-2024*

76.      The fallacy of the PBM Defendants' contention that drugs with higher WAC prices and large rebates cost the same or are cheaper than drugs with lower WAC prices with lower or no rebates is disingenuous and not supported by the math. If you compare a drug with a $50 WAC

---

[54] OptumRx, Inc., *Experts agree, supra* note ~~46~~49.

[55] *Drug prices have outpaced inflation since the 1980s*, USAFacts (Mar. 21, 2025), https://usafacts.org/articles/drug-prices-outpaced-inflation-since-the-1990s/.

price and no rebate and the same drug with a $100 WAC price and a $50 rebate (or combination of rebate and other fees), this sounds deceptively like both drugs have the same net price ($50). But this ignores the fact that the PBM Defendants retain some portion of the fees they negotiate from manufacturers—sometimes a very significant portion. If the PBM Defendants retain $10 of the $50 rebate or other fees, the $100 drug now has a net price of $60—making it more expensive than the $50 drug with no rebate. This implies that, in the absence of PBMsDefendants, a manufacturer would only need to offer a $50 WAC price with no rebate, not $100, to achieve the same margin. In addition, as explained above, many consumers' cost-share amounts are tied to WAC, meaning their out-of-pocket costs will rise along with the WAC price, even if the net cost to the health benefit plan is lowered.

77.    As discussed above and explained in more detail below, this information is material to consumers, and the PBM Defendants' representations are misleading and do not accurately reflect the PBM Defendants' role in the market, their decision-making with regard to their formularies, or their impact on drug prices.

77.78.  The GPO Defendants, which are vertically integrated with the PBM Defendants, have full knowledge of these representations.  Nonetheless, they engage in practices that raise drug prices, including designing formularies that give preference to high-cost drugs with high rebates rather than cheaper drugs that are, in some instances, also safer or more effective than the high-cost alternative. As explained below, these practices by themselves are deceptive.

III.    **Defendants Engage in a Scheme to Artificially Inflate Drug Prices for Their Own Financial Gain**

78.79.  The PBM industry is heavily concentrated. The three largest PBMs are: (1) CVS Caremark (owned by CVS Health, which also owns CVS Pharmacy—the largest retail pharmacy chain in the United States); (2) Express Scripts (owned by Cigna—a global health insurance

company); and (3) OptumRx (owned by UnitedHealth Group Inc.—a healthcare and insurance company).

79.80. Through their multiple lines of business, each of these companies exercise extraordinary influence in health care. They are among the top 20 companies in the Fortune 500. UnitedHealth Group Inc. is listed fourth—below only Walmart, Amazon, and Apple, CVS Health is listed sixth—above Alphabet (Google's parent company) and Costco, and Cigna is listed 16th— above Ford, Bank of America, and Meta.

80.81. Due to a series of mergers and acquisitions, the big three PBMs—the PBM Defendants—now have *very little competition* and collectively manage *80%* of drug benefits, covering more than *220 million Americans*, making preferred placement on their drug formularies a significant bargaining chip when negotiating payments from prescription drug manufacturers (*see* Figure 3 below showing corporation consolidations).[56, 57]

---

[56] Senate Finance Committee Insulin Report, *supra* note 1516, at 68.

[57] Arkansas ex rel. Rutledge v. Eli Lilly & Co., No. 60cv-22-2976, Compl. ¶ 312 (Ark. Pulaski County Cir. Ct. May 11, 2022), https://content.govdelivery.com/attachments/ARAG/2022/05/11/file_attachments/2156162/2022-05-11-%20Insulin%20Complaint%20FINAL%20DRAFT.pdf.

28

*Figure 3: PBM Parent Entity Consolidation*

| 2000 | 2006 | 2012 | 2018 | 2021 |
|------|------|------|------|------|
| Cigna PBM | Cigna PBM | Cigna PBM | Cigna (Express Scripts) | Cigna (Evernorth/Express Scripts) |
| Accredo Health | Medco Health Solutions | Express Scripts | | |
| ProVantage | Express Scripts | | | |
| Merck-Medco Managed Care | NextRx | | | |
| National Prescription Administrators | | | | |
| Express Scripts | | | | |
| CuraScript | | | | |
| Priority Healthcare | | | | |
| WellPoint Pharmacy Management | | | | |
| Anthem Prescription Management | | | | |
| Commcare Pharmacy | Commcare Pharmacy | Premier (CommCare) | Premier (Acro/CommCare) | CVS Health (Caremark/Aetna) |
| Advance Paradigm | Caremark | Acro Specialty Pharmacy | CVS Health (Caremark/Aetna) | |
| Caremark | CVS (PharmaCare) | CVS Caremark | | |
| PCS Health Systems | RxAmerica | Aetna PBM | | |
| CVS (PharmaCare) | MemberHealth | Coram Specialty Infusion/CoramRx | | |
| United Provider Services | Aetna PBM | NovoLogix | | |
| RxAmerica | Coram Specialty Infusion/CoramRx | Omnicare | | |
| MemberHealth | NovoLogix | | | |
| Aetna PBM | Omnicare | | | |
| Prudential HealthCare Pharm. Svc | | | | |
| Coram Specialty Infusion/CoramRx | | | | |
| Ancillary Care Management | | | | |
| Omnicare | | | | |
| LDI Integrated Pharmacy Services | BioRx | BioRx | Diplomat | UHG (OptumRx) |
| National Pharmaceutical Services | LDI Integrated Pharmacy Services | LDI Integrated Pharmacy Services | UHG (OptumRx) | |
| The Apothecary Shop | National Pharmaceutical Services | National Pharmaceutical Services | | |
| International Pharmacy Management | The Apothecary Shop | Burman's Specialty Pharmacy | | |
| Catalyst Rx | Cypress Care, Inc. | Avella Specialty Pharmacy | | |
| HealthTran | Catalyst Rx | Healthcare Solutions | | |
| Centrus Pharmacy Solutions | HealthTran | Catamaran | | |
| The Inteq Group | FutureScripts | UHG (OptumRx) | | |
| NMHC | MedfusionRx | | | |
| Pharmaceutical Care Network | NMHC | | | |
| Pharmacy Associates | MedMetrics Health Partners | | | |
| ScripNet | ScripNet, Inc. | | | |
| Systems Xcellence | SXC Health Solutions | | | |
| Walgreens Health Initiatives | Walgreens Health Initiatives | | | |
| PacifiCare (Prescription Solutions) | UHG (Prescription Solutions) | | | |
| Restat | Restat | | | |

81.82. The PBM Defendants began increasingly exerting their leverage in 2012 by excluding drugs from certain therapeutic classes from their formularies to intensify the rebates manufacturers offered them. The threat of exclusion fundamentally changed drug pricing. Rebates went from modest discounts to steep payments that manufacturers made because not paying could doom a drug's chance of success. Thus, rather than standing up to the PBMs and refusing to pay exorbitant rebates, manufacturers have facilitated the practice by increasing their list prices to accommodate rising rebates. Over time, rebates have become a significant factor that manufacturers consider when setting drug prices.

### A. Defendants Exclude Drugs from Their Formularies to Increase Rebates and Other Fees

82.83. Contrary to their representations that they design formularies to minimize costs and maximize effectiveness and safety, Defendants' decisions about formulary coverage for drugs is

largely driven by their own profits and have the effect of sometimes excluding the most inexpensive and even the most effective and safest treatments (and driving up drug prices).

83.84.  Defendants profit directly and indirectly from rebates: directly by retaining rebates (and, increasingly, other fees) from manufacturers, and indirectly by competing for business based on the misleading impression that their ability to deliver the highest rebates to health benefit plans will result in the lowest net cost (as explained above). As a result, Defendants focus on drugs that deliver the highest rebates.

84.85.  Defendants extract higher rebates from manufacturers by promising to shift nearly all of their "members" (*i.e.*, consumers) to the manufacturers' drugs and away from competing drugs. Defendants do this by requiring health benefit plans to follow their standard formularies. If health benefit plans want to deviate from the standard formulary and adopt customized formularies, which threaten Defendants' ability to profit from the highest rebates, they face substantial costs. Moreover, many health benefit plans cannot cost-effectively devote the resources and/or pharmaceutical expertise necessary to develop their own formularies and negotiate prices for the drugs on those formularies with manufacturers, which is why they outsource formulary decisions to Defendants and accept their standard formularies.

85.86.  CVS Caremark started excluding drugs from its formulary in 2012. Express Scripts and OptumRx began the practice in 2014 and 2016, respectively (*see* Figure 4 below showing the dramatic increase in the number of exclusions by PBM Defendant per year).[58]

---

[58] Adam J. Fein, *The Big Three PBMs' 2024 Formulary Exclusions: Biosimilar Humira Battles, CVS Health's Weird Strategy, and the Insulin Shakeup,* Drug Channels (Jan. 9, 2024), https://www.drugchannels.net/2024/01/the-big-three-pbms-2024-formulary.html.

*Figure 4: Defendant Formulary Exclusions from 2012–2024*



86.87. A study looked at drug utilization restrictions on prescription drugs from 2011–2020 in Medicare Part D plans.[59] It found that in 2020, beneficiaries' access to drugs in unprotected classes (*i.e.*, not in classes of drugs that Medicare Part D plans are required to cover) was restricted either through formulary exclusions, prior authorization, or step therapy requirements (*i.e.*, conditioning the prescription of certain drugs on first trying a different, usually less expensive drug) on an average of 40% of available drugs.[60] Upon information and belief, Defendants' formularies concerning non-Medicare plans are equally (if not more) restrictive.

87.88. Because exclusions were so profitable for Defendants, the number of medicines excluded from Defendants' formularies increased 961% from 2014 (109 unique drug exclusions)

---

[59] Joyce et al., *supra* note 56, at 391.
[60] *Id*. at 396.

to 2022 (1,156 unique drug exclusions).[61] Drugs used to treat chronic conditions—including insulin, antidepressants, antipsychotics, and antiarrhythmics—are most frequently excluded by Defendants, which means Defendants' unfair and deceptive restriction of these drugs may have long-term adverse consequences for the consumer-patients who require them.

88.89. Since Defendants began excluding drugs from their formularies, the monetary value of rebates has skyrocketed. For example, in July 2013, the manufacturer Sanofi offered rebates for insulin products between 2% and 4% for placement on CVS Caremark's formulary. By contrast, in 2018, Sanofi's rebates for insulin products were as high as 56%.[62]

89.90. The overall amount prescription drug manufacturers paid in rebates and other fees nationally doubled from 2013 ($83 billion) to 2018 ($166 billion).[63]

90.91. Defendants argue that their conduct in excluding drugs reduces costs, but the evidence indicates otherwise. A study from the Tufts Center for the Study of Drug Development found that cost-effectiveness did not appear to correlate with a drug's excluded or recommended status; rather, rebates appeared to play the more significant role in determining exclusion and recommendation decisions.[64] The Tufts study conducted a head-to-head comparison of excluded versus recommended drugs in the same therapeutic class. In half the drugs examined, the more cost-effective drug was excluded from coverage.[65] Consistent with Defendants' market rationale

---

[61] Xcenda, *Skyrocketing growth in PBM formulary exclusions continues to raise concerns about patient access*, at 2 (May 2022), https://www.xcenda.com/-/media/assets/xcenda/english/content-assets/white-papers-issue-briefs-studies-pdf/xcenda_pbm_exclusion_may_2022.pdf.

[62] Senate Finance Committee Insulin Report, *supra* note 1516, at 67.

[63] Gill, *supra* note 1920.

[64] Joshua P. Cohen et al., *Rising Drug Costs Drive the Growth of Pharmacy Benefit Managers Exclusion Lists: Are Exclusion Decisions Value-Based?*, 53 (Supp 1) Health Servs. Rsch. 2758, 2767, 2764 (Aug. 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6056588/pdf/HESR-53-2758.pdf.

[65] *Id*. at 2766.

and the PBM Defendants' marketing, that should not have happened even once, and the decisions are more plausibly explained by the influence of rebates.

91. 92.  Between 2019 and 2022, the three big insulin manufacturers launched low WAC price versions of their top selling products.[66] These products had WAC prices 50–60% below the brand-name products. Yet, Defendants gave preferential formulary treatment to the brand-name products with high rebates and excluded the medically equivalent, low WAC price versions with little or no rebates.

92. 93.  Internal documents from Novo Nordisk (another large insulin manufacturer) show that in 2018 the company considered, but ultimately decided against, lowering WAC for its insulin products by 50%.[67] The company's pricing committee warned that reducing WAC posed a significant financial risk to the company—even though the manufacturer's net price (and revenue) would remain the same. One of Novo Nordisk's primary concerns was facing retributive action from other entities in the pharmaceutical supply chain that derive payments based on WAC (namely, PBMs). Novo Nordisk specifically identified as downsides "formulary removal" and "CVS, Express Scripts, & Optum push to be kept whole." In other words, based on its experience and observation of market factors, Novo Nordisk had reason to be concerned that if it set the WAC for its insulin products at their true costs (Novo Nordisk's net price) instead of an inflated price with a 50% rebate, Novo Nordisk risked being removed from Defendants' formularies or having

---

[66] Eli Lilly & Company, *Lilly's Lower-Priced Insulin Now Available* (May 22, 2019), https://investor.lilly.com/news-releases/news-release-details/lillys-lower-priced-insulin-now-available; Novo Nordisk Inc., *Novo Nordisk's new insulin affordability offerings now available in the US* (Jan. 2, 2020),      https://www.novonordisk-us.com/media/news-archive/news-details.html?id=36628; Sanofi, *Sanofi to lower out-of-pocket cost of insulin for uninsured patients and expand access in underserved communities* (June 29, 2022), https://www.news.sanofi.us/2022-06-29-Sanofi-to-lower-out-of-pocket-cost-of-insulin-for-uninsured-patients-and-expand-access-in-underserved-communities.

[67] Senate Finance Committee Insulin Report, *supra* note 15 16, at 61–63, 206–212 (Appendix 3).

to pay Defendants their cut of the now eliminated 50% rebate. Thus, Novo Nordisk chose to facilitate Defendants' scheme by continuing to inflate list prices for their insulin products at the expense of consumers and health benefit plans.

93.94. In fact, when Novo Nordisk lowered the WAC price for its long-acting insulin Levemir by 65% in early 2023, Defendants removed Levemir from their formularies.[68] Levemir went from being accessible to 90% of insured consumers to 36% of insured consumers. In other words, 64% of insulin patients lost access to this cost-effective drug because of Defendants' market manipulation. Novo Nordisk began phasing out Levemir in late 2023 and ultimately discontinued it, and *all* insulin patients lost access to this cost-effective medication.

94.95. In some instances, Defendants give preferential formulary treatment to products that are more expensive *and* have seemingly inferior safety profiles. For example, in 2020, Express Scripts excluded AstraZeneca's Calquence (drug used to treat Chronic Lymphocytic Leukemia) in favor of the higher-priced Imbruvica (manufactured by AbbVie and Johnson & Johnson)—perhaps the first major PBM restriction of an oncology therapy. This is particularly troubling because significantly fewer people who took Calquence suffered atrial fibrillation compared to Imbruvica in a head-to-head trial.[69]

95.96. Often, even products CVS Caremark recommends or gives preferential formulary treatment to are excluded by Express Scripts, and vice versa—further indicating that these

---

[68] Kass, *supra* note 78.

[69] Arlene Weintraub, *Express Scripts axes Novartis' psoriasis drug in favor of Lilly's as discounting takes over: analyst*, Fierce Pharma (Aug. 20, 2020), https://www.fiercepharma.com/pharma/express-scripts-axes-novartis-psoriasis-drug-favor-lilly-s-as-discounting-takes-over-analyst; John C. Byrd, et al., *First results of a head-to-head trial of acalabrutinib versus ibrutinib in previously treated chronic lymphocytic leukemia*, 39(15) J. Clin. Oncol. 7500 (May 28, 2021), https://ascopubs.org/doi/abs/10.1200/JCO.2021.39.15_suppl.7500.

exclusions are not evidence- or value-based.[70] Notably, Defendants' justifications for formulary exclusions are not ordinarily shared with consumers, their doctors, or even the PBM Defendants' clients (health benefit plans).

96.97.  The only reasonable explanation for Defendants' actions is that the higher list prices (WAC) are tied to higher rebates and/or other payments to Defendants. If Defendants were truly passing through 100% of payments from manufacturers to health benefit plans, there would be no incentive for Defendants to give preferential treatment to drugs with higher WAC prices and higher rebates versus comparable drugs with lower WAC prices and lower rebates (*i.e.*, preferring a $100 brand-name drug with a 50% rebate over a $50 generic drug with no rebate).

97.98.  In addition to excluding drugs, Defendants manipulate the formulary tiering system by giving preferential treatment to higher cost drugs for Defendants' own financial gain. According to their own marketing, PBMs are supposed to prefer less expensive drugs and save consumers and health benefit plans money. One key strategy would be placing these drugs in tiers with lower copayments, which would incentivize prescribers and consumers to utilize them, rather than higher cost drugs, which raise prices for consumers and health benefit plans. However, a 2021 study reviewing Medicare claims data from approximately one million patients between 2010 and 2017 reveals the underlying economic dynamics and found the opposite is true.[71] The percentage of generic drugs on the least expensive tier dropped from 73% in 2010 to 28% in 2017. Further, the percentage of drugs on less economical, higher cost tiers rose from 47% in 2010 to 74% in 2017. The list prices (WAC) for brand-name drugs are typically significantly higher than the list price for generic drugs; thus, it is unlikely that rebated brand-name drugs have an equivalent or

---

[70] Cohen et al., *supra* note 6263.
[71] Robin Feldman, *The devil in the tiers*, 8(1) J. Law Biosci, at 1 (Jan. 22, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8109230/.

lower net cost than their generic counterparts. From 2010–2017, tier misplacement cumulatively cost Medicare and the patients involved in the study $13.25 billion.

98.99. A study from the United States Government Accountability Office came to a similar conclusion.[72] It found that generic counterparts for 40 highly rebated brand-name drugs were less likely to be included or given preferred placement over the brand-name drug on Part D formularies compared to generic counterparts for other brand-name drugs.

99.100.        Upon information and belief, the same incentives lead to the same results for non-Medicare plans, where Defendants have even more leeway.

100.101.        Beyond pricing, which is discussed below, drug exclusions cause harm and/or raise a significant risk of concrete harm by forcing non-medical switching (altering a consumer's drug therapy for reasons other than a drug's efficacy, side effects, or clinical outcome). In other words, the choice of drugs available to consumers becomes driven not by which drug is safest or most effective for consumers, but by financial side-deals governing whether and at what cost-share amount a drug is placed on Defendants' formulary.

101.102.        In February 2008, CVS Caremark entered into a $38.5 million settlement agreement with 28 State Attorneys General (not including Rhode Island) under their consumer protection statutes to resolve allegations that the PBM engaged in deceptive business practices by encouraging doctors to switch consumers to different brand-name drugs by saying the consumers

---

[72] U.S. Government Accountability Office, *Medicare Part D: CMS Should Monitor Effects of Rebates on Plan Formularies and Beneficiary Spending*, at 27 (Sept. 2023), https://www.gao.gov/assets/gao-23-105270.pdf.

or their health benefit plans would save money without disclosing that the drug switching would benefit CVS Caremark.[73]

102.103.    Months later, Express Scripts settled similar allegations with 28 State Attorneys General and the District of Columbia (not including Rhode Island).[74] Among other things, the agreement:

- prohibited Express Scripts from eliciting consumers to switch to drugs that would cost them more;

- prohibited Express Scripts from soliciting drug switches when the originally prescribed drug has a generic equivalent, and the proposed drug does not;

- required Express Scripts to inform prescribers of Express Scripts' financial incentives for certain drug switches; and

- required Express Scripts to refrain from making any claims of savings for a drug switch to patients of prescribers unless Express Scripts can substantiate the claims.

103.104.    These changes to address PBM practices that harmed consumers, unfortunately, were short-lived. In the intervening years, Defendants' basic business practices have not changed, but have only become more profitable to Defendants, still at consumers' expense. Historically, Defendants excluded medicines with generic equivalents or classes where multiple products have been shown to achieve similar clinical outcomes. Now, Defendants often exclude

---

[73] Washington Attorney General, *Attorney General McKenna announces Caremark to pay $41 million to resolve multistate consumer protection claims* (Feb. 13, 2008), https://www.atg.wa.gov/news/news-releases/attorney-general-mckenna-announces-caremark-pay-41-million-resolve-multistate.

[74] Washington Attorney General, *Attorney General McKenna announces Express Scripts to pay $9.5 million to resolve consumer protection claims* (May 26, 2008), https://www.atg.wa.gov/news/news-releases/attorney-general-mckenna-announces-express-scripts-pay-95-million-resolve.

medicines for conditions such as cancer, HIV, and autoimmune disorders, for which variation in patient response to drugs has been well-documented.[75]

104.105.    Defendants have claimed that formulary exclusions only affect a small percentage of consumers. However, each of the Defendants manages prescription drug coverage for tens of millions of consumers, including thousands of Rhode Island residents.

105.106.    This means that thousands of individuals may be forced to switch from their current medication to Defendants' preferred alternative each year. Further, because medications to treat *chronic* diseases are among the most frequently targeted by formulary exclusions, vulnerable consumers with chronic illnesses are disproportionately affected, and for much longer periods of time.[76]

106.107.    A 2023 study examining the impact of formulary tier increases on patients' treatment patterns for apixaban, an oral anticoagulant used to prevent strokes in patients with atrial fibrillation, found patients were very reluctant to switch their medication.[77] More than half the patients (57.5%) continued apixaban despite increased out-of-pocket costs ($54 versus $135 for a 30-day supply), 30% discontinued oral anticoagulant treatment, and 12.4% switched to another oral anticoagulant.

107.108.    For consumers with chronic conditions, who often have treatment regimens involving multiple medications that need to work together, having access to their choice of medications can be critical. Frequent changes can be particularly problematic, as changes in one medication can trigger the need for other changes and disrupt treatment.

---

[75] Xcenda, *supra* note 5960, at 11; *see also* Joyce et al., *supra* note 56, at 396.

[76] Xcenda, *supra* note 5960, at 11.

[77] Steven Deitelzweig, *Payer formulary tier increases of apixaban: how patients respond and potential implications*, 39 Current Medical Research & Opinion 1093, 1095 (2023), https://www.tandfonline.com/doi/full/10.1080/03007995.2023.2232636#abstract.

108.109.    Similarly, Defendants increasingly have been excluding drugs approved under the FDA's expedited pathways for novel medicines that meet specific criteria and address unmet medical needs in the treatment of serious and even life-threatening conditions (*e.g.*, Fast Track Designation, Breakthrough Therapy Designation, Accelerated Approval, and Priority Review). In 2022, Defendants each excluded between fourteen to thirty-four products approved through an expedited pathway. This was up sharply from 2016, where the PBM Defendants (prior to the formation of the GPO Defendants) each excluded only one or two products approved through an expedited pathway.

109.110.    Moreover, because each Defendant has different deals with manufacturers that drive the content of their formularies, Defendants' activities exacerbate consumer confusion and up the difficulty of choosing a health plan that will provide the most coverage for a consumer's specific medical needs at the least cost. And even if consumers were able or savvy enough to take these issues into account when choosing a health plan (to the extent they can make a choice), since PBMs can change their formularies at any time, consumers may be harmed in any event.

**B.    Defendants' Rebate Tactics Lead to WAC Price Inflation**

110.111.    Contrary to the PBM Defendants' representations about Defendants lowering costs for consumers, Defendants know their formulary-enabled rebates have the effect of driving up drug prices.

111.112.    Manufacturers compensate for rising rebates by increasing WAC to maintain profit margins. Over time, the gap between WAC and the net price (the price manufacturers receive for selling drugs) has become significant and reflects the role of rebates and other fees that PBMs demand in driving up drug prices. Today, WAC prices bear little resemblance to the true cost of prescription drugs. This has a tremendous negative impact on uninsured consumers paying full WAC prices and insured consumers satisfying deductibles or paying

39

coinsurance tied to WAC. It also likely harms insured consumers with flat copayments since health benefit plans consider the overall cost of drugs when setting premiums and copayment amounts.

112.113.    When the CEO of Novo Nordisk testified before Congress about the pricing of Ozempic and Wegovy, he admitted that list prices are set to accommodate PBMs' financial demands: "It is not our intention that anyone should pay the list price… The list price is the starting point for our negotiation against the PBMs and insurance companies."[78] Yet, many Rhode Island residents are stuck doing just that because they are either uninsured or satisfying a deductible and paying the full WAC (*i.e.*, list) price or making a cost-share payment that is tethered to the artificially inflated WAC price.

113.114.    In response to a 2023 survey, 67% of manufacturers perceived WAC-based fees, such as rebates and administrative fees, as a barrier to lowering WAC prices.[79] However, there is no valid reason to tie PBMs' fees to drug prices because the services PBMs perform are the same regardless of whether the drug has a high cost or low cost.

114.115.    From 2011 to 2019, payments from prescription drug manufacturers (mostly rebates to PBMs) nearly tripled.[80] In 2011, a sample of 13 manufacturers paid 29.2% of their net revenue ($50.1 billion) to PBMs and other intermediaries to generate $171.8 billion in net sales. By 2019, the same manufacturers paid more than twice that amount: 67.4% of net revenue ($141.4 billion) to generate $209.9 billion in net sales.

115.116.    In January of 2021, the Senate Finance Committee released a report detailing a bipartisan investigation into the skyrocketing price of insulin. One of the report's key

---

[78] Kass, *supra* note 78.

[79] Eric Percher, *Trends in Profitability and Compensation of PBMs & PBM Contracting Entities*, Nephron Research, at 13 (Sept. 18, 2023), https://nephronresearch.com/trends-in-profitability-and-compensation-of-pbms-and-pbm-contracting-entities/.

[80] Gill, *supra* note 1920.

findings is that WAC prices for insulin rose sharply between 2013 and 2019 in step with an exponential increase in rebates for these products.[81]

~~116.~~117.    In 2023, gross drug sales at WAC prices totaled $917 billion, but manufacturers received less than half of that on average ($435 billion),[82] a delta which far overshadows the $96 billion spent by manufacturers for research and development in 2023.[83] The balance ($482 billion) consists of (1) rebates and other discounts; (2) PBM fees and profits; and (3) consumers' out-of-pocket payments.[84]

~~117.~~118.    Humira, AbbVie's blockbuster rheumatoid arthritis drug, is a good example of WAC inflation (as shown in Figure 5 below).[85] Humira's WAC increased 78% from 2015 to 2019.[86] Most of the WAC increase is attributable to rebates—which grew over 600% during this period. In sharp contrast, the net price AbbVie received for Humira only grew about 18% (from $2,623 in 2015 to $3,104 in 2019). However, consumers with coinsurance requirements saw their out-of-pocket costs significantly increase. For example, if a consumer's coinsurance requirement was 20%, the consumer would have paid $582.80 for Humira in 2015 but $1,034.80 in 2019.

---

[81] Senate Finance Committee Insulin Report, *supra* note ~~15~~16, at 7.

[82] The IQVIA Institute, *The Use of Medicines in the U.S. 2024: Usage and Spending Trends and Outlook to 2028*, at 42, 44 (Apr. 2024),     https://www.iqvia.com/insights/the-iqvia-institute/ reports-and-publications/reports/the-use-of-medicines-in-the-us-2024.

[83] Matej Mikulic, *R&D Expenditure of the U.S. pharma industry (PhRMA members) from 1980 to 2023* (Sept. 2, 2024), https://www.statista.com/statistics/265055/us-pharmaceuticals-spending-on-research-and-development/.

[84] The IQVIA Institute, *supra* note ~~80~~81, at 60.

[85] Gill, *supra* note ~~19~~20.

[86] *Id.*

*Figure 5: Humira Price Increase from 2015–2019*



118.119.        AbbVie launched a citrate free version of the Humira Pen in 2019 at a price of $5,740 for a 30-day supply.[87] After two years on the market, AbbVie increased the price to $6,833 per month—an increase of almost 20%.[88]

119.120.        Similarly, much of the list prices for GLP-1s are attributable to rebates and other fees. One economist estimated the net monthly prices of these drugs to be around $700 for Wegovy ($650 less than list price), $300 for Ozempic (nearly $650 less than list price), and $215 for Mounjaro (about $800 less than list price).[89]

120.121.        A 2020 study found that for prescription drugs sold from 2016 to 2018, on average, a $1 increase in rebates was associated with a $1.17 increase in WAC.[90]

---

[87] Office of the Health Insurance Commissioner, *Chartbook: Rhode Island OHIC*, at 23–27 (2025), https://ohic.ri.gov/sites/g/files/xkgbur736/files/2025-05/OHIC%20Cost%20Trends%20Chartbook%20Final%2005.12.2025.pdf.
[88] *Id.*
[89] Gina Kolata, *Ozempic and Wegovy Don't Cost What You Think They Do*, N.Y. Times (Sept. 24, 2025), https://www.nytimes.com/2023/10/22/health/ozempic-wegovy-price-cost.html.
[90] Neeraj Sood, et al., *The Association Between Drug Rebates and List Prices*, USC Schaeffer Center, at 1 (Feb. 11, 2020), https://healthpolicy.usc.edu/wp-content/uploads/2020/02/SchaefferCenter_RebatesListPrices_WhitePaper-1.pdf.

121.122.	Defendants claim that prescription drug manufacturers—not Defendants—are responsible for inflating list prices (WAC). This is misleading. Manufacturers may set list prices for their drugs, but Defendants indirectly control list prices by negotiating drug rebates which they know will result in manufacturers raising their prices to maintain their revenue and profit margins. The close correlation, over time, between the rise in WAC prices and the rise in rebates makes the causal connection between rebates and drug prices clear.

122.123.	In January of 2022, before the Tenth Circuit Court of Appeals, Sanofi asserted that PBMs were responsible for the exorbitant cost of Mylan's EpiPen, an auto-injector that treats severe allergic reactions. Sanofi explained that Mylan raised the price of EpiPen in order to allow the manufacturer to cut deals with PBMs and other purchasers in exchange for their agreement to give EpiPen preferential treatment or to not cover Sanofi's competing product, Auvi-Q. Sanofi also disclosed that it paid Express Scripts $36 million in rebates on an unrelated product in exchange for Express Scripts agreeing to cover Auvi-Q.[91] The differential treatment of these two drugs by these Defendants based on rebates is one example of the quid pro quo that affects drug prices and consumers' access to drugs generally, beyond insulin.

123.124.	Prescription drug manufacturers do not seem to be retaining the benefit of (or at least not most of the benefit of) WAC increases. For example, as shown in Figure 6 below, Sanofi disclosed that WAC for its insulins grew 140% from 2012 to 2019, while net prices (*i.e.*,

---

[91] Matthew Perlman, *Sanofi Tells 6th Cir. It Paid $36M To Access EpiPen Market*, Law360 (Jan. 19, 2022), https://www.law360.com/competition/articles/1456660/sanofi-tells-10th-circ-it-paid-36m-to-access-epipen-market.

the revenue Sanofi received) declined by 41%.[92] Humira's net versus WAC price, described at

Paragraph 117, reflects and demonstrates the same dynamic.

*Figure 6: Sanofi Insulin Prices from 2012–2019*



124.125.    In another insulin example, Eli Lilly decided to offer its brand-name insulin

product (Humulin) as an authorized generic—a highly unusual move for a drug that is still under

patent—because PBMs do not impose rebates on generic drugs.[93] Eli Lilly sold Humulin for $184

with a net revenue of $83.44. In sharp contrast, Eli Lilly sold its authorized generic insulin for

$92.50 (without rebates)—half the price of its brand-name insulin. Because Eli Lilly's authorized

generic has no rebates, there is nothing incentivizing Eli Lilly to inflate the list price. Untethered

---

[92] Adam J. Fein, *Drug Channels News Roundup, March 2020: Sanofi's Gross-to-Net Bubble, Drug Pricing Findings, Amazon Replaces Express Scripts, and Drug Channels Video*, Drug Channels (Mar. 31, 2020),    https://www.drugchannels.net/2020/03/drug-channels-news-roundup-march-2020.html.

[93] Emery P. Weinstein and Kevin Schulman, *Exploring Payments in the U.S. Pharmaceutical Market 2011–2019: Update on Pharmacy Benefit Manager Impact*, 227 Am. Heart J. 107, 107–110 (2020), https://doi.org/10.1016/j.ahj.2020.06.017.

from rebates, Eli Lilly was able to reduce the price of its product by 50% and make slightly more profit.

125.126.    Similarly, Sanofi told its investors that between 2012 and 2022, the list price for its insulin products rose 143% yet the net price for its insulin products declined 58%.[94] At the same time, consumers' out-of-pocket costs for Lantus—Sanofi's top-selling insulin—increased by 45%.[95] Sanofi attributed some of the increase in out-of-pocket costs to the fact that the average patient spending on deductibles for individuals with health benefit plans provided by employers increased 61% from 2012 to 2022—meaning because the average consumer's deductible is higher, consumers face more exposure to the full, unrebated list prices, which, as explained above, are artificially inflated as a result of Defendants' practices .[96]

126.127.    However, as explained below, manufacturers nonetheless benefit from the system Defendants created because they are allowed to essentially purchase formulary space from Defendants rather than compete on the merits of their products with competitors.

127.128.    This artificial price inflation dynamic also exists outside of insulin. In 2023, the list prices for brand-name drugs *increased* by mid-single-digits, yet net prices paid to manufacturers by PBMs after extraction of rebates and fees *decreased* by more than 7% after adjusting for inflation.[97] It was the sixth consecutive year that net prices paid to manufacturers by PBMs for brand-name drugs decreased. From 2014 to 2023, there were significant gaps between

---

[94] Sanofi, *Prescription Medicine Pricing: Our principles and perspectives*, at 12, https://web.archive.org/web/20241009020732/https://www.sanofi.com/assets/dotcom/pages/docs/investor-relations/environmental-social-governance/Sanofi-2023-Pricing-Principles-Report.pdf (last visited May 27, 2025).

[95] *Id.*

[96] *Id.* at 13.

[97] Adam J. Fein, *Tales of the Unsurprised: U.S. Brand-Name Drug Prices Fell for an Unprecedented Sixth Consecutive Year (And Will Fall Further in 2024)*, Drug Channels (Jan. 3, 2024), https://www.drugchannels.net/2024/01/tales-of-unsurprised-us-brand-name-drug.html.

the list prices and net prices of brand-name drugs (*see* Figure 7 below showing the change in the *rate* at which the various prices for brand-name prescription drugs either increased or decreased).[98]

*Figure 7: Gaps Between List Prices and Net Prices*
*2014–2023*

128.129.    Defendants' conduct in causing increases in WAC prices harms consumers by increasing out-of-pocket costs for uninsured consumers and insured consumers with coinsurance and high-deductible plans who are in the deductible phase because their costs are directly tied to the WAC price. This cost increase is not speculative or theoretical; it is guaranteed because of the connection between consumers' cost-share payment and the WAC price. Thus, when WAC increases, consumers' out-of-pocket costs will increase.

129.130.    All things equal, economic logic suggests that lower net prices for drugs would be expected to alleviate upward pressure on the health care premiums consumers pay. Instead, health insurance premiums have continued to rise nationally, [99] which on information and

---

[98] *Id.*

[99] Claxton et al., *supra* note 1819, at 7.

belief, suggests that Defendants are retaining a sizable portion of rebates for themselves rather than passing them on to insurers.[100]

130.131.    Researchers from the University of Southern California found that consumers with coinsurance in Medicare Part D plans had substantially higher out-of-pocket costs for drugs in concentrated markets where the demand for rebates is the highest.[101] In other words, paradoxically, more competitors in the market caused at least certain consumers to pay higher costs, which is contrary to how competitive markets typically work. This can be attributed to the fact that Defendants leverage the availability of competitor drugs to demand higher rebates to give preferential treatment to one manufacturer's product and exclude others from their formularies.

131.132.    In some instances, consumers are paying proportionately more of the increased drug prices than their health benefit plans. In a 2023 study, the United States Government Accountability Office examined Medicare Part D expenditures by beneficiaries (*i.e.*, consumers) and health benefit plans.[102] It found that payments by beneficiaries increased dramatically for 79 of the 100 drugs receiving the most rebates, demonstrating both the wide scope of rebate-driven price increases and the substantial impact that rebates and price increases have on consumers' out-of-pocket costs.[103] For these 79 drugs, beneficiaries paid $21 billion and health benefit plans (referred to as health benefit sponsors in the figure below) paid $5.3 billion (*see* Figure 8 below).[104] In other words, beneficiaries paid approximately 80% of the cost for these 79 drugs while health

---

[100] Jessica Mar and January Angeles, *Prescription Drug Spending Is Unaffordable Even When Accounting for Rebates* (Dec. 19, 2023), https://www.healthaffairs.org/content/forefront/three-states-growth-prescription-drug-spending-unaffordable-even-accounting-rebates.

[101] Darius Lakdawalla & Meng Li, *Association of Drug Rebates and Competition With Out-of-Pocket Coinsurance in Medicare Part D, 2014 to 2018*, JAMA Network Open, at 7 (May 5, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8100863/.

[102] U.S. Gov't Accountability Office, *supra* note 7071.

[103] *Id*. at 32–33.

[104] *Id*.

benefit plans paid only 20% after rebates. In other words, the portions of drugs that health benefit plans pay were significantly offset by rebates, but the portions consumers pay were not. Upon information and belief, the same dynamic exists with non-Medicare plans.

*Figure 8: Medicare Expenditures by Beneficiaries vs. Health Benefit Plans*



132.133.    For consumers with high-deductible plans (or even more modest deductible plans) who are still satisfying their deductibles, consumers pay the full cash price and their health benefit plans pay zero. However, Defendants still receive rebates and other manufacturer fees related to those prescriptions. Thus, they effectively profit from some consumers paying the full cash price.

C.    **Defendants' Lack of Transparency Allowed Them to Continue Siphoning Off Substantial Portions of Payments from Manufacturers in the Form of Undisclosed Fees**

133.134.    Retaining a portion of the rebates they negotiate with manufacturers has historically been a major source of revenue for the PBM Defendants. (prior to the creation of the GPO Defendants). For example, in 2012, approximately 46% of the PBM Defendants' revenues were attributable to rebates and price protection fees (additional rebate payments manufacturers are required to pay PBMs if a drug's list price increases beyond an agreed cap).[105]

---

[105] Percher, *supra* note 7778, at 3.

134.135.        However, over the past decade, amidst mounting pressure from health benefit plans and the public, the PBM Defendants began increasingly passing through rebates to health benefit plans. The PBM Defendants now tout that they pass through more than 90% of rebates to health benefit plans.[106] But that does not tell the whole story and, in a sleight of hand, distorts the ways in which PBMs continue to drive up prices and their own profits.

135.136.        Even though Defendants are collectively retaining a smaller percentage of rebates, the overall revenue to PBMs from rebates is increasing: from $46 billion in 2018 to $64 billion in 2022.[107] The gain in overall rebate dollars therefore somewhat offsets the loss in percentage (*i.e.*, 10% of $64 billion is larger than 10% of $46 billion).

136.137.        In addition, Defendants have managed to further increase their profits and avoid passing on payments from manufacturers by recharacterizing these payments from rebates to other fees. The PBM Defendants now utilize the GPO Defendants—some of which are offshore corporations—to categorize and recategorize income streams, which allows Defendants to redefine "rebates" and, by extension, avoid the PBM Defendants' obligation to pass through "rebates." A former senior vice president at OptumRx who helped create Emisar admitted that the intention of GPOs is to "create a fee structure that can be retained and not passed on to a client."[108]

137.138.        One 2023 survey looked at PBM compensation from prescription drug manufacturers between 2018 and 2022. It found PBMs' compensation tied to manufacturer fees

---

[106] CVS Health, *Improving Access and Lowering Costs*, https://business.caremark.com/content/dam/enterprise/business-caremark/insights/pdfs/2023/PBMFactsheet_Final_06.09.23.pdf (last visited May 27, 2025); Evernorth Health Services, *The Reality of Rebates*,  *supra* note 3738; OptumRx, Inc., *Client and Consumer Support*,    https://www.unitedhealthgroup.com/ns/optum-rx/client-and-consumer-support.html (last visited May 27, 2025).
[107] Percher, *supra* note 7778, at 6.
[108] Robbins & Abelson, *supra* note 5

doubled from $3.8 billion in 2018 to $7.6 billion in 2022.[109] Thus, although increased pass through of rebates to health benefit plans reduced PBMs' traditional sources of profitability, novel PBM fees—including fees manufacturers pay to GPOs—more than offset this decline (as shown in Figure 9 below).[110]

**Figure 9: Source of PBM Gross Profits Over Time: A Shift from Rebates and Spread to Fees and Specialty Pharmacy**



Source: Nephron Research PBM Gross Profit Model, August 2023

~~138.~~139.         The 2023 Nephron study at Figure 9 found that PBMs shifted administrative fees to their GPOs—adding additional ***non-transparent*** layers to the drug pricing system. These administrative fees increased 56% from $3.8 billion in 2018 to $5.8 billion in 2022. The study further observed the rise of novel fees that manufacturers now pay to GPOs. In 2018, data fees and vendor fees were effectively zero but have since skyrocketed to $968 million and $759 million, respectively. Although it is unclear what some of these new fees represent, data fees are fees for granting manufacturers access to a portal that contains utilization and other data for manufacturers'

---

[109] ~~Id.~~ Percher, *supra* note 78, at 2.
[110] *Id*. at 3.

drugs. Like rebates, administrative, vendor, and data fees are most frequently calculated as a percentage of WAC prices.

Defendants' lack

140.   An integral part of transparency allows them to profit from secret, undisclosed this GPO scheme is the creation of fees that drive up the cost of drugs. It also preventsthe GPO Defendants charge to manufacturers, including administrative fees, data portal fees, enterprise fees, and other charges that Defendants claim are not "rebates" and therefore are not required to be passed through to health benefit clients.

141.   Manufacturers have no ability to avoid these faux fees. A former Zinc executive said manufacturers' initial response to novel data portal fees was: "I don't need it, I don't want it."[111] Nonetheless, the manufacturers paid the fees. "If you're not compliant," the former Zinc executive explained, "they'll try to disadvantage you versus your competitors. . . . This is Caremark, Express Scripts, Optum, they all do that."[112] Moreover, these bogus charges typically increase every year.[113]

142.   Despite generating billions of dollars a year, the GPO Defendants appear to be paper companies. Emisar and Zinc do not have websites or publicly available email addresses or phone numbers.[114] Moreover, all three entities combined have fewer than 150 employees—about 88 at Ascent, and roughly two dozen each at Emisar and Zinc.[115] Even those roles appear to be

---

[111] Laura Wadsten & Nathaniel Horwitz, *"Bullshit" – The New Way Health Giants Hide Billions*, at 29-30, Hunterbrook (Jan. 6, 2026), https://newsletter.hntrbrk.com/p/bullshit-the-new-way-health-giants.
[112] *Id.*
[113] *Id.*
[114] *Id.* .
[115] *Id.*

intertwined with the operations of the PBM Defendants.[116] For example, OptumRx posted roles for "Pharma Account Manager" and "Associate Director – Pharma Account Manager" which both reported to the "Director of Pharma Services, Emisar."[117] Additionally, according to January 2025 filings with the Arizona Corporation Commission, Emisar and OptumRx share a principal place of business address: 1 Optum Circle, Eden Prairie, MN 55344.[118]   A former Zinc executive admitted: "You really don't know a PBM from a GPO because there is no difference. Think of the PBM/GPO as one entity . . . there was literally a temporary wall put up between Zinc and Caremark. No separate building. . . . Zinc and Caremark reported to the same VP."[119]

143.    It is not entirely clear which functions the GPO Defendants perform and which functions the PBM Defendants perform. When the president of a lobbyist group that represents large, self-funded employers on health and benefit plans (and by extension, consumers) from discovering Defendants' unfair and deceptive practices. issues asked the PBM Defendants, the PBM Defendants were less than forthcoming:

> We reached out to the PBMs and we said, "Hey can you explain to us what these GPOs do?" They said the GPOs are going to negotiate with the drug companies to get the very best deals, because they are going to aggregate all the covered lives that we have, for all our customers. And we said, "That doesn't make any sense, because that's exactly what a PBM is supposed to do! So what exactly is the GPO going to do?" They gave us a Cheshire Cat grin, and no more information.[120]

144.    Given their very modest resources, the GPO Defendants could not plausibly generate billions of dollars a year as separate corporate entities. Collectively, the GPO Defendants

---

[116] *Id.*
[117] *Id.*
[118] *See* Arizona Corporation Commission, https://arizonabusinesscenter.azcc.gov/businesssearch (last visited May 19, 2026).
[119] Wadsten & Horwitz, *supra* note 110.
[120] *Id.*

are estimated to have received more than $50 million in revenue per employee in 2022.[121] By comparison, Apple generated approximately $2.4 million per employee in 2024, and Nvidia, the AI chip company, brings in about $3.6 million annually per employee (*see* Figure 10 below showing the revenue per employee of the GPO Defendants versus Apple and Nvidia).[122]

***Figure 10: Revenue Per Employee of the GPO Defendants Compared to Apple and Nvidia***



139.145.        The PBM Defendants' contracts with health benefit plans enable this smoke-and-mirror behavior by restricting access to information, including claim-level data and the gross profits Defendants generate from administering their prescription drug benefits.[123] In 2024,

---

[121] *Id.*

[122] *Id.*

[123] Ge Bai, *Policy Options To Help Self-Insured Employers Improve PBM Contracting Efficiency*, Health Affairs (May 29, 2019),— https://www.healthaffairs.org/content/forefront/policy-options-help-self-insured-employers-improve-pbm-contracting-efficiency.

Tyson Foods switched from CVS Caremark as its pharmacy benefit manager to a smaller PBM that promises greater transparency.[124] A Tyson executive explained that the switch was driven, at least in part, by CVS Caremark's failure to provide data on Tyson's increasing costs for specialty drugs. The executive said: "I wanted to look at Humira, and I wanted to see what the acquisition cost was. And then I wanted to understand what Tyson was paying for that; it was very difficult to get to those numbers."[125]   Moreover, the establishment of the GPO Defendants by the PBM Defendants (or their parent companies) expressly allows the PBM Defendants to deny their health plan clients the ability to review rebate agreements with manufacturers.  Because the GPO Defendants (who are vertically integrated with the PBM Defendants) negotiate and contract with manufacturers, the PBM Defendants can represent to their health plan clients that they have no contracts for review while still benefiting from the fees the GPO Defendants collect.

140.146.    Seemingly consistent with the data from Nephron's 2023 study, onFor example, Illinois' government employee health plan seemed unaware that its PBM, Defendant CVS Caremark, was using its GPO (Defendant Zinc) to retain payments from manufacturers. On June 24, 2024, CVS Caremark paid $45 million to the State of Illinois to settle allegations that CVS Caremark failed to disclose and pass through certain payments made to Zinc that allegedly constitute rebates pursuant to CVS Caremark's contract with Illinois.

141.147.    Moreover, even if Defendants passed through 100% of all payments from manufacturers—which none of them do—consumers whose out-of-pocket costs are tied to WAC prices would still be harmed by the high WAC price/high rebate system that Defendants have

---

[124] Bertha Coombs, *Tyson Foods drops CVS for upstart pharmacy benefit manager, as industry upheaval over cost concerns spreads*, CNBC (Jan. 24, 2025), https://www.cnbc.com/2024/01/24/tyson-foods-drops-cvs-picks-rightway-pharmacy-benefit-manager.html.
[125] *Id.*

engineered. This is because manufacturer payments are passed through to health benefit plans, not to consumers paying inflated cost-share payments. In fact, it is unclear how or whether consumers' costs are offset by the rebates paid to health benefit plans.

## IV. WAC Prices for Prescription Drugs Have Skyrocketed Over the Last Couple of Decades, Increasing Prices to Consumers

142.148.    As discussed illustratively above and shown in Figure 2, WAC prices are rising.  From 2014 to 2020, WAC prices for prescription drugs increased by 33%, outpacing inflation and price increases for any other medical commodity or service.[126]

143.149.    Between 2016 and 2022, there were 1,216 drugs with WAC prices that exceeded the rate of inflation (8.5%).[127] The average WAC price increase for these drugs was 31.6%. Some drug prices increased by more than $20,000, or 500%.

144.150.    The cost of Spiriva Handihaler—a drug used to treat asthma and COPD from which more than 96,000 Rhode Islanders suffer—increased more than 36% (from $3,886 per year in 2015 to $5,289 per year in 2020).[128]

145.151.    In 2023, the two drug categories with the highest spending in Rhode Island were: (1) immunological agents (medications that combat infections by modifying the immune system); and (2) blood glucose regulators (medications that treat diabetes).[129] Both categories

---

[126] Tori Marsh, *Prices for Prescription Drugs Rise Faster Than Prices for Any Other Medical Good or Service*, GoodRx Health (Sept. 17, 2020),   https://www.goodrx.com/healthcare-access/drug-cost-and-savings/prescription-drugs-rise-faster-than-medical-goods-or-services; Stephen W. Schondelmeyer & Leigh Purvis, *Trends in Retail Prices of Brand Name Prescription Drugs Widely Used by Older Americans, 2006 to 2020*, AARP Public Policy Institute (June 2021), at 1, https://www.aarp.org/content/dam/aarp/ppi/2021/06/trends-in-retail-prices-of-brand-name-prescription-drugs-widely-used-by-older-americans.10.26419-2Fppi.00143.001.pdf.

[127] Assistant Sec'y for Planning and Evaluation, U.S. Dept. of Health and Human Services, *Price Increases for Prescription Drugs, 2016–2022*, at 1 (Sept. 30, 2022), https://aspe.hhs.gov/sites/default/files/documents/e9d5bb190056eb94483b774b53d512b4/price-tracking-brief.pdf.

[128] AARP, *supra* note 1.

[129] Office of the Health Insurance Commissioner, *supra* note 8586.

contain high-priced and highly rebated medications such as Humira (immunological agent) and GLP-1s (blood glucose regulator).

146.152.     Rising WAC prices have made life-saving medications unaffordable for many Americans—particularly the elderly, ages 62 and older. For the average older American taking 4.7 brand-name prescription drugs per month, if drug prices had increased at the rate of general inflation, the annual cash price of therapy in 2020 would have been $13,682 instead of the actual cost of $31,037.[130] This is a significant burden for uninsured consumers or consumers with coinsurance or high-deductible plans. Even consumers with flat copayments are likely harmed because their health benefit plans take into account overall drug costs when setting premiums and copayment amounts.

147.153.     Researchers have found that when drug prices are too high, many consumers will simply not fill their prescriptions.[131] Due in part to high costs, consumers starting new therapy abandoned 98 million prescriptions at pharmacies in 2023.[132] Consumers abandoned prescriptions with increasing frequency as out-of-pocket costs rose, with abandonment rates over 55% for prescriptions costing over $250.[133]

148.154.     In 2020, it was estimated that high out-of-pocket costs for drugs would cause 1.1 million premature deaths of seniors in the Medicare program over the next decade, and lead to an additional $177.4 billion in avoidable Medicare medical costs. Upon information and belief, the effect would be even more acute with respect to non-Medicare plans, where prescription drug benefits are even more limited.

---

[130] Schondelmeyer & Purvis, *supra* note 107125, at 1.
[131] Arleen Leibowitz et al., *The Demand for Prescription Drugs as a Function of Cost-Sharing*, at 18 (Oct. 1985), https://www.rand.org/content/dam/rand/pubs/notes/2005/N2278.pdf.
[132] The IQVIA Institute, *supra* note 8081, at 34.
[133] *Id.*

149.155.     According to a 2024 survey of over 1,000 Rhode Island adults, more than 65% of adults making less than $50,000 a year were somewhat or very worried about affording prescription drugs.[134] Nearly a quarter of adults in Rhode Island either did not fill a prescription, cut pills in half, or skipped a dose due to concerns about costs.[135]

150.156.     Insulin—a drug that millions with diabetes need to live—is a prime example of skyrocketing WAC prices. At a century in use, insulin is one of the oldest biologic drugs in modern medicine. In 1999, Humalog (insulin) was affordably priced at approximately $21 per month. Twenty years later, the WAC price had increased by more than 1000% to approximately $332 per month.[136]

151.157.     For a consumer with Type 1 diabetes with commercial insurance, the annual cost of insulin nearly doubled in just a five-year period, from approximately $3,200 in 2012 to $5,900 in 2016.[137]

152.158.     Due to unprecedent pressure on PBMs and insulin manufacturers, insulin costs are now capped at $35 a month for some consumers. Unfortunately, the PBM Defendants have not provided this same type of relief across the board for other drugs.

## V.     Defendants' Deceptive Acts and Practices Are Material to Consumers

153.159.     As discussed above, the PBM Defendants' marketing emphasizes their role in and commitment to ensuring that the prescription drugs available to consumers are safe,

---

[134] Healthcare Value Hub, *supra* note 2, at 1.

[135] *Id.*

[136] S. Vincent Rajkumar, *The High Cost of Insulin in the United States: An Urgent Call to Action*, 95 Mayo Clinic Proc. 22, 22 (2020), https://www.mayoclinicproceedings.org/article/S0025-6196(19)31008-0/fulltext.

[137] Jean Fuglesten Biniek & William Johnson, *Spending on Individuals with Type 1 Diabetes and the Role of Rapidly Increasing Insulin Prices*, Health Care Cost Institute (Jan. 21, 2019), https://healthcostinstitute.org/diabetes-and-insulin/spending-on-individuals-with-type-1-diabetes-and-the-role-of-rapidly-increasing-insulin-prices.

effective, and affordable because these issues are important to consumers and likely to impact their decision making. Defendants know that, too.

154.160.    For example, CVS Caremark advertises "Your health is our priority[.] As a pharmacy benefit manager (PBM), we manage prescription plans to help make them more cost-effective – so you can get what you need when you need it."[138] It further acknowledges: "Keeping your medication affordable is important." CVS Caremark further claims to "[i]mprov[e] health through affordability" because "people are more likely to take their prescribed medications when they know they can afford them – and that can lead to better health outcomes."[139]

155.161.    For example, Express Scripts claims: "As your pharmacy benefit manager ("PBM"), Express Scripts helps you stress less and save more. We take care of you, so you can focus on what really matters."[140] Express Scripts describes cost as "one of the greatest barriers to care."[141]

156.162.    For example, OptumRx asserts: "Always here for you when you need us – with compassion and care."[142] It further acknowledges: "[M]any people do not take their medications as they should, citing cost as a primary reason."[143] It further states: ""In short, when it comes to treatments for conditions that affect millions of people and drive most employer costs, Optum Rx routinely delivers a far lower price. And lower prices matter."[144]

---

[138] CVS Caremark, *About Us*, *supra* note 2324.
[139] CVS Health, *Member Affordability*, https://www.cvshealth.com/services/prescription-drug-coverage/member-affordability.html (last visited May 27, 2025).
[140] Express Scripts, Inc., *Pharmacy benefits that benefit you*, https://www.express-scripts.com/pharmacy-benefits-manager (last visited May 27, 2025).
[141] Express Scripts, Inc., *Continually Creating for the Needs of Our Members*, https://www.evernorth.com/who-we-serve/members (last visited May 27, 2025).
[142] OptumRx, Inc., *supra* note 2223.
[143] OptumRx, Inc*., Experts agree, supra* note 4647.
[144] *Id*.

157.163.    It is also axiomatic that consumers are concerned about the safety and efficacy of prescription drugs. Pricing and access to prescription drugs are also key concerns to consumers.[145] More than 50% of people in the United States are worried about affording prescription drug costs, with larger shares of black and Hispanic adults and uninsured adults reporting concerns.[146] One quarter of adults have difficulty affording prescription drugs, including larger shares of those who take more medications.[147]

158.164.    Moreover, a health benefit plan may consider complaints made by aggrieved consumers in determining whether to select or retain a particular PBM. In addition, some consumers may be able to change PBMs by selecting a different health benefit plan from those offered by their employer or on the individual market with a different PBM; however, in many instances, switching health benefit plans is cost prohibitive, particularly if consumers switch from an employer-sponsored plan to a private-market plan. Moreover, because Defendants administer prescription drug benefits for approximately 80% of the market, it is difficult for consumers to escape their practices.

159.165.    Defendants' deceptive acts and practices are also likely to affect consumers' conduct regarding Defendants' services in myriad ways.

160.166.    Defendants' formulary decisions will force some consumers to switch medications or potentially ration or forgo treatment because they cannot afford the out-of-pocket costs. For example, an insured parent whose allergic child's EpiPen is no longer covered or preferred by one of the Defendants will have to find a different drug for her child. A cancer patient

---

[145] Grace Sparks et al., *Public Opinion on Prescription Drugs and Their Prices*, KFF (Oct. 4, 2024), https://www.kff.org/health-costs/poll-finding/public-opinion-on-prescription-drugs-and-their-prices/.
[146] *Id.*
[147] *Id.*

who is required to transition to a different chemotherapy drug because of Defendants' formulary practices will certainly find that information material. Diabetic patients with health benefit plans managed by Defendants decided to ration their insulin in response to Defendants' rebate and formulary practices that increased consumers' out-of-pocket costs. For all these consumers, Defendants' deceptive acts and practices are material because they affected consumers' choice of, or conduct regarding, Defendants' services.

161.167.        Since Defendants' formulary and rebate practices significantly inflate the price of brand-name drugs and consumers' out-of-pocket costs, some consumers will decide to forego using their prescription drug benefits altogether because paying cash is cheaper. For example, a consumer taking a drug her PBM designated as "specialty" may be better off purchasing the drug with cash from a pharmacy not affiliated with her PBM that offers a more competitive price. Alternatively, a consumer may choose to pay cash and utilize publicly available drug coupons offered by drug manufacturers or GoodRx.

## VI.    Defendants' Scheme That Artificially Inflates Drug Prices Violates Established Public Policy In Rhode Island

162.168.       Rhode Island has a public policy in favor of making affordable and effective medications accessible to consumers and preventing PBMs from driving up drug costs.

163.169.       This public policy is evidenced through multiple laws among other things. For example, in 2023, Rhode Island passed legislation capping consumers' out-of-pocket costs for specialty drugs at $150 per 30-day supply. *See* R.I. Gen. Laws § 27-18-50.2. In passing the law, the general assembly made several findings, including:

(1)    In 2015, an estimated six hundred thirty-five thousand (635,000) Rhode Island residents had at least one chronic disease, and an estimated two hundred forty-nine thousand (249,000) residents had two (2) or more chronic diseases, which significantly increases their likelihood to depend on prescription specialty drugs;_

60

(2)     In 2016, twenty-five percent (25%) of Rhode Island residents stopped taking a prescription drug as prescribed due to cost. . . .

*Id*. The legislation was sponsored by Representative David Morales and the late Senator Maryellen Goodwin. Representative Morales said, "With over 6,000 of our neighbors battling cancer and many others relying on specialty drugs to stay alive, it is the responsibility of our state government to ensure that all people, regardless of socioeconomic status, can afford these lifesaving medications."[148]

164.170.     In 2021, Rhode Island also capped out-of-pocket costs for insulin products at $40 and banned PBMs' contractual clauses that prevent pharmacies from disclosing information concerning consumers' out-of-pocket costs and lower-priced alternatives. *See* R.I. Gen. Laws §§ 27-20.8-3; 27-20.8-4. The legislation was sponsored by Senator Melissa A. Murray and House Speaker Pro Tempore Brian Patrick Kennedy. Speaker Kennedy said:

> Insulin is both very widely used and absolutely critical to the lives of people with diabetes, many of whom are seniors or disabled people living on low fixed incomes. Unaffordable insulin costs are a serious threat to public health. According to the American Diabetes Association, about a third of the approximately 100,000 diabetes patients in Rhode Island use insulin, and a quarter of those patients ration their insulin. No one should have to choose between paying for their life-saving medication, keeping their lights on, or having enough groceries[.][149]

---

[148] State of Rhode Island General Assembly, *Morales/Goodwin bill to lower prescription drug costs passes General Assembly* (June 16, 2023), https://www.rilegislature.gov/pressrelease/_layouts/RIL.PressRelease.ListStructure/Forms/Displ ayForm.aspx?List=c8baae31%2D3c10%2D431c%2D8dcd%2D9dbbe21ce3e9&ID=373771&We b=2bab1515%2D0dcc%2D4176%2Da2f8%2D8d4beebdf488.

[149] State of Rhode Island General Assembly, *New law limits insulin copays* (July 7, 2021), https://www.rilegislature.gov/pressrelease/_layouts/RIL.PressRelease.ListStructure/Forms/Displ ayForm.aspx?List=c8baae31-3c10-431c-8dcd-9dbbe21ce3e9&ID=371891#:~:text=Under%20the%20new%20law%2C%20insurers,charge%20 less%2C%20if%20they%20choose.

165.171.     Rhode Island also operates the Rhode Island Best RX Prescription Drug Discount Program for the Uninsured to lower prescription drug prices for uninsured consumers. *See* R.I. Gen. Laws §§ 42-66.2.1-2.

166.172.     The Office of the Health Insurance Commissioner reiterated Rhode Island's policy in a recently released report analyzing pharmacy spending, concluding: "It is important for Rhode Islanders to get the care and medications they need to live the healthiest lives possible, but at prices that are not burdensome and a deterrent to access."[150]

167.173.     In contravention of Rhode Island's public policy, Defendants' business practices have the intent and/or effect of artificially increasing prescription drugs costs for Defendants' own financial gain, and this offends the policy of the State of Rhode Island because, among other things, it: (1) raises consumers' out-of-pocket drug costs; (2) results in utilization of high cost brand-name drugs over cheaper and equally effective alternatives; and (3) blocks consumers from meaningfully accessing cheaper and, in some instances, safer alternatives.

## VII.  Defendants Engage in Unfair Methods of Competition

168.174.     Defendants engage in unfair methods of competition that negatively affect competitive conditions in the brand-name prescription drug market and, in the case of the PBM Defendants, the pharmacy market to the detriment of consumers.

### A.  Defendants' Formulary and Rebate Practices Tend to Negatively Affect Competitive Conditions in the Prescription Drug Market

169.175.     Defendants engage in unfair methods of competition when giving preferential formulary treatment to drugs with the highest rebates when there are multiple drugs in a therapeutic class, which tends to negatively affect competitive conditions among drug manufacturers to the detriment of consumers.

---

[150] Office of the Health Insurance Commissioner, *supra* note 8586, at 28.

170.176.    Defendants' treatment of biosimilars perfectly illustrates the anti-consumer and anti-competitive incentives Defendants have created. Biosimilars are biologic products that the FDA has approved to be therapeutic substitutes for an existing biologic product because there is no clinically meaningful difference between the biosimilar and the existing biologic product.[151]

171.177.    Biosimilars directly compete with existing biologic products. In general, biosimilars are lower priced than the existing biologic product. One would expect, based on the PBM Defendants' marketing statements regarding theirDefendants' roles in the market, that when Defendants are faced with fully interchangeable products with no clinically meaningful differences, Defendants would choose the lowest-priced product. Many times, however, the opposite is true. Often, Defendants put their thumb on the scale in favor of drugs with much higher WAC (list) prices, undeniably for their own financial benefit, and against the interests of their health benefit plan clients and health benefit plan members, giving favored status to drugs that come with higher rebates while simultaneously freezing out drugs with considerably lower WAC prices (often biosimilars or generic drugs), thereby causing an artificial distortion of the normal competitive dynamics among drug manufacturers.

172.178.    For example, Viatris (a company formed by the merger between manufacturers Mylan and Upjohn) launched two identical biosimilar insulins that are fully interchangeable with Sanofi's top-selling Lantus. One product is a brand-name biosimilar insulin called Semglee. The other product is a generic biosimilar insulin (Insulin Glargine). Semglee is offered at a WAC 5% below the WAC for Lantus. Insulin Glargine is offered at a WAC 65% lower

---

[151] Xcenda, *supra* note 5960, at 7.

than the WAC for Lantus. Semglee and Insulin Glargine are the exact same product—the only difference between the two products is price.[152]

173.179.      In their 2022 formularies, none of Defendants gave preferred treatment to the insulin product with the lowest WAC (Insulin Glargine). OptumRx preferred Lantus and excluded Semglee but failed to include Insulin Glargine. Express Scripts preferred the higher-priced biologic (Semglee) and excluded the lower-priced biologic (Insulin Glargine)—even though Semglee and Insulin Glargine are identical. CVS Caremark excluded Lantus and preferred Basaglar—a product that is not even a biosimilar to Lantus—without including Semglee or Insulin Glargine.[153] Because Defendants profit from drugs with higher rebates, they have created a barrier for cheaper biosimilar competitors to enter the market. Moreover, even if all of these products had the same net cost (meaning the brand-name products were the same price as the lower-priced biologic after accounting for rebates), consumers with coinsurance and those enrolled in high-deductible plans would pay greater out-of-pocket costs for the brand-name products than the lower-priced products because their cost-share payments were based on the unrebated prices.

174.180.      Humira biosimilars are another example. Humira biosimilars hit the market in 2023 with WAC prices ranging from 5%–85% below Humira.[154] The net price of Humira was approximately $2,100 compared to less than $1,000 for some of the low WAC price biosimilars.[155] Yet, Defendants continued to give preferential treatment to Humira and refused to cover the

_____

[152] Adam J. Fein, *Why PBMs and Payers Are Embracing Insulin Biosimilars with Higher Prices—And What That Means for Humira*, Drug Channels (Nov. 9, 2021), https://www.drugchannels.net/2021/11/why-pbms-and-payers-are-embracing.html.
[153] *Id.*
[154] IQVIA, *Adalimumab Biosimilar Tracking*, at 15 (Apr. 2, 2024), https://biosimilarscouncil.org/wp-content/uploads/2024/04/04022024_IQVIA-Humira-Tracking-Executive-Summary.pdf.
[155] *Id.* at 10.

biosimilars.[156] The only plausible explanation for favoring a drug that is clinically identical but more expensive than its competitors is that the switch would have cost Defendants in lost rebates and other fees.

175.181.        IQVIA—a healthcare data company—estimated that if Defendants had switched to low WAC biosimilars in 2023, Defendants would have lost 87% in profit from rebates and other fees associated from Humira prescriptions and specialty pharmacies (some of which Defendants own) would have lost 90% profit.[157] By sharp contrast, health benefit plans would have saved 80% in lower drug costs and administrative fees and consumers would have saved 76% on copayments.[158]

176.182.        CVS Caremark announced at the beginning of 2024 that it would remove Humira from its major national commercial formularies and cover Humira biosimilars instead.[159] But there was a catch: CVS Caremark gave preferential formulary treatment to a mix of high and low WAC price biosimilars, including biosimilars manufactured by Cordavis—a subsidiary of CVS Health, which also operates CVS Caremark.[160]

177.183.        Similarly, Express Scripts announced in August 2024 that it would also remove Humira from its 2025 commercial formulary in favor of multiple biosimilars with a mix

---

[156] *Id.* at 5–6.
[157] *Id.* at 13.
[158] *Id.*
[159] CVS Health, *CVS Caremark accelerates biosimilars adoption through formulary changes* (Jan. 3, 2024), https://www.cvshealth.com/news/pbm/cvs-caremark-accelerates-biosimilars-adoption-through-formulary-changes.html.
[160] Adam J. Fein, *Humira Biosimilar Price War Update, Should We Be Glad that CVS Health and Express Scripts Are Using Private Label Products to Pop the Gross-to-Net Bubble?* (Sept. 4, 2024), https://www.drugchannels.net/2024/09/humira-biosimilar-price-war-update.html.

of high and low WAC prices, including biosimilars manufactured by Quallent Pharmaceuticals—a subsidiary of Evernorth, which also owns Express Scripts.[161]

178.184.        In other words, CVS Caremark and Express Scripts favored the higher priced, higher rebated Humira and systematically excluded lower priced biosimilar products until they began making their own lower priced biosimilar products from which they could profit.

179.185.        Forcing manufacturers to compete based on the kickbacks they pay to Defendants is an unfair method of competition because it undermines competition on the merits, which, for prescription drugs, is their safety, efficacy, or price. Instead, it constrains products available to consumers and increases prices paid by consumers without regard to the quality, safety, or desirability of the product to consumers—but solely on the willingness and ability of the product manufacturer to offer quid pro quo rebates and other fees to Defendants to gain access to their formularies.

180.186.        Defendants' conduct is coercive, exploitative, and restrictive because it incentivizes manufacturers to compete for formulary placement by prioritizing rebates over the true lowest net price or the safety or efficacy of their products. It also exploits and abuses vulnerable consumers by denying them access to certain medications, including safer and more affordable and effective medications, and forcing certain consumers to pay inflated cost-share payments.

**B.      The PBM Defendants Impose Unfair Contractual Terms on Independent Pharmacies That Negatively Affect Competition and Consumers**

181.187.        A pharmacy's access to the PBM Defendants' networks is critical for financial survival. Given that the PBM Defendants collectively control 80% of the PBM market, being out of network with just one of the PBM Defendants and being unable to bill that PBM for

---

[161] *Id.*

66

drug claims would render it financially unviable for a pharmacy to operate. Thus, many pharmacies—particularly independent pharmacies—have virtually no option but to accede to take-it-or-leave-it contractual terms that the PBM Defendants impose in order to be included in their networks.

182.188.    In addition, the PBM Defendants own or are otherwise affiliated with various pharmacies (*see* Figure 1011 below).[162] This means the PBM Defendants are in competition with many of the non-affiliated pharmacies they contract with as network pharmacies. As laid out below, the PBM Defendants have steered consumers to their own pharmacies or offered higher payments to their own pharmacies, at the expense of independent pharmacies that depend on access to their networks to remain afloat.

*Figure 1011: Defendants' Ownership and Vertical Integration*



[162] Staff of U.S. Federal Trade Comm'n, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*, at 6 (July 2024) (modified version of chart), https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf (hereinafter "FTC PBM Report").

183.189.        As described below, the PBM Defendants have abused their market power by forcing unfair contractual terms on independent pharmacies that tend to negatively affect competitive conditions in the pharmacy market and negatively impact consumers.

184.190.        Independent pharmacies, which are critical and trusted members of many communities, are going out of business across the country. Douglas Hoey from the National Community Pharmacists Association predicted: "Nearly a third of independent pharmacy owners may close their stores this year under pressure from plunging prescription reimbursements by big insurance plans and their pharmacy benefit managers."[163]

185.191.        The same is true in Rhode Island, where independent pharmacies struggle to keep their doors open. Between 2010 and 2021, Rhode Island had a pharmacy closure rate greater than 35% and experienced a net loss of pharmacies—meaning more pharmacies closed than opened.[164] Independent pharmacies were particularly impacted.[165] These closures contribute to the growth of pharmacy deserts, which are low-access communities where residents must travel farther to get to the nearest pharmacy to fill their prescriptions.[166] For example, in 2019, Baker's Pharmacy—the only pharmacy in Jamestown—closed, in part, due to low reimbursements from PBMs, forcing residents to leave the island to fill their prescriptions.[167]

---

[163] National Community Pharmacists Association, *Local Pharmacies on the Brink, New Survey Reveals* (Feb. 27, 2024), https://ncpa.org/newsroom/news-releases/2024/02/27/local-pharmacies-brink-new-survey-reveals.

[164] Guadamuz et al., *supra* note 89, at 1705.

[165] *Id*. at 1707.

[166] Noelle Kwan, *The Impact of Pharmacy Deserts*, U.S. Pharmacist (April 2024), https://bt.e-ditionsbyfry.com/publication/?i=819035&p=46&view=issueViewer.

[167] Eli Sherman and Tim White, *Pharmacies dwindle in RI amid national battle over how drugs are priced*, WPRI (July 31, 2024), https://www.wpri.com/target-12/pharmacies-dwindle-in-ri-amid-national-battle-over-how-drugs-are-priced/.

186.192.      Many consumers rely on their local, community pharmacists for vital services. As Paul Capuano, the co-owner of JB Pharmacy & Compounding in Warwick, explained to the Providence Journal, "The Independent pharmacist really is the most accessible health care professional. They fill the gap in people's care."[168] For example, they administer flu shots, check patients' blood pressure, and can even prescribe HIV prevention therapy and hormonal birth control medications—*free of charge*.

187.193.      Local pharmacist Matthew Olivier predicted that independent pharmacies would become "extinct in Rhode Island" in five or ten years.[169] Currently, there are fewer than twelve independent pharmacies in Rhode Island.[170] If they go out of business, consumers will have little choice but to use large, chain pharmacies, whose understaffing and volume requirements have resulted in serious medication errors.[171] The closing of independent pharmacies also threatens convenient access for consumers in more rural areas of the state, which depend upon independent pharmacies for access to prescription drugs and other services.

### 1.    The PBM Defendants Pay Low Reimbursement Rates—Sometimes Below Pharmacies' Acquisition Costs

188.194.      Pharmacies receive reimbursements for filling prescriptions in two common ways. First, the primary revenue source is the "PBM-to-pharmacy spread," or the difference between what it costs the pharmacy to acquire the drug from a wholesaler and the reimbursement from the PBM when an insured consumer fills a prescription. While this can be a source of revenue, as discussed below, sometimes through the PBM Defendants' unfair practices, it can be a source

---

[168] Johnny Williams, *A Bitter Pill; Low reimbursements pose dire threat to independent pharmacies in Rhode Island*, The Providence J. (Dec. 12, 2024).

[169] *Id*.

[170] *Id*.

[171] Ellen Gabler, *How Chaos at Chain Pharmacies Is Putting Patients at Risk*, N.Y. Times (Oct. 13, 2021), https://www.nytimes.com/2020/01/31/health/pharmacists-medication-errors.html.

of cost for pharmacies. Second, some contracts include a dispensing fee to help cover the pharmacy's overhead.

189.195.        The PBM Defendants also profit from the spread between the amount health benefit plans agree to pay the PBM Defendants for prescription drugs and the amount the PBM Defendants reimburse pharmacies to fill prescriptions (the "PBM-to-health benefit plan spread"). The lower the reimbursement rate the PBM Defendants can negotiate with pharmacies, the greater the PBM Defendants' profits.

190.196.        In July 2024, the Federal Trade Commission ("FTC") released an interim report titled: "Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies." It concluded that increased concentration in the PBM market may give the leading PBMs, including the PBM Defendants, the leverage to enter into complex and opaque contractual relationships that disadvantage many independent pharmacies and the consumers they serve. [172]

191.197.        In the first instance, these contracts, including the PBM Defendants', do not inform pharmacies what their reimbursements will be prior to filling prescriptions. After the prescription is filled, pharmacies submit claims through the relevant PBM's claims adjudication system and are later reimbursed by the PBM (minus any cost-share payment made by consumers when they pick up their prescription).

192.198.        The PBM Defendants typically calculate reimbursements to pharmacies based on a discount off the lowest potential price, which is often the MAC (*i.e.*, the PBM

---

[172] FTC PBM Report, *supra* note 143161, at 3.

Defendants' own proprietary pricing benchmark for generic drugs).[173] For example, the PBM Defendants' contract with a pharmacy may specify that the pharmacy will be reimbursed MAC minus X%, or some pre-set discount from the price set by the PBM Defendants.[174] These prices often do not reflect the actual price at which pharmacies acquire drugs. Some reimbursements are even below the pharmacies' acquisition costs—meaning pharmacies lose money when they fill the prescriptions.

193.199.    MAC prices are specific to generic drugs, which account for approximately 91% of prescriptions filled in the United States. The PBM Defendants maintain "MAC lists" which are proprietary price lists that the PBM Defendants create, maintain, and continuously update, sometimes on a weekly basis or even more frequently. The lists are supposedly tied to acquisition costs meant to encourage pharmacies to source drugs from low-cost suppliers. But the PBM Defendants create different MAC lists for different clients. The FTC found vast disparities between how many lists each PBM, including the PBM Defendants, maintains, with one having tens of thousands of lists, while others have under 200.[175] The PBM Defendants are also quick to update MAC lists when acquisition costs decrease and slow to update MAC lists when acquisition costs increase.[176]

194.200.    According to the 2024 FTC PBM Report, pharmacies are often not even allowed to see the MAC list or to understand how they are set. Further, pharmacies are not notified when the PBM Defendants update their pricing lists, making it difficult for pharmacies to question

---

[173] Three Axis Advisors, *Unraveling the Drug Pricing Blame Game*, at 2, 40 (Sept. 2023), https://static1.squarespace.com/static/5c326d5596e76f58ee234632/t/650924780b6b9c590edfa2b4/1695097983750/Unravelling_the_Drug_Pricing_Blame_Game_3AA_APCI_0923.pdf.
[174] FTC PBM Report, *supra* note 143161, at 58–59.
[175] *Id*. at 58
[176] Three Axis Advisors, *supra* note 154172, at 17.

or challenge the lists. It can also be cost prohibitive for pharmacies to challenge the ultimate reimbursements. Even if they do, the process is typically controlled by the PBM Defendants and therefore hardly impartial.

195.201.    In Georgia, the American Pharmacy Cooperative, which represents independent pharmacies, reviewed the prices an independent pharmacy was reimbursed for certain prescriptions compared to nearby chain pharmacies. The chain pharmacies received an average of $54 for filling the antidepressant bupropion, but the independent pharmacy only received $5.54.[177] Similarly, for the blood pressure medicine amlodipine, the chain pharmacies were paid an average of $23.55, while the independent pharmacy was paid $1.51.[178]

196.202.    The Mississippi Board of Pharmacy uncovered similar conduct in an audit of OptumRx. It identified over 75,000 instances in which OptumRx reimbursed its affiliated pharmacies at higher rates than its unaffiliated pharmacies for the same ~~prescriptions~~prescription drugs.[179] It also found that OptumRx used 49 different MAC lists, including 15 MAC lists exclusive to independent pharmacies and 22 MAC lists solely for chain pharmacies. These lists showed OptumRx reimbursed independent pharmacies at rates 74% lower than chain pharmacies on average. Even worse, the Mississippi Board of Pharmacy found consumers were almost twice as likely to pay the full cost of prescription drug claims without contributions from their health benefit plans at independent pharmacies than at affiliated pharmacies.

---

[177] Andy Miller, *PBM Math: Big Chains Are Paid $23.55 To Fill a Blood Pressure Rx. Small Drugstores? $1.51*, KFF Health News (Oct. 24, 2024), https://kffhealthnews.org/news/article/pbm-pharmacy-benefit-managers-independent-drugstores-versus-big-chain-prices/.

[178] *Id.*

[179] Gwen Dilworth, *Optum audit shows possible law violation, lower payments to independent pharmacies*, Mississippi Today (Nov. 7, 2024),    https://www.djournal.com/mississippi-today/optum-audit-shows-possible-law-violation-lower-payments-to-independent-pharmacies/article_54966fd0-9d5a-11ef-bed5-83f21fb6e2dd.html.

197.203. The same incentives apply to the PBM Defendants' pharmacy reimbursement practices nationally and result in similar disparities in the payments to independent pharmacies in Rhode Island. One local independent pharmacist reported that CVS Caremark only reimburses her $2,200 for drugs that cost over $2,800 despite reimbursing CVS pharmacies over $4,000 for the exact same drug. Another independent pharmacist said he loses $38 nearly every time he fills a prescription for Eliquis, a commonly prescribed blood thinner. In December 2024, the pharmacist lost $3,116 on Eliquis prescriptions alone.

198.204. In one instance, an elderly patient with TRICARE insurance (managed by Express Scripts) came to an independent pharmacy in Rhode Island after a mail-order pharmacy failed to timely deliver her insulin. None of the larger chain pharmacies would help the consumer. The independent pharmacist spent 45 minutes getting a new prescription for the consumer and speaking with the consumer's insurance to ensure it would cover the new prescription. Express Scripts then reimbursed the pharmacist less than the cost of acquiring the insulin to fill the prescription.

199.205. Consumers have no visibility into this practice. In fact, pharmacies have to list the full price for prescriptions on consumer-facing documents. For example, one local independent pharmacist listed the price of the GLP-1 Mounjaro as $1,814.57 on the consumer's prescription information even though the PBM only reimbursed him $824.09.

200.206. Independent pharmacies have little to no recourse against the PBM Defendants. For example, after one local pharmacist asked a consumer to fill a prescription elsewhere because he lost $50 every time he filled it, Express Scripts sent the pharmacist a cease-and-desist letter warning him to stop the practice or risk being removed from Express Scripts' network.

201.207.      In response to concerns over excessive PBM-to-pharmacy spreads and financial viability of independent pharmacies, the West Virginia Medicaid program adopted a new pricing methodology in 2017 that requires PBMs to reimburse pharmacies no less than the NADAC, a common measure of pharmacy acquisition cost of drugs based on amounts reported to the Centers for Medicare & Medicaid Services by pharmacies, plus a professional dispensing fee of $10.49 per prescription.[180] This change essentially replaced PBMs' traditional black-box with a more transparent approach. West Virginia estimated this change saved its Medicaid program over $54 million in one year despite an increase in total pharmacy reimbursement and higher volume of prescriptions.[181] The greater price transparency had driven down PBMs' excessive PBM-to-pharmacy spreads that had been maintained at the expense of pharmacies.[182]

202.208.      Compounding the already thin or negative margins for dispensing drugs based on the PBM Defendants' reimbursements, the PBM Defendants require or incentivize consumers to fill 90-day instead of 30-day prescriptions by waiving or reducing consumers' out-of-pocket cost for longer prescriptions. This practice disadvantages pharmacies because instead of receiving three dispensing fees to fill three, 30-day prescriptions, pharmacies only receive one dispensing fee. The American Psychiatric Association has also expressed concerns about CVS pharmacies' practice of ignoring explicit instructions to dispense limited amounts of medication to mental health patients because it may inadvertently lead more patients to attempt suicide by overdosing.[183]

---

[180] Navigant, *Pharmacy Savings Report: West Virginia Medicaid,* at 12–13 (Apr. 2, 2019), https://dhhr.wv.gov/bms/News/Documents/WV%20BMS%20Rx%20Savings%20Report%202019-04-02%20-%20FINAL.pdf.
[181] *Id*. at 5.
[182] *Id*.
[183] Gabler, *supra* note 152170.

### 2.    The PBM Defendants Steer Consumers to Their Own Affiliated Pharmacies—Particularly for Specialty Drugs

203.209.    The PBM Defendants further disadvantage independent pharmacies and consumers by driving more profitable business—including filling prescriptions for high-cost specialty drugs (explained in more detail below)—to their own pharmacies.

204.210.    The PBM Defendants' contracts prohibit their non-affiliated network pharmacies from providing mail order services. Thus, in the mail order market, Defendantsthe PBM Defendants' affiliates face little to no competition. They also lack competition in the specialty drug market.

205.211.    The PBM Defendants steer certain medications to their affiliated pharmacies by expanding the definition of "specialty drugs" which triggers exclusivity provisions in the PBM Defendants' contracts with health benefit plans. Per these provisions, specialty drugs can only be filled by the PBM Defendants' own specialty pharmacies. There is no standard definition of "specialty drugs" and Defendants are mostly free to make their own determinations and have used this flexibility to steer higher cost and higher margin prescriptions to be filled by their own specialty pharmacies.

206.212.    Specialty drugs account for a significant portion of drug expenditures. Express Scripts stated that "[e]ven though less than 2% of the population uses specialty drugs, those prescriptions account for a staggering 51% of total pharmacy spending."[184]

207.213.    In addition, more than 60% of all specialty drugs (by revenue) are dispensed by the specialty pharmacies affiliated with the PBM Defendants. This is not the product of

---

[184] *How PBMs distort and undertime specialty drug pricing guarantees*, 46brooklyn (May 10, 2023), https://www.46brooklyn.com/research/2023/5/10/how-pbms-distort-and-undermine-specialty-drug-pricing-guarantees-blac.

consumer choice or those pharmacies providing better prices or services; rather, it is the product of the PBM Defendants forcing consumers to use their affiliated pharmacies.

208.214.    The FTC analyzed the number of specialty drug designations by PBM for five PBMs (described as PBMs A through E), including the PBM Defendants. It found all PBMs increased the overall number of drugs on their specialty drug lists and that drugs were treated differently among the different PBMs, suggesting that it was business practices, not qualities intrinsic to these drugs or their dispensing that drove treatment as a specialty drug. For example, PBM A increased its designations of specialty generics by 268% from 2017 to 2021; however, PBM E only increased its designations of specialty generics by 19% during the same time period (*see* Figure 1112 below showing the increase of specialty drug designations for specialty brand drugs and specialty generic drugs compared to total drugs on the market among the five PBMs the FTC studied from 2017 to 2021).[185]

*Figure 1112: Growth and Mix of Specialty Drugs Covered by PBMs for Commercial Members, 2017–2021*

---

[185] FTC PBM Report, *supra* note 143161, at 38.

| | Growth in Number of Drugs Covered, 2017-2021 | | Specialty Generic As Percent of Total, 2021 |
| | Specialty Brand | Specialty Generic | |
|---|---|---|---|
| PBM A | 70% | 268% | 13% |
| PBM B | 44% | 233% | 11% |
| PBM C | 41% | 94% | 13% |
| PBM D | 31% | 73% | 15% |
| PBM E | 20% | 19% | 15% |

209.215.    One recent study found that only 32% of specialty drugs were included on all the PBM Defendants' specialty drug lists and 23% were included on two of their lists. The remaining 45% of specialty drugs were unique to a single PBM Defendant.[186] This variability in these designations supports that the designations are based on the PBM Defendants' subjective determinations rather than any scientific reasoning or objective measure.

210.216.    Designating a drug as a specialty drug without good cause is particularly harmful to consumers because consumers have higher cost-share payments for specialty drugs. For example, in 2024, some health benefit plans with separate tiers for specialty drugs charged an average copayment of $118 for specialty drugs compared to an average copayment of $12–$65 depending on whether the drug is a generic drug or a preferred or non-preferred brand-name drug.[187]

211.217.    Such steering tactics eliminate competition from the marketplace, ultimately harming consumers in terms of cost, service, and convenience. For example, the PBM Defendants often require consumers to utilize their specialty pharmacies for drugs administered in

---

[186] *Id.* at 37–39 (citing Adam J. Fein, Drug Channels Inst., *The 2024 Economic Drug Report on U.S. Pharmacies and Pharmacy Benefit Managers* (Mar. 2024), at 24, https://drugchannelsinstitute.com/files/2024-PharmacyPBM-DCI-Overview.pdf).
[187] Claxton et al., *supra* note 1819, at 158, 154.

clinical settings, such as chemotherapy. In some instances, consumers are forced to obtain needed drugs from the PBM Defendants' specialty pharmacies and bring the drugs with them to receive treatment, a practice known as "brown bagging." Or, they may have to purchase their drug from the PBM Defendants' specialty pharmacies, and have it shipped to their doctors' offices, a practice known as "white bagging." The American Society of Clinical Oncology opposes "brown bagging," and has expressed concerns about "white bagging," because the practices remove doctors' ability to ensure the safe preparation and handling of drugs.[188]

212.218.    According to a 2023 survey on PBM compensation, fees from specialty pharmacies have become a primary source of revenue for PBMs—accounting for an estimated 39% of their revenue.[189]

213.219.    The FTC also found that the PBM Defendants are often reimbursing their own pharmacies significantly more than unaffiliated pharmacies for filling specialty medications.[190] The FTC compared gross reimbursement rates paid by the PBM Defendants with rates paid to unaffiliated pharmacies and to the NADAC. The PBM Defendants' affiliated pharmacies received reimbursements often roughly 20- to 40-times higher than NADAC.[191] For example, in 2022, the PBM Defendants reimbursed affiliated pharmacies for generic Zytiga (used to treat prostate cancer) more than $5,800 per month—25-times the $229 acquisition cost reflected by NADAC.[192] The FTC further found that the PBM Defendants marked up numerous specialty

---

[188] American Soc'y of Clinical Oncology, *"Brown Bagging" and "White Bagging" of Chemotherapy Drugs* (2021), www.asco.org/files/content-files/advocacy-and-policy/documents/2021-White-Brown-Bagging-Update.pdf.
[189] Percher, *supra* note 7778, at 3.
[190] FTC PBM Report, *supra* note 143161, at 40.
[191] *Id*.
[192] *Id*. at 41–42.

generic drugs by thousands of percent, and many others by hundreds of percent.[193] These high costs ultimately are passed on to consumers and health benefit plans.

214.220.    When an affiliated pharmacy is a consumer's only choice, that pharmacy has no incentive to provide competitive prices or better services. Consumers often experience frustration when dealing with affiliated specialty pharmacies—missed deliveries, medications that are spoiled through improper handling, etc.—that undermine their care and create health risks. Moreover, as noted above, consumers who have developed a trusted relationship with a community pharmacist can find that provider relationship disrupted when the PBM Defendants force them to switch pharmacies.

215.221.    The PBM Defendants' use of their enormous market power to force independent pharmacies to accept low reimbursement rates, including rates that are sometimes below pharmacies' acquisition costs—and then steer more profitable business to the PBM Defendants' own affiliated pharmacies—particularly for specialty drugs—negatively impacts independent pharmacies' ability to compete in the pharmacy market and provide services to consumers. This dysfunctional market has made independent pharmacies a dying industry. It also grants the PBM Defendants a monopoly in the specialty drug market, allowing the PBM Defendants to charge noncompetitive prices, which negatively impacts consumers.

216.222.    As a result of each and every unfair, deceptive, and anti-competitive act and practice described above, Defendants have obtained financial benefits from consumers, health benefit plans, and, in the case of the PBM Defendants, independent pharmacies that it would be inequitable and unjust for the PBM Defendants to retain.

---

[193] Staff of U.S. Federal Trade Comm'n, *Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers* (January 2025) at 9, https://www.ftc.gov/system/files/ftc_gov/pdf/PBM-6b-Second-Interim-Staff-Report.pdf.

79

## CLAIMS FOR RELIEF

### COUNT ONE
### Violation of the Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-2
### Deceptive Acts and Practices
### (All Defendants)

217.223.    The State re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

218.224.    Section 6-13.1-2 prohibits deceptive acts or practices in the conduct of any trade or commerce.

219.225.    A deceptive act or practice is "(1) a representation, omission, or practice, that (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." *Long v. Dell, Inc.*, 93 A.3d 988, 1003 (R.I. 2014).

220.226.    A representation, omission, or practice is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Id*.

221.227.    "[E]xpress representations that are shown to be false are presumptively material." *Id*.

222.228.    Defendants engage in trade and commerce by administering prescription drug benefits for Rhode Island consumers.

223.229.    Since in or around 2012, if not earlier, the PBM Defendants have engaged in deceptive acts or practices in trade or commerce in violation of R.I. Gen. Laws § 6-13.1-2 by, among other things:

   a.    misrepresenting that the PBM Defendants function to lower the cost of prescription drugs, including through the use of rebates and other fees from manufacturers;

80

b.    representing that the PBM Defendants function to lower prescription drug costs, including through the use of rebates and other fees from manufacturers, while failing to disclose that, among other things:

　　i.    Defendants' practices artificially inflate WAC prices for brand-name prescription drugs;

　　ii.    a significant portion of WAC prices (*e.g.*, 30% or more) are attributable to rebates and other fees from manufacturers;

　　iii.    Defendants profit from rebates and other fees from manufacturers; and/or

　　iv.    the high WAC price/high rebate system Defendants engineered will result in a substantial number of consumers paying higher out-of-pocket costs;

c.    misrepresenting that the PBM Defendants design their formularies to maximize safety and effectiveness and minimize costs;

d.    representing that the PBM Defendants design their formularies to maximize safety and effectiveness and minimize costs while failing to disclose that:

　　i.    Defendants may receive more compensation from manufacturers by preferring or excluding certain drugs; and/or

　　ii.    even if Defendants cover or prefer drugs with the lowest net cost (*i.e.*, WAC prices minus rebates or other price concessions from manufacturers), those drugs may not result in the lowest out-of-pocket cost for consumers;

81

e. representing, directly or by implication, that ~~the PBM~~ Defendants operate in consumers' best interests while not disclosing Defendants' significant conflicts of interest, including the compensation Defendants receive from manufacturers and affiliated pharmacies;

f. representing that ~~the PBM~~ Defendants retain a specified percentage of rebates without disclosing that Defendants receive many other sources of compensation from manufacturers, including compensation that—like rebates—is based on a percentage of WAC prices;

g. engaging in rebate and formulary practices that artificially inflate the price of brand-name prescription drugs while representing that ~~the PBM~~ Defendants function to lower prescription drug prices;

h. preferring drugs on the PBM Defendants' formularies that are less effective, safe, and/or affordable than other drugs for their own financial benefit while representing ~~the PBM~~ Defendants design their formularies to maximize safety and effectiveness and minimize costs; ~~and/or~~

i. engaging in self-dealing practices in negotiations with manufacturers and pharmacies that negatively impact consumers while representing ~~the PBM~~ Defendants are working for the benefit of consumers~~.~~; and/or

j. creating the GPO Defendants for the purpose of avoiding their obligation to pass through rebates and other fees to health plans.

~~224.~~230. Since as early as 2019, the GPO Defendants, which have full knowledge of the PBM Defendants' deceptive representations and omissions described above, have engaged in

deceptive acts or practices in trade or commerce in violation of R.I. Gen. Laws § 6-13.1-2 by, among other things:

 a. engaging in rebate and formulary practices that artificially inflate the price of brand-name prescription drugs at the behest of the PBM Defendants while the PBM Defendants simultaneously represented that ~~the PBM~~ Defendants function to lower prescription drug prices;

 b. retaining rebates and other fees from manufacturers that the GPO Defendants knew the PBM Defendants were supposed to pass through to their health plan clients;

 ~~b.~~c. preferring drugs on Defendants' formularies that are less effective, safe, and/or affordable than other drugs for their own financial benefit at the behest of the PBM Defendants while the PBM Defendants represented ~~they~~that Defendants design their formularies to maximize safety and effectiveness and minimize costs; and/or

 ~~c.~~d. engaging in self-dealing practices in negotiations with manufacturers and pharmacies that negatively impact consumers at the behest of the PBM Defendants while the PBM Defendants represented that ~~they~~Defendants are working for the benefit of consumers.

Unlike the State's deceptive acts claim against the PBM Defendants, which is based on the PBM Defendants' representations, omissions, and practices, the State's deceptive acts claim against the GPO Defendants is based solely on the GPO Defendants practices.

 ~~225.~~231. Upon information and belief, the State believes Defendants' conduct is ongoing.

226.232.    Defendants' misrepresentations, omissions, and practices were material and likely to mislead consumers., including Rhode Island employers who are consumers of health benefit plans.

227.233.    Defendants' deceptive practices constitute multiple violations of R.I. Gen. Laws § 6-13.1-2.

## COUNT TWO
### Violation of the Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-2
### Unfair Acts and Practices
### (All Defendants)

228.234.    The State re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

229.235.    Section 6-13.1-2 prohibits unfair acts or practices in trade or commerce.

230.236.    In determining whether an act or practice is unfair, the Rhode Island Supreme Court held the following factors apply: "(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, or otherwise—whether, in other words, it is within at least the penumbra of some common-law statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." *Long*, 93 A.3d at 1000. An act or practice must not satisfy every factor to be unfair; it may be unfair because it meets one factor to a great degree or two or three factors to a lesser degree. *Id*. at 1001.

231.237.    Defendants engage in trade and commerce by administering prescription drug benefits for Rhode Island consumers.

84

232.238. Since in or around 2012 for the PBM Defendants, if not earlier, and as early as 2019 for the GPO Defendants, Defendants have engaged in unfair acts or practices in trade or commerce in violation of R.I. Gen. Laws. § 6-13.1-2 by engaging in a scheme to artificially inflate WAC prices for brand-name prescription drugs to extract higher fees.

233.239. Defendants' scheme to artificially inflate WAC prices for brand-name prescription drugs is unfair because it: (1) offends public policy (2) is immoral, unethical, oppressive, and unscrupulous, and (3) causes substantial injury to consumers and competitors.

234.240. Upon information and belief, the State believes Defendants' conduct is ongoing.

**COUNT THREE**
**Violation of the Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-2**
**Unfair Methods of Competition**
**(All Defendants)**

235.241. The State re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

236.242. Section 6-13.1-2 prohibits unfair methods of competition in trade or commerce.

237.243. Defendants engage in trade and commerce by administering prescription drug benefits for Rhode Island consumers.

238.244. Section 6-13.1-3 states: "It is the intent of the legislature that in construing §§ 6-13.1-1 and 6-13.1-2 due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to § 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), as from time to time amended."

239.245.    According to the Federal Trade Commission, a method of competition is unfair if it goes beyond competition on the merits.[194] A method of competition is conduct undertaken by an actor in the marketplace—as opposed to merely a condition of the marketplace, not of the actor's making, such as high concentration or barriers to entry.[195] Competition on the merits (which is not unfair) may include, for example, superior products or services, superior business acumen, truthful marketing and advertising practices, investment in research and development that leads to innovative outputs, or attracting employees and workers through offering of better employment terms.[196]

240.246.    When evaluating whether conduct goes beyond competition on the merits there are two key criteria to consider. First, the conduct may be coercive, exploitative, collusive, abusive, deceptive, predatory, or involve the use of economic power of a similar nature. It may also be restrictive or exclusionary, depending on the circumstances. Second, the conduct must tend to negatively affect competitive conditions, including, for example, conduct that tends to foreclose or impair the opportunities of market participants, reduce competition among rivals, limit choice, or otherwise harm consumers. These two principles are weighed according to a sliding scale.

241.247.    Examples of unfair competition include, but are not limited to: (1) a manufacturer's use of its economic power over its dealers to coerce them into buying tires, batteries, or accessories only from those who paid the manufacturer a commission, *FTC v. Texaco, Inc.*, 393 U.S. 223, 229–230 (1968); *Atlantic Refining Co. v. FTC*, 381 U.S. 357, 371 (1965); (2) offering special benefits to dealers who agreed to exclude competing product lines, *FTC v. Brown*

---

[194] *See* Federal Trade Commission, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act*, at 8–9 (Nov. 10, 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P221202Section5PolicyStatement.pdf.
[195] *Id*. at 8.
[196] *Id*. at 8–9.

*Shoe Co.*, 384 U.S. 316, 319–20 (1966); (3) scheming to control prices by cutting off supplies to those selling at a discount, *FTC v. Beech-Nut Packing Co.*, 257 U.S. 441, 455 (1922); (4) participating in collective action to eliminate price competition, *FTC v. National Lead Co.*, 352 U.S. 419, 429–30 (1957); *FTC v. Cement Institute*, 333 U.S. 683, 725–26 (1948); *Sugar Institute, Inc. v. United States*, 297 U.S. 553, 597–600 (1935); (5) marketing inferior goods to children through use of a gambling scheme, *FTC v. R.F. Keppel & Bro., Inc.*, 291 U.S. 304, 314 (1934); or (6) inducing use of exclusive dealing contracts that are restrictive in character, *FTC v. Motion Picture Advertising Service Co.*, 344 U.S. 392, 396–98 (1953).

### *Defendants' Formulary and Rebate Practices*

242.248.     Since in or around 2012 for the PBM Defendants, if not earlier, and as early as 2019 for the GPO Defendants, Defendants have engaged in unfair methods of competition when giving preferential treatment to drugs with the highest rebates when there are multiple drugs in a therapeutic class. This method of competition is unfair because it goes beyond competition on the merits.

243.249.     Defendants' conduct is coercive, exploitative, collusive, abusive, deceptive, predatory, restrictive, and exclusionary because they use their enormous market power to: (1) induce rival manufacturers to compete for formulary placement by prioritizing rebates over lower WAC prices or net prices or the safety or efficacy of their products; and (2) exploit and abuse vulnerable consumers by denying them access to certain medications, including more affordable medications, and force certain consumers to pay inflated cost-share payments.

244.250.     Defendants' conduct tends to negatively affect competitive conditions because: (1) it incentivizes drug manufacturers to compete for formulary placement by inflating WAC prices to counteract high rebates and other fees and deters drug manufacturers from lowering

87

the artificially inflated WAC prices; (2) it stifles the ability of less expensive drugs to enter the market (*e.g.*, biosimilars); and (3) many consumers are forced to purchase drugs with high WAC prices and pay higher out-of-pocket costs based on the artificially inflated WAC prices.

### PBM Defendants' Pharmacy-Related Practices

245.251.     For at least the last five years, if not longer, the PBM Defendants have used their significant leverage to force independent pharmacies to accept unfair contract terms that materially disadvantage independent pharmacies and consumers. This includes the PBM Defendants forcing independent pharmacies to accept unfair reimbursement rates which are near or sometimes even below acquisition costs and steering mail order and specialty business, which is significantly more profitable, to the PBM Defendants' affiliated pharmacies. These methods of competition are unfair because they go beyond competition on the merits.

246.252.     The PBM Defendants' conduct is coercive, exploitative, collusive, abusive, deceptive, predatory, restrictive, and exclusionary because the PBM Defendants are taking advantage of their significant power in the PBM market to force their competitors in the pharmacy market to accept unfair contractual terms. The PBM Defendants' conduct also denies consumers free and fair access to the pharmacy of their choice.

247.253.     The PBM Defendants' conduct tends to negatively affect competitive conditions because it: (1) disadvantages independent pharmacies by reimbursing them at or near acquisition cost for many drugs while systematically blocking them from business with higher profit margins, reducing their ability to provide services to consumers and compete in the pharmacy market; (2) significantly reduces and, in some instances, eliminates competition in the mail order and specialty pharmacy business by forcing consumers to use the PBM Defendants'

88

affiliated pharmacies; and (3) drives up costs for consumers, particularly with respect to specialty drugs.

248.254.    Upon information and belief, the State believes the PBM Defendants' conduct is ongoing.

**PRAYER FOR RELIEF**

WHEREFORE, the State prays for judgment against Defendants as permitted by Rhode Island law, as follows:

A.    An Order and Judgment against Defendants, and in favor of the State, for each violation alleged in this Complaint;

B.    ~~Declararation~~Declaration that Defendants' acts and practices alleged herein are unfair and deceptive and constitute unfair methods of competition in violation of R.I. Gen. Laws § 6-13.1-2;

C.    An injunction pursuant to R.I. Gen. Laws § 6-13.1-5(a) permanently enjoining Defendants from engaging in unfair and deceptive acts and practices and unfair methods of competition;

D.    Consumer restitution pursuant to R.I. Gen. Laws § 6-13.1-5(c) to Rhode Island consumers affected by Defendants' unlawful acts and practices;

E.    Civil penalties pursuant to R.I. Gen. Laws § 6-13.1-8 for each and every violation alleged in this Complaint against Defendants;

F.    Disgorgement of Defendants' unjust enrichment, benefits, and ill-gotten gains, plus interest, acquired as a result of the unlawful conduct alleged herein;

G.    Costs, filing fees, pre- and post-judgment interests, and attorneys' fees; and

H.    All other relief deemed just by this Court._____

89

Dated: ~~May 28, 2025~~June 5, 2026

STATE OF RHODE ISLAND,

**PETER F. NERONHA**
**ATTORNEY GENERAL**

By Its Attorneys,

*/s/ ~~Sarah W. Rice~~ Dorothea R.*
*Calvano Young*_____
Sarah W. Rice (Bar No. 10588)
Assistant Attorney General
Dorothea R. ~~Lindquist~~Calvano Young (Bar No. 6661)
Jordan Broadbent (Bar No. 10794)
Special Assistant Attorneys General
150 South Main Street
Providence, RI 02903
Tel. (401) 274-4400
srice@riag.ri.gov
~~dlindquist~~dyoung@riag.ri.gov
jbroadbent@riag.ri.gov

~~Robert J. McConnell~~
~~Michael G. Rousseau~~
~~**MOTLEY RICE LLC**~~
~~48 Westminster St., 5th Floor~~
~~Providence, RI 02903~~
~~Tel. (401) 457-7700~~
~~Fax. (401) 457-7708~~
~~bmcconnell@motleyrice.com~~
~~mrousseau@motleyrice.com~~

Linda Singer
*Admitted* Pro Hac Vice ~~to be submitted~~
Elizabeth Paige Boggs
*Admitted* Pro Hac Vice ~~to be submitted~~
Devin X. Williams
*Admitted* Pro Hac Vice ~~to be submitted~~
**MOTLEY RICE LLC**
401 9th Street, NW, Suite 630
Washington, DC 20004
Tel. (202) 386-9626

90

Fax. (202) 386-9622
lsinger@motleyrice.com
pboggs@motleyrice.com
dwilliams@motleyrice.com

91